## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RONALD HOWES,

       Plaintiff,

vs.                                                                No. CIV 21-0263 JB/SCY

NEW MEXICO DEPARTMENT OF HEALTH;
THOMAS MASSARO and RICHARD
GROGAN, in their official and individual
capacities,

       Defendants.

### MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Memorandum Brief in

Support of Their Motion to Dismiss for Failure to State a Claim, Qualified Immunity, and

Prohibition Against Implied Contracts with the State, filed March 29, 2021 (Doc. 7)("MTD");

(ii) the Plaintiff's Opposed Motion to Remand to State Court, filed April 1, 2021

(Doc. 9)("Remand Motion"); (iii) the Plaintiff's Emergency Opposed Motion for Stay of Briefing

of Defendants' Motion to Dismiss Pending Consideration of Plaintiff's Motion to Remand, or in

the Alternative, an Extension of Time to Respond, filed April 11, 2021 (Doc. 11)("Stay Motion");

and (iv) the Defendants' Motion to Strike Plaintiff's Second Amended Complaint for violation of

---

[1]On March 31, 2022, the Court entered an Order disposing of: (i) the Defendants' Memorandum Brief in Support of Their Motion to Dismiss for Failure to State a Claim, Qualified Immunity, and Prohibition Against Implied Contracts with the State, filed March 29, 2021 (Doc. 7); (ii) the Plaintiff's Opposed Motion to Remand to State Court, filed April 1, 2021 (Doc. 9); and (iii) the Plaintiff's Emergency Opposed Motion for Stay of Briefing of Defendants' Motion to Dismiss Pending Consideration of Plaintiff's Motion to Remand, or in the Alternative, an Extension of Time to Respond, filed April 11, 2021 (Doc. 11). See Order at 1 n.1, filed March 31, 2022 (Doc. 33). In the Order, the Court stated that it would "issue at a later date . . . a Memorandum Opinion more fully detailing its rationale for this decision." See Order at 1 n.1. This Memorandum Opinion and Order is the promised opinion.

42 U.S.C. § 1983, filed March 28, 2022 (Doc. 31)("Strike Motion").  The Court held a hearing on

the MTD, Remand Motion, and Stay Motion on March 1, 2022.  See Clerk's Minutes at 1, filed

March 1, 2022 (Doc. 28).  The primary issues are: (i) whether the Court should stay briefing on

the MTD pending consideration of the Remand Motion; (ii) whether the Court should dismiss the

Plaintiff's Amended Complaint for Violations of 42 U.S.C. §1983, Breach of Implied Contract,

and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed

March 25, 2021 (Doc. 5-1)("Removed Complaint"),[2] because (a) Dr. Howes does not state a claim

upon which relief can be granted against Defendants Dr. Thomas Massaro and Richard Grogan

where Dr. Howes does not show that he has a property or liberty interest, (b) Dr. Massaro and

Grogan are entitled to qualified immunity for claims brought under 42 U.S.C. § 1983, (c) Dr.

Massaro and Grogan are not proper defendants to Dr. Howes' contract claims, and (d) Dr. Howes

does not have an express written contract with the State of New Mexico; (iii) whether the Court

should remand the case to State court, because the contract at issue in the litigation contains a

forum selection clause that grants exclusive venue and exclusive jurisdiction to the State Courts of

New Mexico; and (iv) whether the Court should strike the Plaintiff's Complaint for Violations of

---

[2]In the MTD, the Defendants move to dismiss Plaintiff's Amended Complaint for
Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination/Breach of
Implied Covenant of Good Faith and Fair Dealing, filed March 25, 2021 (Doc. 5-1)("Removed
Complaint"), which Plaintiff Dr. Ronald Howes filed in State court as an amendment to his initial
Complaint.  Dr. Howes most recently filed, however, a Complaint for Violations of 42 U.S.C.
§1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of
Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29)("Amended Complaint"), directly
before the Court without moving for leave to amend pursuant to rule 15(a) of the Federal Rules of
Civil Procedure.  See Fed. R. Civ. P. 15(a).  As the Court discusses in detail below, the Court
grants Dr. Howes retroactive leave to amend and analyzes both the arguments that Dr. Howes
presents in his Removed Complaint as well as the arguments that he presents in his Amended
Complaint.

42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Contract of Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29)("Amended Complaint"). For the reasons stated below, the Court will: (i) grant the Defendants' requests in their MTD; (ii) deny the Stay Motion; (iii) deny the Remand Motion; and (iv) deny the Strike Motion.

## FACTUAL BACKGROUND[3]

Dr. Howes is a clinical psychologist who, pursuant to a one-year contract with the placement firm Ap.Contractor.com/Locumtenans ("Locumtenens"),[4] contracts with hospitals around the nation. See Removed Complaint ¶ 8 at 3; id. ¶ 51, at 7. Pursuant to a separate contract with Locumtenens, Defendant New Mexico Department of Health ("NMDOH") employed Dr. Howes as a contractor at the New Mexico Behavioral Health Institute ("NMBHI") beginning May, 2020. See Removed Complaint ¶ 2, at 2; id. ¶ 11, at 3. The contract between the NMDOH and Locumtenens is a standard contract that the NMDOH issues for services. See Amended

---

[3]The Defendants move to dismiss Dr. Howes' claims under rule 12(b)(6). See MTD at 1; Fed. R. Civ. P. 12(b)(6). Accordingly, the Court takes as true all well-pleaded facts in the Complaint and makes all reasonable inferences in Dr. Howes' favor. See Brokers' Choice of America, Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1105 (10th Cir. 2017)(quoting Ruiz v. McDonnell, 299 F.3d 1173, 1181 (10th Cir. 2002)).

[4]The Removed Complaint refers variably to this firm as "Ap.Contractor.com/ Locumtenans," Removed Complaint ¶ 8, at 2, "AP-Contractor.Com\Locumtenans," Removed Complaint ¶¶ 10-11, at 3, and "Locumtenans," Removed Complaint ¶ 12, at 3. The Contract No. 20-665-6300-22593 State of New Mexico for Services, filed March 29, 2021 (Doc. 7-1)("Services Contract"), refers to Locumtenens.com, which appears to be the accurate spelling of both the Latin phrase and the company website. See LocumTenens.com (last visited November 16, 2022); locum tenens, Merriam-Webster, https://www.merriam-webster.com/ dictionary/locum%20tenens (last visited November 16, 2022)(defining locum tenens as "one filling an office for a time or temporarily taking the place of another -- used especially of a doctor or clergyman"). Accordingly, the Court refers to the company as Locumtenens in this Memorandum Opinion and Order.

Complaint ¶ 12, at 3. Dr. Howes was the contract's intended third-party beneficiary, in exchange for providing services to the NMDOH. See Amended Complaint ¶ 59, at 8.

In its services contracts, the NMDOH grants itself the "unilateral right to terminate the contract for 'cause or convenience.'" Amended Complaint ¶ 60, at 8 (no citation given for quotation). Locumtenens, on the other hand, has the right to terminate the contract only "for a 'material, uncured breach.'" Amended Complaint ¶ 61, at 9 (no citation given for quotation). The contract also requires Locumtenens to give the NMDOH notice and an opportunity to cure. See Amended Complaint ¶ 61, at 9. Locumtenens cannot terminate the contract if the NMDOH "notice[s] an intent to cure and [makes] any good faith effort to begin to cure the breach." Amended Complaint ¶ 61, at 9. The contract requires both parties to give 30 days' notice of termination. See Amended Complaint ¶ 62, at 9. The contract does not provide that the NMDOH can terminate the contracted employees that Locumtenens provides the NMDOH, with or without notice. See Amended Complaint ¶ 64, at 9.

Dr. Howes required a reciprocal license to practice medicine in New Mexico. See Removed Complaint ¶ 13, at 3. While he awaited his reciprocal license's approval, Dr. Howes worked under Dr. Matthias Stricherz' supervision. See Removed Complaint ¶ 14, at 3. Dr. Howes is "already licensed in four other states, and has never experienced a single problem . . . obtaining a reciprocal license in any state he has worked in." Removed Complaint ¶ 9, at 3. Dr. Howes did not encounter any problems while working under Dr. Stricherz. See Removed Complaint ¶ 15, at 3.

On Thursday, June 25, 2020, Locumtenens called Dr. Howes and informed him that "someone from DOH had called Locumtenens and told them that Dr. Howes' license had been suspended after a complaint had been made that he was practicing medicine without a license."

Removed Complaint ¶ 16, at 3-4.  Practicing medicine without a license is a crime, and allegations

that a doctor has practiced medicine without a license "is a serious and damaging allegation which

can have lasting consequences."   Amended Complaint ¶ 31, at 5.   Neither Dr. Stricherz nor

NMBHI's Chief Medical Officer, Dr. Wendy Dimmette, had any knowledge about this allegation,

and no one alerted Dr. Howes to any concerns regarding his performance before he received this

phone call.  See Removed Complaint ¶¶ 17-18, at 4.  Dr. Howes has since received no further

information regarding this allegation.   See Amended Complaint ¶ 17, at 4.   Dr. Massaro, the

NMDOH's Chief Medical Officer and an NMBHI Governing Board member, made the decision

to terminate immediately Dr. Howes' employment and contract.  See Removed Complaint ¶ 19, at

4; id. ¶ 42, at 6.   Grogan, NMBHI's hospital administrator, ordered someone -- presumably

NMBHI security -- to escort Dr. Howes from the premises.  See Removed Complaint ¶ 20, at 4;

id. ¶ 26, at 4.   Grogan is responsible for all NMBHI employment decisions.   See Removed

Complaint ¶ 27, at 5.  Dr. Howes did not receive any written documentation that explained why

NMBHI terminated his contract, and did not have the opportunity to be heard or to defend himself

or his reputation.  See Removed Complaint, ¶¶ 21-22, at 4.  Dr. Stricherz believed that Dr. Howes'

termination was a mistake and appealed Dr. Howes' termination to Grogan, who denied the appeal.

See Removed Complaint, ¶ 23, at 4.  The New Mexico Regulation and Licensing Department,

which oversees the Board of Psychological Examiners, granted Dr. Howes' license in August,

2020, "after a period of unexplained delay."  Removed Complaint ¶ 24, at 4.  The New Mexico

Regulation and Licensing Department has no record of anyone lodging a complaint or taking

disciplinary action against Dr. Howes or his license.  See Removed Complaint ¶ 24, at 4.  Because

of his termination, Dr. Howes returned to South Carolina to search for another job.  See Removed

Complaint ¶ 38, at 6.  Dr. Howes has resorted to accepting several shorter-term contracts around

the country, which requires that he incur costs to relocate and terminate leases.  See Removed

Complaint ¶ 58, at 8.

## PROCEDURAL BACKGROUND

On February 24, 2021, Dr. Howes filed with Santa Fe County, First Judicial District Court,

State of New Mexico, his Amended Complaint for Violations of 42 U.S.C. §1983, Breach of

Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair

Dealing, filed March 25, 2021 (Doc. 5-1)("Removed Complaint").   The Removed Complaint

alleges: (i) that both Dr. Massaro and Grogan, in his individual capacity, violated Dr. Howes' right

to "procedural and substantive due process prior to being deprived of his property interests in his

professional license and contract and his liberty interests in his reputation and his job at NMBHI,"

Removed Complaint ¶ 28, at 5; id. ¶ 46, at 7; (ii) that the Defendants, in their official capacities,

breached an "implied one-year contract directly between Dr. Howes and the Department of

Health," Removed Complaint ¶ 53, at 8;  see Removed Complaint ¶ 55, at 8; and (iii) that the

Defendants, in their official capacities, "breached the Implied Covenant of Good Faith and Fair

Dealing when they called Locumtenens and made defamatory statements about Dr. Howes['] work

performance and the status of his license," Removed Complaint ¶ 61, at 8, and when they

"wrongfully terminated Dr. Howes' contract with no notice and provided him no reason for this

termination," Removed Complaint ¶ 62, at 9.  The Defendants removed this case to federal court

on March 24, 2021.  See Notice of Removal at 1, filed March 24, 2021 (Doc. 1).

### 1.    The MTD.

The Defendants filed their MTD on March 29, 2021.  See MTD at 1.  The MTD states four

grounds on which the Court should dismiss the Removed Complaint: (i) Dr. Howes fails to state a

claim on which relief can be granted, because he cannot show that he has a property or liberty

interest; (ii) Dr. Massaro and Grogan are entitled to qualified immunity on Dr. Howes' § 1983 claims; (iii) Dr. Massaro and Grogan are not proper Defendants to Dr. Howes' contract claims; and (iv) Dr. Howes did not have an express written contract with New Mexico, and so cannot prevail on his breach-of-contract, wrongful-termination, and breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claims.  See MTD at 1-2.  Defendants attach as an exhibit to the MTD the Services Contract between New Mexico and Locumtenens.  See Contract No. 20-665-6300-22593 State of New Mexico for Services (dated October 16, 2019, amended April 21, 2020), filed March 29, 2021 (Doc. 7-1)("Services Contract").  They argue that the Court should consider the Services Contract as part of its analysis under rule 12(b)(6) of the Federal Rules of Civil Procedures, because Dr. Howes refers to it in his Removed Complaint, and because there are some differences between Dr. Howes' description of the Services Contract and the Services Contract's express language.  See MTD at 5-6.

The Defendants' second argument is that the Court should dismiss Dr. Howes' claims against Grogan and Dr. Massaro in their individual capacities, pursuant to rule 12(b)(6), because Dr. Howes does not have a property or liberty interest in his continued employment.  See MTD at 6-7  (citing  Gonzales v. City of Albuquerque,  849 F. Supp. 2d  1123,  1157  (D.N.M. 2011)(Browning, J.), aff'd, 701 F.3d 1267 (10th Cir. 2012), and Cockrell v. Bd. of Regents of N.M. State Univ., 1999-NMCA-073, ¶ 11, 127 N.M. 478, 481, 983 P.2d 427, 430).  Particularly, the Defendants argue that, although Dr. Howes alleges that Locumtenens entered into a contract with the NMDOH, he "has not alleged there is a separate written contractual agreement between him and DOH," and therefore he had no "entitlement to continued employment with DOH."  MTD at 7.  They argue that a plaintiff may not bring a § 1983 claim arising out of an alleged property interest in a contract to which the plaintiff is not a party.  See MTD at 8 (citing Martin Marietta

Materials, Inc. v. Kan. Dep't of Trans., 810 F.3d 1161, 1177 (10th Cir. 2016)).  The Defendants further argue that, even if Dr. Howes is a party to the Services Contract, the Services Contract allows the NMDOH to "terminate the Services Contract at its convenience and . . . require a change in representative without notice or an opportunity for the contractor representative to be heard." MTD at 7.  The Defendants then argue that Dr. Massaro and Grogan are entitled to qualified immunity, because Dr. Howes does not demonstrate that Dr. Massaro and Grogan violated a clearly established right at the time of the alleged violation.  See MTD at 9.

The Defendants' final argument is that New Mexico State law prohibits implied contracts with the State, and so the Court should dismiss Dr. Howes' breach-of-an-implied-contract claim, as well as his wrongful-termination and breach-of-implied-covenant-of-good-faith-and-fair-dealing claims.  See MTD at 12.  They argue that, because Dr. Howes alleges these claims against all Defendants in their official capacities, the Court should treat the Defendants as the State and apply sovereign immunity, which New Mexico has waived only for contract actions brought pursuant to a written contract.  See MTD at 12-13 (citing N.M.S.A. § 37-1-23(A) ("Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract.").  Additionally, the Defendants contend that Dr. Howes does not allege that Dr. Massaro and Grogan are parties to the implied contact, "and therefore [they] are not proper defendants to this claim or any of Plaintiff's contract claims."  MTD at 13.  The Defendants also assert that Dr. Howes' argument for his wrongful-termination claim does not state a claim upon which relief can be granted, because there was no written contract between him and the NMDOH, and, therefore, his employment was at-will and the NMDOH could terminate his employment at any time.  See MTD at 13 (quoting Hudson v. Vill. Inn Pancake House of Albuquerque, Inc., 2001-NMCA-104, ¶ 4, 121 N.M. 308, 310, 35 P.3d 313, 315).  They argue that, while an implied

contract can restrict an employer's ability to terminate an employee, State law prohibits implied contracts, and thus, that exception does not apply.  See MTD at 14.  Similarly, the Defendants argue that, because there is no implied contract, Dr. Howes' breach-of-implied-covenant-of-good-faith-and-fair-dealing claims also must fail.  See MTD at 14.  Finally, referring to Dr. Howes' breach-of-implied-covenant-of-good-faith-and-fair-dealing claims, the Defendants "contend these causes of action are not properly joined in Count IV as there is no relation between the causes of action."  MTD at 13 n.3.

**2.      Dr. Howes' Remand Motion and Stay Motion.**

Dr. Howes did not respond initially to the MTD.  Instead, he filed the Remand Motion on April 1, 2021, and the Stay Motion on April 11, 2021.  See Remand Motion at 1; Stay Motion at 1.  In the Remand Motion, Dr. Howes argues that the NMDOH and Locumtenens' Services Contract "contains a clear and mandatory forum provision which gives exclusive jurisdiction to the Courts of the State of New Mexico . . . [and] renders removal to federal court improper."  Remand Motion at 3.  Specifically, he quotes the following clause:

> "The laws of the State of New Mexico shall govern this Agreement, without giving effect to its choice of law provisions.  Venue shall be proper only in a New Mexico court of competent jurisdiction in accordance with NMSA 1978, § 38-3-l (G).  By execution of this Agreement, Contractor acknowledges and agrees to the jurisdiction of the courts of the State of New Mexico over any and all lawsuits arising under or out of any term of this Agreement."

Remand Motion at 4 (quoting Services Contract ¶ 27, at 12).  Dr. Howes states that the clause's language is "clearly mandatory" and situates venue properly "only in a New Mexico court."  Remand Motion at 4 (emphasis in original).  He further asserts that the NMDOH "clearly anticipated and desired the exclusive jurisdiction of, and venue in, New Mexico State courts."  Remand Motion at 4.  Dr. Howes contends additionally that he "was a skilled employee who was

provided because of this contract, and as such, is a clear third-party beneficiary of this contract," and, therefore, he "has standing to enforce this forum provision."[5]   Remand Motion at 4. Accordingly, because Dr. Howes asserts that removal was improper, in light of the Services Contract's forum selection cause, he requests both that the Court remand the case to Santa Fe County, First Judicial District, State of New Mexico, where he filed originally the Removed Complaint, and that the Court award him attorney's fees and costs resulting from the removal.  See Remand Motion at 4-5.

In Dr. Howes' Stay Motion, he reminds the Court of his Remand Motion and notes that, if the Court grants the Remand Motion, the MTD will become moot.  See Stay Motion ¶ 7, at 2. Accordingly, Dr. Howes contends that requiring full briefing on the MTD will "cause unnecessary costs and burden to the Federal Court resources."  Stay Motion ¶ 8, at 2.  He notes that a temporary stay would not prejudice either party and that, if the Court determines that it does have jurisdiction over the case, the Court can lift the stay and resume briefing on the MTD.  See Stay Motion ¶ 9, at 2.  Thus, Dr. Howes requests that the Court stay the proceedings until it rules on the Remand Motion and, alternatively, requests a two-week extension to respond to the MTD in the event that the Court denies the Stay Motion.  See Stay Motion at 3.

### 3.     The Defendants' Responses to the Remand Motion and Stay Motion.

The Defendants responded to the Remand Motion on April 15, 2021.  See Defendants' Response in Opposition to Plaintiffs' [sic] Motion to Remand, filed April 15, 2021 (Doc. 12)("Remand Response").  In the Remand Response, the Defendants assert that removal is

---

[5]Dr. Howes states that he had not seen the Services Contract until the Defendants included it as an attachment in their MTD.  See Remand Motion at 4 n.2.  Accordingly, he asserts that he "intends to seek leave to amend his complaint to reflect his clear status as a third-party beneficiary."  Remand Motion at 4 n.2.

proper under the Court's 28 U.S.C. § 1331 federal-question jurisdiction and 28 U.S.C. § 1441 removal jurisdiction.  See Remand Response at 2.  The federal questions that the Defendants assert confer jurisdiction upon the Court are Dr. Howes' § 1983 claims.  See Remand Response at 2. Defendants thus conclude that the Court also has supplemental jurisdiction over Dr. Howes' related State law claims under 28 U.S.C. § 1367.  See Remand Response at 2.

The Defendants also argue that Dr. Howes was not party to the Services Contract, and that the Services Contract "includes a forum selection clause for the benefit of the parties to the contract, the State and Locumtenans," and that therefore the forum selection clause governs contractual disputes between those two parties, and not between Dr. Howes and the NMDOH, or between Dr. Howes and Locumtenens.  Remand Response at 3.  See id. at 3-4.  Defendants refer to the same language that Dr. Howes references, highlighting specifically language stating that, "'[b]y execution of this Agreement, *Contractor acknowledges and agrees* to the jurisdiction of the courts of the State of New Mexico . . . .'"  Remand Response at 3 (quoting Services Contract ¶ 27, at 12)(emphasis added in Remand Response).  In sum, the Defendants assert that Dr. Howes "cannot attempt to avoid federal jurisdiction under the guise of a forum selection clause contained in a contract to which he was not a party and . . . which does not form the basis of his underlying claims."  Remand Response at 4.  Accordingly, the Defendants request that the Court deny the Remand Motion.  See Remand Response at 4.

The Defendants responded to the Stay Motion on April 23, 2021.  See Defendants' Response in Opposition to Plaintiff's Emergency Opposed Motion for Stay of Briefing of Defendants' Motion to Dismiss Pending Consideration of Plaintiff's Motion to Remand, or in the Alternative, and Extension of Time to Respond, filed April 23, 2021 (Doc. 13)("Stay Response"). In the Stay Response, the Defendants note that the Federal Rules of Civil Procedure do not provide

for stayed proceedings during a motion to dismiss' pendency, but point instead to rule 1, which "instructs that the rules of procedure should be construed 'to secure the just, speedy, and inexpensive determination of every action and proceeding.'"  Stay Response at 2 (quoting Fed. R. Civ. P. 1).  The Defendants contend that, while granting a stay is within the Court's discretion, the United States Court of Appeals for the Tenth Circuit has directed courts to consider four factors before staying proceedings.  See Stay Response at 2-3 (quoting United Steelworkers of Am. v. Or. Steel Mills, Inc., 322 F.3d 1222, 1227 (10th Cir. 2003)).  The Defendants note that Dr. Howes "establishes none of the . . . factors" and assert that he is not likely to prevail on the Remand Motion.  Stay Response 3.  The Defendants observe that Dr. Howes could amend his Removed Complaint to excise his federal causes of action and return to State court.  See Stay Response at 3.  Finally, the Defendants dispute Dr. Howes' argument that a stay will not prejudice the parties, arguing that the "Defendants should not be deprived of an expeditious resolution to this proceeding, without justification."  Stay Response at 3 (citing Fed. R. Civ. P. 1).  Accordingly, the Defendants request that the Court deny the Stay Motion.  See Stay Response at 4.

**4.     Dr. Howes' Replies Supporting His Remand Motion and Stay Motion.**

Dr. Howes replied to the Remand Response on April 26, 2021.  See Plaintiff's Reply in Support of His Motion to Remand to State Court, filed April 26, 2021 (Doc. 14)("Remand Reply").  Dr. Howes counters the Defendants' assertion that a third-party beneficiary to a contract cannot enforce a forum selection clause with case law which states that a forum selection clause in an agreement that has a "'sufficiently strong'" connection with the non-signatory can bind the non-signatory to the agreement.  Remand Reply at 1 (quoting Presidential Hosp. L.L.C. v. Wyndham Hotel Grp., L.L.C., 333 F. Supp. 3d 1179, 1225 (D.N.M. 2018)(Browning, J.).  He also asserts that a financial benefit's presence from the contract "can help determine whether a forum clause applies

to a third party."  Remand Reply at 2 (citing Affiliated Mortg. Prot., LLC v. Tareen, No. CIV 06-4908(DRD), 2007 WL 203947, at *4 (D.N.J. January 23, 2007)(Debevoise, Sr. J.)).  Dr. Howes asserts that he is a third-party beneficiary to the Services Contract, that the Services Contract's forum selection clause is mandatory, and that, although the Defendants removed on federal-question grounds, the forum selection clause's mandatory nature makes removal improper.  See Remand Reply at 2.  Accordingly, Dr. Howes requests that the Court enforce the forum selection clause and grant his Remand Motion.  See Remand Reply at 3.

Dr. Howes replied to the Stay Response on May 4, 2021.  See Plaintiff's Reply in Support of His Emergency Motion for Stay of Briefing of Defendants' Motion to Dismiss Pending Consideration of Plaintiff's Motion to Remand, or in the Alternative, an Extension of Time to Respond, filed May 4, 2021 (Doc. 16)("Stay Reply").  In the Stay Reply, Dr. Howes asserts that "[i]t is likely that this Court will enforce this contract, and remand this case . . . ."  Stay Reply at 1. He accuses the Defendants of "ignor[ing] the forum clause at issue" and disagrees that he would first have to dismiss his federal causes of action to return to State court, noting that the State courts "have concurrent jurisdiction over the federal claims herein . . . ."  Stay Reply at 2.  Dr. Howes reiterates that the parties should not fully brief the MTD until the Court decides whether it has jurisdiction to hear the case, particularly in light of the legal costs that Dr. Howes would incur. See Stay Reply at 2.  He also asserts that the Defendants should not be concerned that granting the Stay Motion will result in a delayed resolution to the case, because "their Motion to Dismiss can't be decided before the Motion to Remand because the Remand decides whether this Court has jurisdiction over the Motion to Dismiss."  Stay Reply at 2.  He states that, if the Court grants the Motion to Remand, the parties will have to brief unnecessarily the Motion to Dismiss a second

time.  See Stay Reply at 2.  Accordingly, Dr. Howes reiterates his request that the Court grant the Stay Motion.  See Stay Reply at 2.

**5.      The March 1, 2022, Hearing.**

The Court held a hearing via Zoom on the MTD, the Remand Motion, and the Stay Motion on March 1, 2022.  See Clerk's Minutes at 1; Transcript of Motion Proceedings at 1 (taken March 1, 2022), filed May 24, 2022 (Doc. 40)("Tr.").  To start, the Court took up the Remand Motion. See Tr. at 2:22-25 (Court).  The Court began by noting that the Tenth Circuit has analyzed forum selection clauses, and has found some to be permissive, some to be mandatory, and some to be consent-to-be-sued provisions.   See Tr. at 3:3-10 (Court).   The Court stated that its initial inclination, without having reviewed recently the Tenth Circuit's decisions, is that the Services Contract's forum selection clause "is a permissive clause, not mandatory, and therefore, there is not a good basis for remanding back to state court."  Tr. at 4:3-5.

Dr. Howes spoke first on the Remand Motion, arguing that the Services Contract forum selection clause is mandatory, "because it states that the laws of New Mexico shall govern this agreement."  Tr. at 4:18-20 (Burke).  The Court replied that it applies regularly New Mexico law, but that does not mean that it is "divested of jurisdiction."  Tr. at 24-25 (Court).  Dr. Howes further highlighted the Services Contract's language stating that "'venue shall be proper only in a New Mexico court of competent jurisdiction.'"  Tr. at 5:4-5 (Burke)(quoting Services Contract ¶ 27, at 12).  In response, the Court asked whether that language includes the United States District Court for the District of New Mexico as a "New Mexico court."  Tr. at 5:7 (Court).  Dr. Howes noted the statute that the Services Contract provision references, which the Court notes establishes venue and not necessarily jurisdiction.  See Tr. at 5:14-6:2 (Court, Burke).  Dr. Howes stated that he reads the phrase

> "contractor acknowledges and agrees to the jurisdiction of the courts of the State of New Mexico over any and all lawsuits arising under or out of any term of this agreement" . . . as requiring jurisdiction only in the State of New Mexico court, rather than the federal jurisdiction of the district of New Mexico courts.

Tr. at 6:4-12 (Burke)(quoting Services Contract ¶ 27, at 12).  Dr. Howes also asserted that, because the NMDOH created the agreement, the "state purchasing department would contemplate not waiving any immunity or consent to sue in federal court, but instead on insisting on being in their own state court."  Tr. at 6:16-19 (Burke).  Dr. Howes reiterated that "[h]e is an intended third-party beneficiary, because both the State of New Mexico derived a benefit from him being assigned, and he also derived a benefit from the assignment . . . ."  Tr. at 7:2-5 (Burke).  The Court noted that the Services Contract's heading in this section is "'Applicable Law,'" and not "Applicable law and location of suit . . . ."  Tr. at 7:12-14 (Court)(quoting Services Contract at 12).

The Defendants spoke next on the Remand Motion, arguing that the forum selection clause appears to be permissive.  See Tr. at 8:9-10 (Ackermann).  They discussed two of the clause's lines in particular: (i) "'venue shall be proper only in a New Mexico court,'" which does not specify that only State courts have jurisdiction over disputes under the contract, Tr. at 8:12-13 (Ackermann); see Tr. at 8:13-15 (Ackermann); and (ii) "'[b]y execution of this agreement contractor acknowledges,'" which the Defendants argued binds only the contractor, and not necessarily New Mexico, Tr. at 8:17-18 (Ackermann).  See Tr. at 8:18-24 (Ackermann).  The Defendants also noted that Dr. Howes does not proffer any evidence indicating that he has a contract with Locumtenens such that he could be a third-party beneficiary to the Services Contract between the NMDOH and Locumtenens.  See Tr. at 8:25-9:9 (Ackermann)(" It's our understanding that Locum[t]enens worked possibly with AP Contractors, and that the plaintiff had an agreement

with AP Contractors. But we're not aware of [there] being any agreement between Locum[t]enens").

Dr. Howes spoke again, disagreeing with the Defendants' argument that the forum selection clause is permissive.  See Tr. at 10:2-3 (Burke).  In response to the Defendants' arguments that the forum selection clause bound only the contractor and not the NMDOH, Dr. Howes asserted that "[t]here is nothing in this language to . . . suggest that the State of New Mexico wants to exclude itself from this section of the agreement."  Tr. at 10:7-9 (Burke). Dr. Howes further stated that at the hearing is the first time that the Defendants raised the argument that he did not have an agreement with Locumtenens, and noted that there is no dispute that he provided services to New Mexico.  See Tr. at 10:10-15 (Burke).  Accordingly, Dr. Howes asserts, "he was contemplated as part of the psychiatrists and psychologists that were provided explicitly under this agreement . . . ."  Tr. at 10:15-17 (Burke).

The Court indicated that, for purposes of hearing the remaining motions' arguments, it likely would deny the Remand Motion.  See Tr. at 10:23-25 (Court).  The Court also stated that "the first sentence of the provision indicates that it's a choice of law provision" and that "the second sentence is just an indication that venue is going to be in accordance with that state statute." Tr. at 10:25-11:5 (Court).  The Court acknowledged that, although the provision suggests that the parties contemplate being in State court, it did not mandate that result, and that the third sentence seemed to be a consent provision.  See Tr. at 11:5-10 (Court).

The Defendants spoke next on the MTD.  See Tr. at 12:11 (Ackermann).  They asserted that the basis for requesting that the Court dismiss Dr. Howes' § 1983 claims is that he does not have a property or liberty interest at stake, because he had no contract for continued employment, and New Mexico is an at-will employment state.  See Tr. at 12:12-17 (Ackermann).  The

Defendants reiterated that Dr. Howes is not a party to the Services Contract, and that, even if he were a party to the Services Contract, "the State can terminate, at its convenience, according to the terms of the actual contract." Tr. at 12:23-25 (Ackermann). The Defendants further asserted that the two individual Defendants, Dr. Massaro and Grogan, have qualified immunity, because any constitutional rights that they allegedly violated are not clearly established. See Tr. at 13:16-14:2 (Ackermann). The Defendants noted that New Mexico law prohibits implied contracts with New Mexico and asserted that there is no contract to which Dr. Massaro and Grogan are a party. See Tr. at 14:3-11 (Ackermann). Finally, they asserted that Dr. Howes does not allege any retaliatory discharge that gives rise to a wrongful-termination claim. See Tr. at 14:18-22 (Ackermann).

Dr. Howes spoke next, stating that he had not submitted response briefing on the MTD, because he moves to stay pending the Court's decision on the Remand Motion. See Tr. at 15:4-5 (Burke). The Court asked how Dr. Howes proposes to respond to the MTD, to which Dr. Howes stated that he opposes the MTD and that he "intended to amend the complaint to include the third-party beneficiary status that we were made aware of when" the Defendants filed the Services Contract. Tr. at 15:20-22 (Burke). See id. at 15:17-24 (Burke). Instead, Dr. Howes argued in favor of his Stay Motion, reiterating his belief that the forum selection clause is mandatory and that the parties would incur unnecessary expenses if they briefed the MTD and the Court later remanded the case to the State court. See Tr. at 16:18-24 (Burke). The Court discussed briefly whether it would be possible for the parties to use the same briefs upon remand, which would obviate concerns about incurring additional expenses, which Dr. Howes acknowledged was "[t]rue. Depending on how the Court handles it . . . ." Tr. at 17:16-17 (Burke). See id. at 16:25-17:22 (Court, Burke). The Defendants replied, stating that they opposed the Stay Motion and that Dr. Howes has not met the standard necessary to support a motion to stay. See Tr. at 17:25-18:14

(Ackermann).  Dr. Howes rebutted, asserting that the Defendants had not demonstrated that they will face irreparable harm or prejudice, other than that "they would like this to be resolved more quickly."  Tr. at 18:21-22 (Burke).  See id. at 18:18-24 (Burke).  Dr. Howes then noted that, in the alternative to the Stay Motion, he requests a two-week time extension to respond to the MTD.  See Tr. at 18:24-19:1 (Burke).  The Court announced that it would deny the Stay Motion and instructed Dr. Howes to respond to the MTD before the Court decided the MTD at the end of March.  See Tr. at 19:10-17 (Court).  The Court also indicated that it was inclined to grant the MTD, because "this is an at-will state, and this is a contract involving somebody else, not this individual, so I'm a little cautious about thinking that there is a contractual right or a property right . . . ."  Tr. at 20:8-12 (Court).  The Court then turned the hearing into an initial scheduling conference.  See Tr. at 20:15-16 (Court).  During the scheduling conference, the Court extended to March 15, 2022, the deadline for Dr. Howes to file a response to the MTD and to move for leave to amend the Removed Complaint under rule 15(a), warning the parties that the Court intended to file an Order without a complete opinion by March 31, 2022, pursuant to its obligations under the Civil Justice Reform Act, 28 U.S.C. § 476.  See Tr. at 19:12-19 (Court); id. at 25:8-27:21 (Court, Ackermann, Burke); Fed .R. Civ. P. 15(a).  Specifically, the Court stated:

> So we'll change [the deadline to amend the pleadings and to join additional parties] to March 15.  This doesn't change the substantive requirements of Rule 15(a).  So if you can do something as of right, you need to do it by that date, and if you need leave of the Court, you need to move for leave of the Court by that date.

Tr. at 27:1-9 (Court).

### 6.    Post-Hearing Briefing on the MTD.

On March 14, 2022, Dr. Howes filed two documents with the Court.  First, he filed a Complaint for Violations of 42 U.S.C. §1983, Breach of Implied Contract, and Wrongful

Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29)("Amended Complaint").[6]   Second, he filed the Plaintiff's Response in Opposition to Defendants' Motion to Dismiss, filed March 14, 2022 (Doc. 30)("MTD Response").

Dr. Howes begins his MTD Response by reciting case law on third-party contract beneficiaries, adhesion contracts, and contractual unconscionability.  See MTD Response at 2-3. He then describes the Services Contract's aspects that favor the NMDOH, such as the unbalanced termination requirements, and asserts that the termination clause therefore is "clearly unconscionable, and . . . is the classic 'take it or leave it' example of an unconscionable adhesion contract."  MTD Response at 4 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 146 N.M. 256, 265, 208 P.3d 901, 910).   He also points to language in the Services Contract -- "'The agency . . . shall make every effort to provide Clinical Psychologists . . . adequate and timely notice of [changes to Clinical Psychologists' schedules]'" -- and asserts that the Services Contract, therefore, does not allow the NMDOH to terminate Dr. Howes' employment without notice.  MTD Response at 4-5 ("[N]owhere in this contract, or the addendum, does it contemplate the right of Defendants to unilaterally terminate Plaintiff's individual assignment specifically, let alone without any notice and for made up, defamatory reasons.").  Dr. Howes notes that the Defendants did not terminate the entire Services Contract and that Locumtenens continues to work with New Mexico, making them unwilling to enforce Dr. Howes' contractual rights.  See MTD Response at 5 ("It then falls to Dr. Howes to enforce his own right as a third-party beneficiary

---

[6]Both the Court's Order and the Defendants' MTD analyze the arguments that Dr. Howes includes in his original Removed Complaint.  Because the Court is delivering the opinion it promised in its Order, it does not summarize Dr. Howes' Amended Complaint here and does not analyze its arguments, to the extent that they diverge from those in the Removed Complaint, in the sections below.  See Order at 1 n.1; supra n.1.

to rely that his individual contract assignments will not be subject to arbitrary and capricious breaches.").  He insists that, even if the Defendants had the right to terminate his employment, the Services Contract requires them to provide Dr. Howes thirty-days' notice.  See MTD Response at 5.

Turning to his § 1983 claims, Dr. Howes first asserts that "defamation which occurs in the course of termination is sufficient, even if it does not foreclose future opportunities," to amount to a violation of his liberty interests in his reputation.  See MTD Response at 6.  He then notes that he must show both governmental defamation and an altered legal status to prevail on his claim that the Defendants violated his liberty interest.  See MTD Response at 7 (quoting Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d 1161, 1184 (10th Cir. 2016)).  Dr. Howes states that he has satisfied these requirements by alleging: (i) that Dr. Massaro and Grogan's statements impugned his reputation when they accused him of criminal activity; (ii) that those accusations are false; (iii) that Dr. Massaro and Grogan made these statements "in the course of terminating Dr. Howes"; (iv) that the statements resulted in the termination of Dr. Howes' contract; (v) that the statements resulted in damages; (vi) that Dr. Massaro and Grogan communicated these statements to the public -- i.e., Locumtenens, and possibly the Board of Psychological Examiners; and (vii) that these statements "exposed Plaintiff to enormous potential stigma and actual embarrassment."  MTD Response at 8.  See id. at 8 n.4 ("A Locumtenans representative has stated that the allegations were sufficiently severe to have normally been a bar to further contracts with them, however, they found Defendant[']s behavior so unusual as to not give their allegations the normal weight.").  He then asserts that his "right to be free from the stigma of allegations of unprofessional and illegal conduct is well established."  MTD Response at 8.  Thus, he asserts that

he "has sufficiently pled a prima facie violation of his liberty interest in his reputation, good name, honor and integrity under § 1983." MTD Response at 8.

Dr. Howes also asserts that he has a property interest in his contract, as "[i]t is undisputed that Plaintiff is a contractor, and therefore has a contract." MTD Response at 9. He also disputes the Defendants' interpretation of the Services Contract, particularly their description of Dr. Howes as a contractor representative under the Services Contract's provisions which allow the NMDOH to "require a change in contractor representatives." Services Contract ¶ 21, at 10. See MTD Response at 9. Instead, he asserts that "this provision refers to those individuals who act on behalf of Locumtenans for contracting purposes, not those who are provided under the contract." MTD Response at 9. Dr. Howes concludes by asserting that he is a third-party beneficiary to the Services Contract, that he has the right to enforce the Services Contract, including in response to the breach of good faith, and that the Defendants violated his clearly established constitutional rights by defaming him, and by terminating his employment with no notice or opportunity to respond. See MTD Response at 10.

The Defendants replied by filing their Defendants' Reply in Support of Their Motion to Dismiss for Failure to State a Claim, Qualified Immunity, and Prohibition against Implied Contracts with the State, filed March 28, 2022 (Doc. 32)("MTD Reply"). They first assert that, when he filed the Amended Complaint, Dr. Howes violated rule 15(a)(2), which requires parties to seek the Court's leave when amending pleadings not as a matter of right. See MTD Reply at 1-2; Fed. R. Civ. P. 15(a)(2). They then state that they will not address any of Dr. Howes' arguments in the MTD Response "that are inconsistent with" the Removed Complaint, because the Amended Complaint "is not properly before this Court, and those arguments are not responsive

to the MTD."[7]  MTD Reply at 2 (citing Dobson v. Anderson, 319 F. App'x 698, 701 (10th Cir. 2008)(unpublished); Hayes v. Whitman, 264 F.3d 1017, 1025 (10th Cir. 2001)("[A] court may not consider allegations or theories that are inconsistent with those pleaded in the complaint.")).  The Defendants then reiterated their argument that Dr. Howes cannot have an implied contract with New Mexico and therefore cannot bring suit against New Mexico for his breach-of-contract claims, including his wrongful-termination and breach-of-implied-covenant-of-good-faith-and-fair-dealing claims.  See MTD Reply at 2.  They note that Dr. Howes does not respond to those arguments in his MTD Response.  See MTD Reply at 3.  Accordingly, the Defendants reiterate that, "[b]ecause Counts III and IV of the [Removed] Complaint are based on an implied contract with the State, those claims should be dismissed."  MTD Reply at 3.

The Defendants then address Dr. Howes' § 1983 claims.  See MTD Reply at 3.  They acknowledge that Dr. Howes asserts a property interest in the Services Contract and in his NMDOH employment.  See MTD Reply at 3.  They note that Dr. Howes cannot have such a property interest, because he cannot have an implied contract with New Mexico, and does not allege retaliatory discharge in the Removed Complaint.  See MTD Reply at 3, n.3.  The Defendants also note that Dr. Howes "argued in the Response, but did not allege in the [Removed] Complaint, that he had a property interest as a third-party beneficiary to the Services Contract."  MTD Reply at 3.  The Defendants argue that, because "[t]his argument is inconsistent with the [Removed] Complaint," the Court should disregard it.  MTD Reply at 3.

---

[7]Specifically, the Defendants refer to Dr. Howes' arguments that "he is a third-party beneficiary to the contract between Locumtenans and the State, the contract is an adhesion contract, and that Locumtenans['] notice requirements in the contract are unconscionable . . . ." MTD Reply at 2 n.2.

The Defendants argue that, even if the Court considers Dr. Howes' third-party beneficiary argument, Dr. Howes does not state a claim for a violation of his rights in the Removed Complaint. See MTD Reply at 3-4.  They argue that Dr. Howes has not shown that he is an intended third-party beneficiary of the Services Contract and has not referenced any of the Services Contract's provisions that show a "clear intent" that the contracting parties intended Dr. Howes to benefit. MTD Reply at 4.  Thus, the Defendants assert that Dr. Howes "has not sufficiently alleged in the [Removed] Complaint he was a third-party beneficiary to the Services Contract, and therefore could not have a property interest for a 1983 Claim."  MTD Reply at 4.

The Defendants next turn to Dr. Howes' assertion that he has a cognizable liberty interest for § 1983's purposes, arguing that he has not alleged sufficiently his liberty interest.  See MTD Reply at 5.  They apply the "stigma plus" test that the Supreme Court of the United States of America develops in Paul v. Davis, 424 U.S. 693, 708-09 (1976), to determine whether the alleged defamation against Dr. Howes' reputation -- i.e., that he practiced medicine without a license -- rises to the level of a liberty interest violation.  MTD Reply at 5-9.  The Defendants note that they and Dr. Howes agree on the stigma-plus test's requirements, but the Defendants assert conversely that Dr. Howes has not met all four elements.  See MTD Reply at 5.  First, the Defendants state that Dr. Howes alleges only that "'someone'" from the NMDOH contacted Locumtenens, but does not specify whom that person is, does not name the NMDOH in his § 1983 claims, and alleges only in the MTD Response, and not in the Removed Complaint, that Dr. Massaro or Grogan made the impugning statements.  MTD Reply at 6 (quoting Removed Complaint ¶ 16, at 3).  The Defendants then go through the stigma-plus test.  See MTD Reply at 6-9.  First, they argue that Dr. Howes does not allege that the allegedly stigmatizing statement caused his termination or that it foreclosed entirely other employment opportunities in his

profession.  See MTD Reply at 6-8.  Second, they argue that Locumtenens does not count as the public and that a telephone call to Locumtenens does not meet the stigma-plus test's publication requirement.  See MTD Reply at 8-9.  Third, they argue that Dr. Howes has not evaluated sufficiently the alleged statement's veracity and, therefore, does not meet the test's final two prongs.  See MTD Reply at 9.

Finally, the Defendants turn to Dr. Howes' assertion that Dr. Massaro and Grogan are not entitled to qualified immunity.  See MTD Reply at 9.  The Defendants argue that, because they raise the qualified-immunity issue in the MTD, Dr. Howes has the burden to prove that Dr. Massaro and Grogan violated a federal constitutional or statutory right, and that the right was clearly established when the violation occurred.  See MTD Reply at 9 (citing P.J. ex rel Jensen v. Wagner, 603 F.3d 1182, 1196 (10th Cir. 2010)).  They argue that Dr. Howes has not met this burden, and request that the Court confer upon Dr. Massaro and Grogan qualified immunity.  See MTD Reply at 9.

### 7.     The Strike Motion.

The Defendants filed the Strike Motion on March 28, 2022.  Dr. Howes has not responded. In the Strike Motion, the Defendants assert that the Court should strike the Amended Complaint pursuant to rule 12(f)(2).  See Strike Motion at 3 (quoting Fed. R. Civ. P. 12(f)(2))(citing Est. of Anderson v. Denny's Inc., 291 F.R.D. 622, 634 (D.N.M. 2013)(Browning, J.)).  Specifically, they argue that Dr. Howes has not complied with rule 15(a)(1), which allows a party to amend its pleading once as a matter of course, and amend subsequently its pleading only with the Court's leave.  See Strike Motion at 4 (quoting Fed. R. Civ. P. 15(a)(2)).  The Defendants assert that the Removed Complaint is an amended version of Dr. Howes' original State court complaint, and, therefore, exhausts Dr. Howes' ability to amend his complaint once by right.  See Strike Motion

at 4 (citing <u>Fay v. Hartford Ins. Co.</u>, No. CIV 17-1054 MV/SCY, 2019 WL 1014791, at *2 n.3 (D.N.M. March 4, 2019)(Yarbrough, M.J.)).

The Defendants argue further that the Court should not grant Dr. Howes retroactive leave to amend the Removed Complaint -- <u>i.e.</u>, that the Court should not allow the Amended Complaint to stand.  <u>See</u> Strike Motion at 4.  They note that it is within the Court's discretion whether to allow such leave and that the Tenth Circuit has announced a list of factors it considers when determining whether to allow an amendment, including "'whether the amendment will result in undue prejudice, whether the request was unduly and inexplicably delayed, was offered in good faith, or that the party had had sufficient opportunity to state a claim and failed.'"  Strike Motion at 5 (quoting <u>State Distributors, Inc. v. Glenmore Distilleries Co.</u>, 738 F.2d 405, 416 (10th Cir. 1984)). Specifically, the Defendants point to Tenth Circuit cases which view amendments unfavorably, because they were untimely, particularly when they were untimely and in response to an unfavorable ruling.  <u>See</u> Strike Motion at 5-6 (citing <u>Pallottino v. City of Rio Rancho</u>, 31 F.3d 1023, 1027 (10th Cir. 1994)).

The Defendants assert that Dr. Howes alleges in his Amended Complaint several new claims and facts, many of which the Court has noted above in this Memorandum Opinion and Order, including allegations regarding the Services Contract and Dr. Howes' alleged third-party beneficiary status.  <u>See</u> Strike Motion at 6-7 (citing Amended Complaint ¶¶ 10-13, 18, 20, 22, 31-33, 50-52, 57-61, 67, 69, 74, at 3-10).  The Defendants assert that "none of the new allegations in the Second Amended Complaint were unknown to Plaintiff when the Original Complaint and First Amended Complaint were filed almost thirteen (13) months prior."  Strike Motion at 7.  They assert that Dr. Howes "is also asserting new untimely theories of liability to salvage his case and a series of new theories to avoid dismissal following the Court's indication at the March 1, 2022

hearing that it was inclined to grant the MTD."  Strike Motion at 8.  The Defendants also oppose Dr. Howes' altering his § 1983 claims against Dr. Massaro and Grogan to include more information about the alleged impact his termination will have on his continued employment.  See Strike Motion at 9.  They note finally that Dr. Howes "has waited almost thirteen (13) months to amend the First Amended Complaint even though the allegations in the Second Amended Complaint were known or should have been known to him when the Original Complaint was filed . . . ."  Strike Motion at 10.  Accordingly, the Defendants request that the Court strike the Amended Complaint.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994)(Brorby, J.).  The sufficiency of a complaint is a question of law, and, when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)("[O]nly if a reasonable person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)(Briscoe, J.)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff.")(citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006)(McKay, J.)).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. "At the motion-to-dismiss stage, the court does not weigh the evidence, and 'is interested only in whether it has jurisdiction and whether the [p]laintiffs plead a claim to relief that is plausible on its face.'" Rivero v. Bd. of Regents of Univ. of N.M., No. CIV 16-0318 JB\SCY, 2019 WL 1085179, at *47 (D.N.M. March 7, 2019)(Browning, J.)(quoting Begay v. Pub. Serv. Co. of N.M., 710 F. Supp. 2d 1161, 1199 (D.N.M. 2010)(Browning, J.)).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). This standard requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Nowell v. Medtronic Inc., 372 F. Supp. 3d 1166, 1245 (D.N.M. 2019)(Browning, J.)(quoting Ashcroft v. Iqbal, 556 U.S. at 678). "Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." Ridge at Red

- 27 -

Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(Kelly, J.)(emphasis in original).

The Tenth Circuit has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the line
> from conceivable to plausible."  . . . .   The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(McConnell, J.)(quoting Bell Atl.

Corp. v. Twombly, 550 U.S. at 570).  See Gallegos v. Bernalillo Cnty. Bd. of Cnty. Comm'rs, 278

F. Supp. 3d 1245, 1259 (D.N.M. 2017)(Browning, J.).

The Court's role in evaluating a rule 12(b)(6) motion is "'to assess whether the plaintiff[s']

*complaint alone* is legally sufficient to state a claim for which relief may be granted.'"  Dobson v.

Anderson, 319 F. App'x at 701 (quoting Tal v. Hogan, 453 F.3d 1244, 1252 (10th Cir.

2006))(emphasis and alteration in Dobson v. Anderson, but not in Tal v. Hogan).[8]  In addition to

---

[8]Dobson v. Anderson, 319 F. App'x 698 (10th Cir. 2008) is an unpublished opinion, but
the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in
the case before it.  See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may
be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored . . . .
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its disposition,
> we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Dobson
v. Anderson; Nard v. City of Okla. City, 153 F. App'x 529 (10th Cir. 2005); Douglas v. Norton,
167 F. App'x 698 (10th Cir. 2006); Fundamental Admin. Servs., LLC v. Patton, 504 F. App'x 694
(10th Cir. 2012); Gas Sensing Technology Corp. v. Ashton, 795 F. App'x 1010 (10th Cir. 2020);
King v. PA Consulting Grp., Inc., 78 F. App'x 645 (10th Cir. 2003); Castillo v. Hobbs Mun. Sch.
Bd., 315 F. App'x 693 (10th Cir. 2009); McCarty v. City of Bartlesville, 8 F. App'x 867 (10th Cir.
2001); Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Routt v. Howry,
835 F. App'x. 379 (10th Cir. 2020); Muller v. Culbertson, 408 F. App'x 194 (10th Cir. 2011);

the pleadings, the Court also may review "'mere argument contained in a memorandum in opposition to dismiss.'" Miller v. Glanz, 948 F.2d 1562, 1565 (10th Cir. 1991)(quoting Ohio v. Peterson, Lowry, Rall, Barber & Ross, 585 F.2d 454, 457 (10th Cir. 1978)).  Any facts or legal theories that a party asserts in response to a motion to dismiss, however, must be "consistent with the facts and theories advanced in the complaint . . . [and] a court may not consider allegations or theories that are inconsistent with those pleaded in the complaint."  Hayes v. Whitman, 264 F.3d at 1025 (citing Sterling v. Kazmierczak, 983 F. Supp. 1186, 1189 (N.D. Ill. 1997)(Alesia, J.)); Henthorn v. Dep't of Navy, 29 F.3d 682, 688 (D.C. Cir. 1994); and Pennsylvania ex rel. Zimmerman v. PepsiCo, 836 F.2d 171, 181 (3d Cir. 1988)).  In Hayes v. Whitman, the Tenth Circuit concluded that "the argument Plaintiffs advanced in the brief in opposition to the Motion to Dismiss, that Oklahoma had submitted [total maximum daily loads ("]TMDLs["]), but they were defective and should not have been approved by the EPA," was inconsistent with the plaintiffs' initial allegations "that Oklahoma did not submit any TMDLs and that . . . it did not intend to submit any TMDLs."  Hayes v. Whitman, 264 F.3d at 1025.

"When a party presents matters outside of the pleadings for consideration, as a general rule 'the court must either exclude the material or treat the motion as one for summary judgment.'"

---

Estate of Cummings v. United States, 651 F. App'x 822 (10th Cir. 2016); Kornfeld v. Kornfeld, 321 F. App'x 745 (10th Cir. 2009); Orderly Health, Inc. v. NewWave Telecom & Techs., No. 20-1441,  2021 WL 4592268 (10th Cir. October 6, 2021); Chiddix Excavating, Inc. v. Colo. Springs Utils., 737 F. App'x 856 (10th Cir. 2018); Alcorn v. La Barge, WY, 784 F. App'x 614 (10th Cir. 2019); Rooker v. Ouray County, 504 F. App'x 734 (10th Cir. 2012); Black Card, LLC v. Visa U.S.A., Inc., 766 F. App'x 583 (10th Cir. 2019); Glasser v. King, 721 F. App'x 766 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906 (10th Cir. 2017); and Armijo v. Affilion, LLC, 854 F. App'x 236 (10th Cir. 2021), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d 1081, 1103 (10th Cir. 2017)(quoting Alexander v. Oklahoma, 382 F.3d 1206, 1214 (10th Cir. 2004)).  There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322; (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice,"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322.  See Brokers' Choice of Am., Inc. v. NBC Universal, Inc., 861 F.3d at 1103-04 (holding that the district court did not err by reviewing a seminar recording and a television episode on a rule 12(b)(6) motion, which were "attached to or referenced in the amended complaint," central to the plaintiff's claim, and "undisputed as to their accuracy and authenticity").  "[T]he court is permitted to take judicial notice of its own files and records, as well as facts which are a matter of public record."  Van Woudenberg v. Gibson, 211 F.3d 560, 568 (10th Cir. 2000), abrogated on other grounds by McGregor v. Gibson, 248 F.3d 946, 955 (10th Cir. 2001).

     In Gee v. Pacheco, 627 F.3d 1178 (10th Cir. 2010), the defendants "supported their motion with numerous documents, and the district court cited portions of those motions in granting the motion." 627 F.3d at 1186.  The Tenth Circuit held that "[s]uch reliance was improper" and that, even if "the district court did not err initially in reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual assertions and effectively convert the motion to one for summary judgment." 627 F.3d at 1186-87.  In other cases, the Tenth Circuit has emphasized that, "[b]ecause the district court considered facts outside of the complaint . . . it is clear that the district court dismissed the claim under Rule 56(c) and not Rule 12(b)(6)." Nard v. City of Okla. City,

153 F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In <u>Douglas v. Norton</u>, 167 F. App'x 698 (10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission -- which missed deadline the Tenth Circuit analogized to a statute of limitations -- and concluded that, because the requirement is not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment." <u>Douglas v. Norton</u>, 167 F. App'x at 704-05.

The Court previously has ruled that, when a plaintiff references and summarizes the defendants' statements in a complaint, the Court cannot rely on documents containing those statements that the defendants attach to their briefing.  See <u>Mocek v. City of Albuquerque</u>, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.). The Court reasoned that the complaint did not incorporate the documents by reference, nor were the documents central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack the defendant's reliability and truthfulness.  See 2013 WL 312881, at *50-51.  The Court also has previously ruled that, when determining whether to toll a statute of limitations in an action alleging fraud and seeking subrogation from a defendant, the Court may not use interviews and letters attached to a motion to dismiss, which show that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See <u>Great Am. Ins. Co. v. Crabtree</u>, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court in <u>Great American Insurance Co. v. Crabtree</u> determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a

complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.

On the other hand, in a securities class action, the Court has ruled that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, so the Court may consider the operating certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cty. Emps.' Ret. Sys. v. Thornburg Mortg. Secs. Tr. 2006-3, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).  See, e.g., S.E.C. v. Goldstone, 952 F. Supp. 2d 1060, 1217-18 (D.N.M. 2013)(Browning, J.)(considering, on a motion to dismiss, electronic mail transmissions referenced in the complaint as "documents referred to in the complaint," which are "central to the plaintiff's claim" and whose authenticity the plaintiff did not challenge); Mata v. Anderson, 760 F. Supp. 2d 1068, 1101 (D.N.M. 2009)(Browning, J.)(relying on documents outside of the complaint, because they were "documents that a court can appropriately view as either part of the public record, or as documents upon which the Complaint relies, and the authenticity of which is not in dispute").

## LAW REGARDING CONTRACT INTERPRETATION IN NEW MEXICO

In contract cases, "the role of the court is to give effect to the intention of the contracting parties."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 122 N.M. 422, 428, 925 P.2d 1184, 1190.  "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument."  Bogle Farms, Inc. v. Baca, 1996-NMSC-051, ¶ 21, 122 N.M. at 428, 925 P.2d at 1190 (citing Shaeffer v. Kelton, 1980-NMSC-117, ¶ 8, 95 N.M. 182, 185, 619 P.2d 1226, 1229).  "The parol evidence rule 'bars admission of evidence extrinsic to the contract

to contradict and perhaps even supplement the writing.'" Mem'l Med. Ctr., Inc. v. Tatsch Const., Inc., 2000-NMSC-030, ¶ 16, 129 N.M. 677, 683, 12 P.3d 431, 437 (quoting C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 16, 112 N.M. 504, 509, 817 P.2d 238, 243). If a contract is ambiguous, however, "evidence will be admitted to aid in interpreting the parties' expressions." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 112 N.M. at 508, 817 P.2d at 242. "On the other hand, if the court determines that the contract is clear and unambiguous on its face, evidence of the circumstances surrounding the transaction is inadmissible *to vary or modify its terms*." C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 12, 112 N.M. at 508, 817 P.2d at 242 (emphasis in original)(citing Franciscan Hotel Co. v. Albuquerque Hotel Co., 1933-NMSC-053, ¶ 17, 37 N.M. 456, 462, 24 P.2d 718, 721).

The question whether an agreement contains an ambiguity is a matter of law. See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. 778, 781, 845 P.2d 1232, 1235 (citing Levenson v. Mobley, 1987-NMSC-102, ¶ 7, 106 N.M. 399, 401, 744 P.2d 174, 176). "An ambiguity exists in an agreement when the parties' expressions of mutual assent lack clarity." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 (citing C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 112 N.M. at 508-09, 817 P.2d at 242-43). If the "evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235. If, however, the court finds that the contract is "reasonably and fairly susceptible of different constructions, an ambiguity exists." Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 (citing Vickers v. North Am. Land Dev., Inc., 1980-NMSC-021, ¶¶ 9-10, 94 N.M. 65, 68, 607 P.2d 603, 606).

New Mexico courts may consider extrinsic evidence to determine "whether the meaning of a term or expression contained in the agreement is actually unclear." Mark V., Inc., v. Mellekas, 1993-NMSC-001, ¶ 11, 114 N.M. at 781, 845 P.2d at 1235. See id., 1993-NMSC-001, ¶ 12, 114 N.M. at 781, 845 P.2d at 1235 ("New Mexico law, then, allows the court to consider extrinsic evidence to make a preliminary finding on the question of ambiguity."); C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ¶ 15, 112 N.M. at 508-09, 817 P.2d at 242-43 ("We hold today that in determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance.")(citation and footnote omitted).

> [I]n determining whether a term or expression to which the parties have agreed is unclear, a court may hear evidence of the circumstances surrounding the making of the contract and of any relevant usage of trade, course of dealing, and course of performance . . . .  It is important to bear in mind that the meaning the court seeks to determine is the meaning one party (or both parties, as the circumstances may require) attached to a particular term or expression at the time the parties agreed to those provisions.
>
> . . . .
>
> It may be that the evidence presented is so clear that no reasonable person would determine the issue before the court in any way but one.  In that case, to the extent the court decides the issue, the question then may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070 ¶¶ 15-17, 112 N.M. at 508-10, 817 P.2d at 242-44 (affirming the trial court, because it "considered all evidence adduced in response to the motion for summary judgment, including collateral or extrinsic evidence of the circumstances surrounding the execution of the lease amendment, and quite properly found no ambiguity").  In addition, in determining whether an ambiguity exists,

> [a] court may employ the many rules of contract interpretation that do not depend on evidence extrinsic to the contract.  *See, e.g.*, *Smith v. Tinley*, 100 N.M. 663, 665, 674 P.2d 1123, 1125 (1984)(reasonable interpretation of contract is favored); *Schultz & Lindsay Constr. Co. v. State*, 83 N.M. 534, 536, 494 P.2d 612, 614 (1972) (uncertainties construed strictly against drafter); *Id.* at 535, 494 P.2d at 613 (each part of contract is to be given significance according to its place in the contract so as to give effect to the intentions of the parties).  To the extent a court resolves an issue of contract interpretation solely by reference to such aids, or by traditional rules of grammar and punctuation, without resort to evidence of surrounding facts and circumstances, then that issue, as well, may be described as one of law.

C.R. Anthony Co. v. Loretto Mall Partners, 1991-NMSC-070, ℙ 17 n.5, 112 N.M. at 510 n.5, 817 P.2d at 244 n.5.  Once the court concludes that an ambiguity exists, the resolution of that ambiguity becomes a question of fact.  See Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 114 N.M. at 781, 845 P.2d at 1235.  To decide any ambiguous terms' meaning, "the fact finder may consider extrinsic evidence of the language and conduct of the parties and the circumstances surrounding the agreement, as well as oral evidence of the parties' intent."  Mark V., Inc. v. Mellekas, 1993-NMSC-001, ¶ 13, 114 N.M. at 782, 845 P.2d at 1236.  See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d 1157, 1184-85 (D.N.M. 2015)(Browning, J.).

As this Court stated in Great American Insurance Co. of New York v. W. States Fire Protection Co., 730 F. Supp. 2d 1308 (D.N.M .2009)(Browning, J.):

> In *Mark V, Inc. v. Mellekas*, the Supreme Court of New Mexico summarized the circumstances under which it is appropriate for a district court to construe a contract as a matter of law, and when a district court should find that a contract is ambiguous and leave construction of the contract to a jury.  According to the Supreme Court of New Mexico in *Mark V, Inc. v. Mellekas*, a district court may take extrinsic evidence to determine whether a contract is ambiguous, and "if the evidence presented is so plain that no reasonable person could hold any way but one, then the court may interpret the meaning as a matter of law.  If the court determines that the contract is reasonably and fairly susceptible of different constructions, an ambiguity exists."  *Id.*, 845 P.2d at 1235 (citations omitted).

730 F.Supp.2d at 1314 n.1.

## NEW MEXICO LAW REGARDING THIRD PARTY BENEFICIARIES

As a general rule, "one who is not a party to a contract cannot maintain suit upon it." Fleet

Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 49, 811 P.2d 81, 82.  Despite this

general rule, a third party may be a beneficiary of a contract, and may, as a beneficiary, have

enforceable rights against another party to the contract.  See Fleet Mortg. Corp. v. Schuster, 1991-

NMSC-046, ¶ 4, 112 N.M. at 49, 811 P.2d at 82.   "There are two classes of third-party

beneficiaries: intended beneficiaries and incidental beneficiaries."  Tarin's Inc. v. Tinley, 2000-

NMCA-048, ¶ 13, 129 N.M. 185, 190-91, 3 P.3d 680, 685-86.[9]  The Supreme Court of New

Mexico has explained:

> A third-party may have an enforceable right against an actual party to a
> contract if the third-party is a beneficiary of the contract . . . .  A third-party is a
> beneficiary if the actual parties to the contract intended to benefit the third-
> party . . . .   The intent to benefit the third-party "'must appear either from the

---

[9]In this case, which comes before the Court in part on a federal question and in part under the Court's diversity jurisdiction, which the Court addresses below, see infra, at 184 n.51, the Court must look to how the Supreme Court of New Mexico, rather than the Court of Appeals of New Mexico, would resolve New Mexico State law issues.  Under the doctrine that the Supreme Court of the United States announced in Erie R. Co. v. Tompkins, 304 U.S. 64 (1938)("Erie"), federal courts sitting in diversity must apply the substantive law of the state that would otherwise have jurisdiction over the claims at issue.  See 304 U.S. at 78.  Similarly, federal courts exercising supplemental jurisdiction over State law claims under 28 U.S.C. § 1367 "'apply the substantive law of the forum state.'"  Sawyers v. Norton, 962 F.3d 1270, 1287 n.16 (10th Cir. 2020)(quoting Glasser v. King, 721 F. App'x 766, 769 (10th Cir. 2018)(unpublished).  See Reno v. Bd. of Cnty. Comm'rs for Cnty. of Eddy, 577 F. Supp. 3d 1204, 1214 n.5 (D.N.M. 2022)(Fouratt, M.J.)(quoting N.Y. Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996)).  In the absence of an authoritative pronouncement from the highest court, a federal court's task under the Erie doctrine is to predict how the State's highest court would rule if presented with the same case.  See Wade v. EMCASCO Ins. Co., 483 F.3d 657, 666 (10th Cir. 2007).  The rules the Court cites from Tarin's Inc. v. Tinley all originated in Supreme Court of New Mexico cases.  See Permian Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, ¶¶ 20-22, 63 N.M. 1, 6-7, 312 P.2d 533, 536-37; Valdez v. Cillessen & Son, Inc., 1987-NMSC-015, ¶ 34, 105 N.M. 575, 581, 734 P.2d 1258, 1264; Jaramillo v. Providence Washington Ins. Co., 1994-NMSC-018, ¶ 17, 117 N.M. 337, 343, 871 P.2d 1343, 1349.  The Court predicts, therefore, that the Supreme Court of New Mexico would follow Tarin's Inc. v. Tinley and that this Court should also consider it authoritative in applying New Mexico State law.

contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.'"

Callahan v. N.M. Fed'n of Teachers–TVI, 2006-NMSC-010, ¶ 20, 139 N.M. 201, 208, 131 P.3d 51, 58 (quoting Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶¶ 1-4, 112 N.M. at 50, 811 P.2d at 83 (quoting Valdez v. Cillessen & Son, Inc., 1987-NMSC-015, ¶ 34, 105 N.M. 575, 581, 734 P.2d 1258, 1264 (1987))).   See Great Am. Ins. Co. of New York v. W. States Fire Prot. Co., 730 F. Supp. 2d at 1316.

> Only intended beneficiaries can seek enforcement of a contract.  The promisor must have "had reason to know the benefit was contemplated by the promisee as one of the motivating causes for entering the contract." *Stotlar* [*v. Hester*], [1978-NMCA-067, ¶ 18,] 92 N.M. [26,] 30, 582 P.2d [403,] 407.  "The paramount indicator of a third party beneficiary status is a showing that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries." *Valdez v. Cillessen & Son, Inc.*, 105 N.M. 575, 581, 734 P.2d 1285, 1264 (1987).

Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 129 N.M. at 191, 3 P.3d at 686.  "'The burden is on the person claiming to be a third-party beneficiary to show that the parties to the contract intended to benefit him.'"   Fundamental Admin. Servs., LLC v. Patton, 504 F. App'x 694, 698 (10th Cir. 2012)(unpublished)(quoting Tarin's, Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 129 N.M. at 191, 3 P.3d at 686).  The Supreme Court of New Mexico has recognized:

> "A third party who is not a promisee and who gave no consideration has an enforceable right by reason of a contract made by two others (1) if he is a creditor of the promisee or of some other person and the contract calls for a performance by the promisor in satisfaction of the obligation; or (2) if the promised performance will be of pecuniary benefit to him and the contract is so expressed as to give the promisor reason to know that such benefit is contemplated by the promisee as one of the motivating causes of his making the contract.  A third party may be included within both of these provisions at once, but need not be.  One who is included within neither of them has no right, even though performance will incidentally benefit him."

McKinney v. Davis, 1972-NMSC-077, ¶ 8, 84 N.M. 352, 354, 503 P.2d 332, 334 (quoting Permian

Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, 63 N.M. 1, 312 P.2d 533; in turn quoting 4 Corbin

on Contracts § 776, at 18-19.  The Supreme Court of New Mexico also has noted with approval

the assertion that "the third party can show by evidence extrinsic to a contract which contains no

indication of intent to benefit him that its provisions were in fact intended for his benefit." Permian

Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, ¶ 22, 63 N.M. at 7, 312 P.2d at 537 (quoting 4 Corbin

on Contracts §§ 776, 779)

The Court previously has identified an arbitration agreement that expressly bound "'all

parties to this Agreement and their spouses, heirs, representatives, executors, administrators,

successors, and assigns, as applicable' to arbitration," because the contracting parties intended that

the listed parties receive the benefits of arbitration.  Jerry Erwin Assocs., Inc. v. Estate of Asher

by and through Zangara, 290 F. Supp. 3d 1213, 1250 (D.N.M. 2017)(Browning, J.)(quoting

Arbitration Agreement at 3).  Similarly, the Court identified the following language in a

subrogation-rights-waiver clause as "intended to benefit parties other than those who signed the

Contract": "'The Owner and Contractor waive all rights *against (1) each other and any of their*

*Subcontractors*, Sub-subcontractors, agents and employees, each of the other . . . .'" Great Am.

Ins. Co. of N.Y. v. W. States Fire Protection Co., 730 F. Supp. 2d at 1322 (quoting Contract

§ 11.4.8, at 54)(emphasis in Great Am. Ins. Co. of N.Y. v. W. States Fire Protection Co.).

Language which indicates that a contract clause contemplates "'a considerable depth of parties,'"

such as referencing the rights not only of subcontractors, but also of sub-subcontractors, supports

a conclusion that the parties drafted the clause at issue intending to create third-party beneficiaries.

Great Am. Ins. Co. of N.Y. v. W. States Fire Protection Co., 730 F. Supp. 2d at 1323 (Browning,

J.)(quoting Temple EasTex, Inc. v. Old Orchard Creek Partners, Ltd., 848 S.W.2d 724, 730 (Ct.

App. Tex. 1992)).  The Court also has determined that a nursing home resident was an intended

third-party beneficiary to a contract providing for her care -- i.e., that the contract's terms

"demonstrate that the signatories intended for [her] to receive benefits" from the

contract -- because she "is the named resident, the contract's clear purpose is for her care, and,

under its terms, she was to receive, among other things, 'room, board, required nursing care,

dietary services, [and] an activities program.'"  Evangelical Lutheran Good Samaritan Soc'y v.

New Mexico, 277 F. Supp. 3d 1191, 1233 (D.N.M. 2017)(Browning, J.)(quoting Admission

Agreement at 2)(second alteration in Evangelical Lutheran Good Samaritan Soc'y v. New

Mexico).

## LAW REGARDING FORUM SELECTION CLAUSES IN NEW MEXICO

The Court previously has stated:

> Contrary to the general rule that a defendant's removal of the action from
> state court waives or cures any objection to improper venue in the federal court, an
> objection to the lack of proper venue based on a clause designating a court of
> another state or a foreign court as the exclusive forum is not waived or cured if the
> defendant removes the action from state court.

Knight Oil Tools, Inc. v. Unit Petrol. Co., No. CIV 05-0669 JB/ACT, 2005 WL 2313715, at *2

(D.N.M. Aug. 31, 2005)(Browning, J.)(citing 17 James W. Moore et al., Moore's Federal Practice

§§ 111.04[3][d], 111.36[5][a], at 111-42 to 111-43, 111-179 (3d ed. 2004)("Moore's")).  Accord

Lambert v. Kysar, 983 F.2d 1110, 1113 n.2 (1st Cir. 1993)("[A] valid forum selection clause

operates to render venue improper, not only under 28 U.S.C. § 1391 [the general venue statute]

but also under 28 U.S.C. § 1441(a) [the removal statute].").  See Int'l Software Sys., Inc. v.

Amplicon, Inc., 77 F.3d 112, 113-15 (5th Cir. 1996)(without discussing removal issue, affirming

dismissal on improper venue grounds of action removed from state court when forum selection

clause specified state courts of another state as exclusive forum); Spradlin v. Lear Siegler Mgmt.

Servs. Co., 926 F.2d 865, 866 (9th Cir. 1991)(without discussing removal issue, affirming dismissal of removed action on improper venue grounds based on clause making Saudi Arabia the exclusive forum).

"In the typical case not involving a forum-selection clause, a district court considering a § 1404(a) motion (or a forum non conveniens motion) must evaluate both the convenience of the parties and various public-interest considerations." Atl. Marine Constr. Co. v. United States Dist. Court, 571 U.S. 49, 62 (2013)("Atl. Marine")(footnote omitted). "Ordinarily, the district court would weigh the relevant factors and decide whether, on balance, transfer would serve 'the convenience of parties and witnesses' and otherwise promote 'the interests of justice.'" Atl. Marine, 571 U.S. at 62-63 (quoting 28 U.S.C. § 1404(a)). "The calculus changes, however, when the parties' contract contains a valid forum-selection clause." Atl. Marine, 571 U.S. at 63.

> The "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." [Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 33] . . . (KENNEDY, J., concurring). For that reason, and because the overarching consideration under § 1404(a) is whether a transfer would promote "the interest of justice," "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." [Stewart Org., Inc. v. Ricoh Corp., 487 U.S.] at 33 ([Kennedy, J., concurring]).

Atl. Marine, 571 U.S. at 63.

"The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." Atl. Marine, 571 U.S. at 63. "First, the plaintiff's choice of forum merits no weight." Atl. Marine, 571 U.S. at 63 ("[A]s the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained for is unwarranted."). "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private

interests." Atl. Marine, 571 U.S. at 64 ("[A] district court may consider arguments about public-interest factors only.").   "Third, when a party bound by a forum-selection clause flouts its contractual obligation and files a suit in a different forum, a § 1404(a) transfer of venue will not carry with it the original venue's choice-of-law rules -- a factor that in some circumstances may affect public-interest considerations." Atl. Marine, 571 U.S. at 64.  Given these modifications to the 28 U.S.C. § 1404(a) factor analysis, the Supreme Court has held that, "[w]hen the parties have agreed to a valid forum-selection clause, a district court should ordinarily transfer the case to the forum specified in that clause." Atl. Marine, 571 U.S. at 62.  See id. at 66 ("In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain.")(quoting 28 U.S.C. § 1404(a)); Niemi v. Lasshofer, 770 F.3d 1331, 1351 (10th Cir. 2014)("We will enforce a mandatory forum selection clause unless the party challenging it 'clearly show[s] that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.'")(quoting M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15 (1972)).

> [W]hen parties select in advance the exclusive venue and/or forum for the resolution of future disputes, and one party timely seeks enforcement of that agreement, federal courts give effect to these provisions through a transfer of venue (when the provision points to a different federal forum) or dismissal without prejudice under the doctrine of *forum non conveniens* (when the provision identifies a state or foreign forum).

Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d 660, 668 (10th Cir. 2020)(citing Atl. Marine, 571 U.S. at 59-60)(italics in original).  See Niemi v. Lasshofer, 770 F.3d at 1351 ("[T]he proper mechanism for enforcement of a forum selection clause is a motion to transfer under 28 U.S.C. § 1404(a)."); Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d at 1210.

When the party seeking to avoid a forum selection clause does not allege that the forum selection clause particularly is a product of fraud, the Court will not invalidate the clause as a result of fraud or overreaching.  See Juaire v. T-Mobile West, LLC, No. CIV 12-1284 JB/KBM, 2013 WL 6504326, at *21 (D.N.M. October 31, 2013)(Browning, J.)("Even assuming T-Mobile's agents said [that the agreement at issue was only a formality], T-Mobile's agents directed these statements at the Agreement as a whole and not at the forum selection clause in particular.").  The Court also has determined that, even though enforcing a forum selection clause may make litigation more expensive for a party who may have to litigate his or her case in a different state, this additional burden is not so great as to foreclose that party from pursuing a remedy, particularly when the forum selection clause selects a forum within the United States.  See Juaire v. T-Mobile West, LLC, 2013 WL 6504326, at *22 ("[B]y designating King County as the venue for lawsuits that Juaire intends to bring against it, T-Mobile is not choosing some 'remote alien forum' to harass Juaire and discourage him from bringing suit.")(quoting Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 593-94 (1991).

1.      **Choice-of-Law Issues and Interpreting Forum Selection Clauses.**

In Stewart Organization v. Ricoh Corp., the Supreme Court holds: "Federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum selection clause." Stewart Org. v. Ricoh Corp., 487 U.S. at 32. See Atl. Marine, 571 U.S. at 52 ("[A] forum selection clause may be enforced by a motion to transfer under § 1404(a)."). There is a distinction, however, between what law governs the enforceability of a forum selection clause and what law governs the interpretation of a forum selection clause. See Yavuz v. 61 MM, Ltd., 465 F.3d 418, 430 (10th Cir. 2006). See also Weber v. PACT XPP Techs., AG, 811 F.3d 758, 770 (5th Cir. 2016)("[A]s several circuits have explicitly recognized, the

question of enforceability is analytically distinct from the issue of interpretation."); Martinez v. Bloomberg LP, 740 F.3d 211, 220 (2d Cir. 2014)("Distinguishing between the enforceability and the interpretation of forum selection clauses, moreover, accords with the traditional divide between procedural and substantive rules developed under *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938)[("Erie")] . . . ."). Notably, the Tenth Circuit has not drawn rigid distinctions between State and federal law when interpreting forum selection clauses, and has applied federal law to interpret these clauses when "there are no material discrepancies between [State] law and federal common law on these matters." Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d 318, 320-21 (10th Cir. 1997)(not deciding the choice-of-law issue between Colorado law and federal law). In contrast, the United States Court of Appeals for the Third Circuit, in accordance with the United States Court of Appeals for the Second Circuit, has ruled that federal law cannot apply to forum selection-clause interpretation, because that would "frustrate[ ] the principles of *Erie*." Collins v. Mary Kay, Inc., 874 F.3d 176, 182 (3d Cir. 2017)("Applying federal common law to these issues would 'generate a sprawling "federal general common law" of contracts.'" (quoting Martinez v Bloomberg LP, 740 F.3d at 221)). See Weber v. PACT XPP Techs., AG, 811 F.3d at 770 ("A choice-of-law analysis to determine what substantive law should guide this court's interpretation of the [forum selection clause] is proper under ordinary principles governing diversity litigation."); Martinez v. Bloomberg LP, 740 F.3d at 221 ("Erie . . . warns against an approach that would force federal courts to generate a sprawling federal general common law of contracts to govern such questions [of interpretation] whenever they arise in the context of forum selection clauses."). But see Manetti-Farrow, Inc. v. Gucci Am., Inc., 858 F.2d 509, 513 (9th Cir. 1988)("Moreover, because enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses."). Since the

- 43 -

Tenth Circuit's decision in <u>Excell, Inc. v. Sterling Boiler & Mechanical, Inc.</u>, it has not confronted squarely whether State or federal law should be used to interpret a forum selection clause.  <u>See Presidential Hosp., LLC v. Wyndham Hotel Grp.</u>, LLC, 333 F. Supp. 3d. at 1211.  The Tenth Circuit generally has applied, however, State law when deciding to classify a forum selection clause as mandatory or permissive.  <u>See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC</u>, 953 F.3d at 673 (noting that, "to find indicia of exclusivity, Colorado courts do not require any specific incantation," and relying on <u>Vanderbeek v. Vernon Corp.</u>, 25 P.3d 1242 (Colo. App. 2000), to analyze a forum selection clause as permissive).  <u>But see Gas Sensing Technology Corp. v. Ashton</u>, 795 F. App'x 1010, 1015-16 (10th Cir. 2020)(analyzing Wyoming law concerning forum selection clauses, and concluding that "Wyoming law drawing a distinction between forum selection clauses and jurisdictional concessions is consistent with our decisions explaining the difference between mandatory and permissive forum selection clauses," before relying on <u>K & V Sci. Co. v. BMW</u>, 314 F.3d 494 (10th Cir. 2002), in deciding that the forum selection clause at issue was permissive).  When confronted with a contract between foreign citizens with a forum selection clause, the Tenth Circuit has held that "under federal law the courts should ordinarily honor an international commercial agreement's forum-selection provision *as construed under the law specified in the agreement's choice-of-law provision*."  <u>Yavuz v. 61 MM, Ltd.</u>, 465 F.3d at 430 (emphasis in original).

The Court has recognized in the past that "New Mexico state courts have not had much opportunity to address forum-selection clauses."  <u>Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.</u>, No. CIV 10-1020 JB/LFG, 2010 WL 5559750, at *12 (D.N.M. November 30, 2010)(Browning, J.).  Relying on a case from the Tenth Circuit, the Court of Appeals of New Mexico has recognized that the general rule on enforcement of forum selection clauses is that,

"when venue is specified in a forum selection clause with mandatory or obligatory language, the clause will be enforced." Mueller v. Sample, 2004-NMCA-075, ¶ 11, 135 N.M. 748, 752, 93 P.3d 769, 773 (citing K & V Scientific Co., Inc. v. BMW, 314 F.3d at 499).  The Court previously has concluded that, "although New Mexico has not addressed forum-selection clauses in particular, its decisions relating to choice-of-law provisions indicate that New Mexico would apply the same rule as the Tenth Circuit as well." Knight Oil Tools, Inc. v. Unit Petroleum Co., 2005 WL 2313715, at *9.[10]

**2.      Enforceability of Forum Selection Clauses.**

The Supreme Court has noted that there is substantial overlap between precedent interpreting the enforceability of arbitration agreements and forum selection clauses.  See Scherk v. Alberto-Culver Co., 417 U.S. 506, 518-19 (1974)("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute.").  The Supreme Court has stated that "an arbitration or forum-selection clause in a contract is not enforceable if the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. at 518-19.  Reiterating this rule, the Tenth Circuit has stated: "A plaintiff seeking to avoid a choice provision on a fraud theory must, within the confines of Fed. R. Civ. P. 9(b) and 11, plead fraud going to the specific provision; the teachings of *Scherk*, interpreting *M/S Bremen*, require no less." Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d 953, 960 (10th Cir. 1992).  The Tenth Circuit thus requires that a party seeking to avoid a forum selection clause produce evidence

---

[10]The Supreme Court of Texas also has relied on federal precedent to determine whether forum selection clauses are enforceable.  See In re AIU Ins. Co., 148 S.W.3d 109, 118-19 (Tex. 2004)(relying on federal precedent in a discussion on the enforceability of forum selection clauses).

showing that the provision is a product of fraud or coercion.  See Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960 ("Third, at no time did Riley offer any evidence on the stipulated issues tending to show that *the arbitration provision* (or any other choice provision, for that matter) was a product of fraud or coercion.")(emphasis in original); Presidential Hospitality, LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d at 1123 (relying on Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 960, in concluding that plaintiffs had not shown that a forum selection clause was not contractually valid where plaintiffs contended "that they were fraudulently induced to enter into the . . . Agreement," because "attacks on the contract in general do not amount to attacks on specific contract provisions").  The Honorable Lourdes A. Martinez, former United States Magistrate Judge for the United States District Court for the District of New Mexico, similarly has stated that "[a] general claim of fraud or misrepresentation concerning an entire contract does not affect the validity of a forum selection clause."  Mann v. Auto. Protection Corp., 777 F. Supp. 2d 1234, 1240 (D.N.M. 2011)(Martinez, M.J.).

The Supreme Court has rejected the notion that the parties must negotiate specifically a forum selection clause for it to be enforceable.  See Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593 ("[W]e do not adopt the Court of Appeals' determination that a nonnegotiated forum-selection clause in a form ticket contract is never enforceable simply because it is not the subject of bargaining."); Montoya v. Fin. Fed. Credit, Inc., 872 F. Supp. 2d 1251, 1270 (D.N.M. 2012)(Browning, J.)(concluding that an "argument that the forum-selection clause is not enforceable based on the lack of negotiation between the parties is . . . unpersuasive").  Accord Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d 216, 221 (5th Cir. 1998)(holding that a forum selection clause in a seaman's employment contract was enforceable even when the parties did not negotiate for the provision).  Magistrate Judge Martinez similarly has held:

- 46 -

> This argument [that an unequal bargaining position should render a forum selection provision unenforceable] also fails because unequal bargaining position and form contracts do not invalidate forum selection provisions . . . .  The fact that Plaintiff is an individual and the contract was presented to him as a form contract does not invalidate the forum selection provision, and Plaintiff's belief that he could not negotiate or change the terms of the Agreement does not rise to the level of overreaching that would make it unreasonable or unfair to enforce the forum selection provision.

Mann v. Auto. Prot. Corp., 777 F. Supp. 2d at 1240 (citing Carnival Cruise Lines, Inc. v. Shute, 499 U.S. at 593-94; Milk 'N' More, Inc. v. Beavert, 963 F.2d 1342 (10th Cir. 1992); and Marinechance Shipping, Ltd. v. Sebastian, 143 F.3d at 221 n.26).

Courts have also imposed a high standard for negating a forum selection clause on the basis that it is inconvenient.  The Tenth Circuit, for instance, has stated:

> Finally, in *Carnival Cruise Lines* [*v. Shute*], the Court relied on *M/S Bremen* [*v. Zapata Off-Shore Co.*] in enforcing a domestic forum selection clause, despite inconvenience to the plaintiffs. *Carnival Cruise Lines*[ *v. Shute*], [499 U.S. at 594]. Only a showing of inconvenience so serious as to foreclose a remedy, perhaps coupled with a showing of bad faith, overreaching or lack of notice, would be sufficient to defeat a contractual forum selection clause.  *Id.*

> . . . .  The fact that an international transaction may be subject to laws and remedies different or less favorable than those of the United States is not a valid basis to deny enforcement, provided that the law of the chosen forum is not inherently unfair.  *See Carnival Cruise Lines*, [499 U.S. at 594]; *AVC Nederland B.V. v. Atrium Inv. Ptrshp*, 740 F.2d 148, 158-59 (2d Cir. 1984); *Medoil Corp.* [*v. Citicorp*], 729 F. Supp. [1456,]1460 [(S.D.N.Y. 1990)(Stanton, J.)]; *Karlberg European Tanspa, Inc. v. Jk-Josef Kratz Vertriebsgesellschaft mbH*, 618 F. Supp. 344, 348 (N.D. Ill. 1985)[(Moran, J.)]; *Dukane Fabrics Int'l Inc. v. M.V. Hreljin*, 600 F. Supp. 202, 203-04 (S.D.N.Y. 1985)[(Lasker, J.)].  English law does not preclude Riley from pursuing an action for fraud and we agree with the Defendants that the Lloyd's Act does not grant statutory immunity for such claims.  *See* Lloyd's Act, § 14(3) . . . .  We have been shown nothing to suggest than an English court would not be fair, and in fact, our courts have long recognized that the courts of England are fair and neutral forums.  *See M/S Bremen* [*v. Zapata Off-Shore Co.*], 407 U.S. at 12 . . . ; *Syndicate 420 at Lloyd's London v. Early American Ins. Co.*, 796 F.2d 821, 829 (5th Cir. 1986); *Bonny v. Society of Lloyd's*, 784 F. Supp. 1350, 1353 (N.D. Ill. 1992)[(Norgle, J.)].  Given the international nature of the insurance underwriting transaction, the parties' forum selection and choice of law provisions contained in the agreements should be given effect.

Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958.  Magistrate Judge Martinez similarly held that, "[t]o invalidate a forum selection provision for reasons of inconvenience, however, a party must show that enforcement of the provision would cause an inconvenience 'so serious as to foreclose a remedy.'"  Mann v. Auto. Prot. Corp., 777 F. Supp. 2d at 1241 (quoting Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

       **3.**      **Permissive and Mandatory Forum Selection Clauses.**

      "The difference between a mandatory and permissive forum selection clause is that '[m]andatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum.'"  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d 921, 926 (10th Cir. 2005)(quoting Excell, Inc. v. Sterling Boiler & Mech., Inc., 106 F.3d at 321).  "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere."  Am. Soda, LLP v. U.S. Filter Wastewater Grp., Inc., 428 F.3d at 926-27 (citing Excell, Inc. v. Sterling Boiler Mech., Inc., 106 F.3d at 321).  In K & V Scientific Co. v. BMW, the Tenth Circuit adopts the majority rule for enforcing forum selection clauses.  See 314 F.3d at 500.  Specifically, it concludes that, when venue is specified, such as when the parties designate a particular county or tribunal, and mandatory or obligatory language accompanies the designation, courts will enforce a forum selection clause as mandatory. See 314 F.3d at 499.

      In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit held that the forum selection clause was mandatory and precluded removal of the case to federal court. See 963 F.2d at 1343.  In that case, the defendant appealed an order remanding the breach-of-contract action to a Kansas state court.  See 963 F.2d at 1343.  The federal district court concluded that an enforceable forum

selection clause in the agreement required the remand.  See 963 F.2d at 1343.  The clause in the

Milk 'N' More, Inc. v. Beavert agreement provides: "The parties herein have mutually agreed that

said lease and the purchase option agreement contained herein, where applicable, shall be governed

by the laws of the State of Kansas and the parties further agree that venue shall be proper under

this agreement in Johnson County, Kansas."  963 F.2d at 1343.  The federal district court granted

the motion to remand on the ground that the contractual agreement contains an enforceable forum

selection clause, relying on the principle that forum selection clauses are "prima facie valid and

should be enforced" unless shown to be unreasonable.  963 F.2d at 1344 (quoting M/S Bremen v.

Zapata Off-Shore Co., 407 U.S. at 10).  On appeal, the defendant contended that the federal district

judge erred in construing the clause as a mandatory agreement between the parties to resolve any

dispute under the contract exclusively in the state court in Johnson County, Kansas; he said instead

that the court should have construed the clause as merely a permissive designation of venue.  See

Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1344.  The defendant contended that the district court

erroneously construed the contract language as an agreement making Johnson County, Kansas, the

exclusive forum in which the parties could resolve disputes that arose under the agreement.  See

963 F.2d at 1345.  The Tenth Circuit affirmed, stating that the clause's dispositive portion provided

that "venue shall be proper under this agreement in Johnson County, Kansas." 963 F.2d at 1345-46.

The Tenth Circuit held: "We are persuaded that the district judge made the proper interpretation

and correctly enforced the clause." 963 F.2d at 1346.

        The Tenth Circuit continues that a waiver of one's statutory right to be in federal court

must be "'clear and unequivocal.'"  963 F.2d at 1346 (quoting Regis Assocs. v. Rank Hotels,

894 F.2d 193, 195 (6th Cir. 1990)).  The Tenth Circuit acknowledges that, if there is ambiguity in

the clause, the court should construe it against the drafter.  See Milk 'N' More, Inc. v. Beavert,

963 F.2d at 1346.  Nevertheless, the Tenth Circuit says that "[s]uch clauses are prima facie valid

and should be enforced unless enforcement is shown by the resisting party to be unreasonable

under the circumstances."  963 F.2d at 1346.  The Tenth Circuit states that the provision that

"venue shall be proper under this agreement in Johnson County, Kansas" is "reasonably clear and

the wording strongly points to the state court of that county."[11]  963 F.2d at 1346.  The Tenth

---

[11]The Court also has reasoned that an agreement which specifies only a "[c]ounty and not
to a specific judicial district, venue lies only in state court." Juaire v. T-Mobile West, LLC, 2013
WL 6504326, at *25.  In that case, the Court interpreted a provision that in part stated "[v]enue in
any action brought with respect to this Agreement shall be in King County, Washington, and each
party consents to the jurisdiction of the courts sitting therein." Juaire v. T-Mobile West, LLC,
2013 WL 6504326, at *1.  In that case, the Court determined that venue was mandatory in State
court, and denied the defendant's motion to transfer venue and, because it could not transfer the
case to more appropriate federal venue, dismissed the case without prejudice.  See Juaire v. T-
Mobile West, LLC, 2013 WL 6504326, at *25.  The Court in Juaire v. T-Mobile West, LLC cited
to Excell, Inc. v. Sterling Boiler & Mech., Inc. for the proposition that,

> [f]or federal court purposes, venue is not stated in terms of "counties." Rather, it is
> stated in terms of "judicial districts." See 28 U.S.C. § 1391. Because the language
> of the clause refers only to a specific county and not to a specific judicial district,
> we conclude venue is intended to lie only in state district court.

Excell, Inc. v. Sterling Boiler & Mech., Inc.,106 F.3d at 321.  See Juaire v. T-Mobile West, LLC,
2013 WL 6504326, at *24.  The Court noted in a footnote that:

> This reasoning explains an anomaly the authors of Federal Practice and
> Procedure notice. Professors Wright, Miller, and Cooper cite Excell, Inc. v. Sterling
> Boiler & Mech., Inc. as an example of what they believe is a "common error[:]
> suggesti[ng] that there is still a dispute as to whether the enforcement of forum
> selection clauses in diversity cases presents a question of federal law or state law
> under the Erie doctrine." 14D C. Wright, A. Miller & E. Cooper, Federal Practice
> and Procedure: Jurisdiction § 3803 .1, at 106 & n.65.  The authors continue:

>> The Supreme Court in Stewart held that, when a Section
>> 1404(a) analysis is possible, forum selection clause enforceability is
>> a procedural matter wholly subject to federal law.  Nonetheless,
>> some courts still appear to conclude that forum selection clauses
>> create substantive rights properly governed by state law.  Most
>> courts, however, correctly recognize that it is a matter of federal law.

Circuit says the use of the word "shall" generally indicates a mandatory intent unless a convincing argument to the contrary is made. 963 F.2d at 1346. In Milk 'N' More, Inc. v. Beavert, the Tenth Circuit cites with approval Intermountain Sys., Inc. v. Edsall Constr. Co., 575 F. Supp. 1195, 1198 (D. Colo. 1983)(Kane, J.), stating that the case is particularly persuasive, because it holds enforceable a similar clause: "It is agreed for purposes of this agreement, venue shall be in Adams County, Colorado." Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346. In K & V Scientific Co. v. BMW, the parties entered into a new agreement which, unlike their earlier agreement, contains a jurisdictional and choice-of-law provision, stating: "Jurisdiction for all and any disputes arising out of or in connection with this agreement is Munich. All and any disputes arising out of or in connection with this agreement are subject to the laws of the Federal Republic of Germany." 314 F.3d at 496. The plaintiff filed suit, asserting various contract, tort, and statutory causes of action. See 314 F.3d at 497. The defendant removed the case to federal court and moved to dismiss under rules 12(b)(2) and 12(b)(3) for lack of personal jurisdiction and improper venue. See 314 F.3d at 497; Fed. R. Civ. P. 12(b)(2)-(3). The district court granted the defendant's motion to dismiss for improper venue. See 314 F.3d at 497. The district judge concluded that the forum selection clause

---

14D C. Wright, A. Miller & E. Cooper, supra 3803.1, at 106–108 (footnotes omitted). The trouble with citing Excell, Inc. v. Sterling Boiler & Mech., Inc., as an example of this flaw is that, because the Tenth Circuit held that the forum selection clause placed venue in state court, a Section 1404(a) analysis was unavailable. In a subsequent supplement, the authors have acknowledged the division among the federal courts of appeals on this issue, and have cited Excell, Inc. v. Sterling Boiler & Mech., Inc. as explicating the Tenth Circuit's position that, "because for federal courts venue is stated in terms of 'judicial districts,' the use of the terminology of a specific county indicates that venue was intended to lie only in state courts." 14D C. Wright, A. Miller & E. Cooper, supra 3803.1, at 9 & n.91 .6 (Supp. 2013).

Juaire v. T-Mobile West, LLC, 2013 WL 6504326, at *25 n.8 (alterations in original).

in the second confidentiality agreement is "unambiguous and enforceable," and demonstrates "[t]he parties' intent to locate jurisdiction for this action solely in the courts of Munich." 314 F.3d at 497. On appeal, the plaintiff argued that the clause's language contains no reference to venue, contains no language designating the courts in Munich as exclusive, and contains no language indicating that suit elsewhere is impermissible. See 314 F.3d at 497. The Tenth Circuit made the distinction between a venue provision which fixes venue in a certain location -- a mandatory clause -- versus one which merely grants jurisdiction to a certain place -- a permissive clause. See 314 F.3d at 498. The Tenth Circuit set forth an analysis for determining whether forum selection clauses within a contract are mandatory or permissive:

> This court and others have "frequently classified" forum selection clauses "as either mandatory or permissive." *Excell*, [*Inc. v. Sterling Boiler Mech., Inc.*,] 106 F.3d at 321. "Mandatory forum selection clauses contain clear language showing that jurisdiction is appropriate only in the designated forum." *Id.* (internal quotations omitted). "In contrast, permissive forum selection clauses authorize jurisdiction in a designated forum, but do not prohibit litigation elsewhere." *Id.* (internal quotations omitted).

K & V Sci. Co. v. BMW, 314 F.3d at 498. The Tenth Circuit cites Milk 'N' More, Inc. v. Beavert, noting that, there, it concludes that a forum selection clause stating that "venue shall be proper under this agreement in Johnson County, Kansas" is mandatory. K & V Sci. Co. v. BMW, 314 F.3d at 498.

The Tenth Circuit states that, "generally speaking," the Courts of Appeals are in "agreement" that the following formula is to be used in determining whether the selection clause is mandatory or permissive: "[W]here venue is specified [in a forum selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." K & V Sci. Co. v. BMW,

314 F.3d at 499 (alterations in original)(quoting <u>Paper Express, Ltd. v. Pfankuch Maschinen</u>

<u>GmbH</u>, 972 F.2d 753, 757 (7th Cir. 1992)).  The Tenth Circuit analyzes language from six forum

selection clauses considered permissive, including four different forum selection clauses wherein

the provision used the word "shall" together with the name of a court.  <u>K & V Sci. Co. v. BMW</u>,

314 F.3d at 499.  The <u>K & V Scientific Co. v. BMW</u> formula for the four clauses using the word

"shall" and considered permissive are:

> \*       "Any dispute arising between the parties hereunder shall come within the jurisdiction of the competent Greek Courts, specifically of the Thessaloniki Courts." *John Boutari* [*& Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs. Inc.*], 22 F.3d [51,] 52 [(2d Cir. 1994)].
>
> . . . .
>
> \*       "The courts of California, County of Orange, shall have jurisdiction over the parties in any action at law relating to the subject matter or the interpretation of this contract." *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 76 (9th Cir. 1987).
>
> . . . .
>
> \*       "This agreement shall be construed and enforceable according to the law of the State of New York and the parties submit to the jurisdiction of the courts of New York." *Keaty* [*v. Freeport Indon., Inc.*], 503 F.2d [955,] 956 [(5th Cir. 1974)] (concluding phrase was ambiguous and, when construed against drafter, was permissive).
>
> \*       "This agreement shall be governed by and construed in accordance with the laws of the Federal Republic of Germany. \* \* \* Place of jurisdiction shall be Dresden." *Hull Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 926 (N.D. Ill. 1999).

<u>K & V Sci. Co. v. BMW</u>, 314 F.3d at 499.  The other two examples of permissive clauses are:

> \*       "The laws and courts of Zurich are applicable." *Caldas & Sons, Inc. v. Willingham*, 17 F.3d 123, 127 (5th Cir. 1994).
>
> . . . .

> \*       "Place of jurisdiction is Sao Paulo/Brazil." *Citro Florida*[*, Inc. v. Citrovale, S.A.*], 760 F.2d 1231, 1231 (11th Cir. 1985)(concluding phrase was ambiguous and, when construed against drafter, was permissive).

K & V Sci. Co. v. BMW, 314 F.3d at 499.  The Tenth Circuit in K & V Scientific Co. v. BMW

also notes that courts have held the following clauses to be mandatory:

> \*       "[P]lace of jurisdiction . . . is the registered office of the trustee [in Germany], to the extent permissible under the law." *Frietsch v. Refco, Inc.*, 56 F.3d 825, 827 (7th Cir. 1995); *see id.* at 829 (concluding that the phrase "to the extent permissible under the law" "would have no function if the [forum selection] clause were not mandatory -- if, in other words, a party could sue anywhere he wanted").

> \*       "In all disputes arising out of the contractual relationship, the action shall be filed in the court which has jurisdiction for the principal place of business of the supplier . . . . The supplier also has the right to commence an action against the purchaser at the purchaser's principal place of business." *Paper Express*[*, Ltd. v. Pfankuch Maschinen GmbH*], 972 F.2d at 755; *id.* at 756 (concluding the last sentence "would be appropriate and meaningful only if the clause were in fact mandatory").

> \*       "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia.  Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia." *Docksider*[*, Ltd. v. Sea Tech., Ltd.*], 875 F.2d [762,] 763 (9th Cir. 1989).

K & V Sci. Co. v. BMW, 314 F.3d at 499-500 (footnote omitted)(ellipsis, and first and second

alterations, in K & V Sci. Co. v. BMW).

Using the majority rule, the Tenth Circuit had little trouble concluding that the forum

selection clause at issue in K & V Scientific Co. v. BMW is permissive.  See 314 F.3d at 500.  The

clause refers only to jurisdiction and makes the reference in non-exclusive terms.  See 314 F.3d at

500.  A clause is mandatory, in accordance with K & V Scientific Co. v. BMW, only when the

venue is specific with mandatory language.  See 314 F.3d at 500.  Mandatory language is venue

coupled with such terms as "exclusive," "sole," or "only."  K & V Scientific Co. v. BMW, 314 F.3d

at 500.  If the paragraph is ambiguous -- capable of being construed as either permissive or

mandatory -- the paragraph is permissive.  The Tenth Circuit in K & V Scientific Co. v. BMW

states:

> Even if the clause were deemed to be ambiguous (i.e., capable of being construed as either permissive or mandatory), the rule in this circuit and others is that the clause must be construed against the drafter, in this case defendant.  *See Milk 'N' More*, 963 F.2d at 1346 (holding "if there is any ambiguity in the clause [the court] should construe it against the drafter").  Accordingly, the clause would be deemed permissive.

K & V Sci. Co. v. BMW, 314 F.3d at 500-01.

> Although the Tenth Circuit has said the use of the word "shall" generally indicates a mandatory intent, unless a convincing argument to the contrary is made, Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346, "shall" does not automatically render a forum-selection clause mandatory.  Courts should resolve any ambiguity whether a forum-selection clause is mandatory or permissive by construing the language against the drafter.  See K & V Sci. Co. v. BMW (citing Milk 'N' More, Inc. v. Beavert, 963 F.2d at 1346).

Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1210.

In an unpublished decision that follows K & V Scientific Co. v. BMW, the Tenth Circuit

clarifies that the K & V Scientific Co. v. BMW decision addresses the issue

> whether a recognition-of-jurisdiction provision implies an exclusive selection of venue.  Use of mandatory language like "shall" in a clause dealing directly with venue carries stronger implications regarding the intent to designate an exclusive forum.  *See Milk 'N' More*, 963 F.2d at 1346 (holding clause stating that "venue shall be proper . . . in" effected an exclusive designation of forum).  When, as here, the relation of such language to the question of venue is at most derivative, through a jurisdictional provision, decisions such as "*Milk 'N' More* . . . are of little assistance in resolving the . . . dispute."  *K & V Scientific*, 314 F.3d at 498-99.

King v. PA Consulting Grp., Inc., 78 F. App'x 645, 648 n.2 (10th Cir. 2003)

(unpublished)(emphasis in original).  The Tenth Circuit, in American Soda, LLP v. U.S. Filter

Wastewater Group, Inc., also has recognized that a party to a contract can waive venue in federal

court in a forum selection clause, thus requiring remand to State court:

The parties not only consented to the jurisdiction of the Colorado state courts, they went a step further by designating the state courts or arbitration as "the exclusive forum for the resolution of any disputes related to or arising out of [the contract]." We conclude that by consenting to state court jurisdiction and selecting the state courts as the "exclusive forum," the parties indicated their intent to make venue exclusive in state court with respect to any disputes not resolved in arbitration. Because the forum selection clause at issue is mandatory, U.S. Filter unequivocally waived its right to remove this lawsuit to federal court.

428 F.3d at 927.

The Court has concluded that a forum selection clause is mandatory when the clause states that a certain district or county is "the exclusive jurisdiction" for litigation.  Montoya v. Fin. Fed. Credit, Inc., 872 F. Supp. 2d at 1276 ("The word *exclusive* in relation to Harris County as a venue indicates the parties' intent that Harris County be the exclusive venue for any suits.")(emphasis in original).  The Court also has determined that a forum selection clause with "shall" language was mandatory. See Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211 (analyzing the following forum selection clause: "'The parties agree that *all actions and proceedings* arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby *shall be brought in the United States District Court in the County of New York* . . . .'" (quoting Broker-Dealer Agreement at 14)(emphasis in Presbyterian Healthcare Servs. v. Goldman, Sachs & Co.)); Juaire v. T-Mobile West, LLC, 2013 WL 6504326, at *1, *23 (concluding that, where a forum selection clause did not include the words "exclusive," "sole," "or" only, but did include a provision that "[t]he laws of the State of Washington shall govern the construction and interpretation of this Agreement", the forum selection clause was mandatory).  Although acknowledging the Tenth Circuit's rule that "shall" language does not automatically make a forum selection clause mandatory, the Court determines that the forum selection clause in that case strongly "parallels [the] structure of the clause in Docksider, Ltd v. Sea Technology, Ltd." and so

concludes that the clause was mandatory.  Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211 (quoting Riley v. Kingsley Underwriting Agencies, Ltd., 969 F.2d at 958).

## NEW MEXICO LAW REGARDING THE IMPLIED COVENANT OF GOOD FAITH

"Whether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. 57, 60, 801 P.2d 639, 642.  "'Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits of the agreement.'"  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. at 60, 801 P.2d at 642 (quoting Romero v. Mervyn's, 1989-NMSC-081, ¶ 32, 109 N.M. 249, 257, 784 P.2d 992, 1000).  "'The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party.'"  Sanders v. FedEx Ground Package Sys., 2008-NMSC-040, ¶ 7, 114 N.M. 449, 452, 188 P.2d 1200, 1203 (quoting Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 1993-NMSC-039, ¶ 64, 115 N.M. 690, 706, 858 P.2d 66, 82).  The Supreme Court of New Mexico has expressed reluctance, however, to use the covenant of good faith and fair dealing "under circumstances where . . . it may be argued that from the covenant there is to be implied in fact a term or condition necessary to effect the purpose of a contract."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. at 60, 801 P.2d at 642.

> "Generally, in the absence of an express provision on the subject, a contract contains an implied covenant of good faith and fair dealing between the parties. Under the implied covenant of good faith and fair dealing, courts can award damages against a party to a contract whose actions undercut another party's rights or benefits under the contract.  Our Supreme Court has nevertheless refused to apply this implied covenant to override an express at-will termination provision in an integrated, written contract."

Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co, 407 F.3d 1091, 1114-15 (10th Cir. 2005)(quoting

Kropinak v. ARA Health Servs., Inc., 2001-NMCA-081, ¶¶ 3-4, 131 N.M. 128, 130, 33 P.3d 679,

681)(secondary citations omitted).

      New Mexico has recognized that a cause of action for breach of the covenant of good faith

and fair dealing sounds in contract.   See Bourgeous v. Horizon Healthcare Corp.,

1994-NMSC-038, ¶ 17, 117 N.M. 434, 439, 872 P.2d 852, 857.   The Supreme Court of New

Mexico also has explained that tort recovery for breach of the covenant of good faith and fair

dealing is permissible only where a special relationship exists, such as between an insurer and its

insured.  See Bourgeous v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 117 N.M. at 439,

872 P.2d at 857.  The "relationship of insurer and insured is inherently unbalanced; the adhesive

nature of insurance contracts places the insurer in a superior bargaining position."  Bourgeous v.

Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857 (quoting

Egan v. Mutual of Omaha Ins. Co., 24 Cal. 3d 809, 820 620 P.3d 141, 146 (Cal. 1979)).

      The Supreme Court of New Mexico has indicated that "the duty to not act in bad faith or

deal unfairly," which an implied covenant of good faith and fear dealing within a contract imposes,

"becomes part of the contract and the remedy for its breach is on the contract itself."  Bourgeous

v. Horizon Healthcare Corp., 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857 (discussing

an Arizona case and distinguishing this measure of damages from tort damages that are available

for breach of this covenant in the insurance context).  In the insurance context, however, a plaintiff

can recover tort damages for breach of this implied covenant.  See Bourgeous v. Horizon

Healthcare Corp., 1994-NMSC-038, ¶ 17, 117 N.M. at 439, 872 P.2d at 857.

The Supreme Court of New Mexico notes that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." Melnick v. State Farm Mut. Auto. Ins. Co., 1988-NMSC-012, ¶ 13, 106 N.M. 726, 730, 749 P.2d 1105, 1109. This limitation is because "there *is* no contract of employment upon which the law can impose the stated duty to exercise good faith and fair dealing." Sanchez v. The New Mexican, 1987-NMSC-059, ¶ 13, 106 N.M. 76, 78, 738 P.2d 1321, 1324 (emphasis in original). See Lee v. Univ. of N.M., 449 F. Supp. 3d 1071, 1151 (D.N.M. 2020) (Browning, J.)(dismissing a breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claim where plaintiff did not allege a contract between himself and the alleged breaching party, because "[w]ithout a contract, there is no cause of action for the" claim).

## LAW REGARDING NEW MEXICO'S UNCONSCIONABILITY DEFENSE TO CONTRACT ENFORCEMENT

In New Mexico, "unconscionability is an affirmative defense to contract enforcement . . . ." Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 3, 304 P.3d 409, 412. Consequently, "[c]ourts may render a contract or portions of a contract unenforceable under the equitable doctrine of unconscionability when the terms are 'unreasonably favorable to one party while precluding a meaningful choice of the other party.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 6, 385 P.3d 619, 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 146 N.M. at 262, 208 P.3d at 907).

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

N.M.S.A. § 55-2-302(1).  The party asserting an unconscionability defense "bears the burden of proving that a contract or a portion of a contract should be voided as unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶¶ 24, 39, 48, 304 P.3d at 416-21).  "The burden of proving unconscionability refers only to 'the burden of persuasion, i.e., the burden to persuade the factfinder' and not 'the burden of production, i.e., the burden to produce evidence.'"  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (quoting Strausberg v. Laurel Healthcare Providers, LLC, 2013-NMSC-032, ¶ 24, 304 P.3d at 416).

"A contract can be procedurally or substantively unconscionable."  Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 7, 385 P.3d at 621 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 21, 146 N.M. at 262, 208 P.3d at 907).  See Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 144 N.M. 464, 470, 188 P.3d 1215, 1221 ("The classic articulation of unconscionability is that it is comprised of two prongs: substantive unconscionability and procedural unconscionability.")(citing 7 Joseph M. Perillo, Corbin on Contracts § 29.4, at 388 (2002)).  "Substantive unconscionability relates to the content of the contract terms and whether they are illegal, contrary to public policy, or grossly unfair."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 144 N.M. at 470, 188 P.3d at 1221 (citing Padilla v. State Farm Mut. Auto. Ins. Co., 2003-NMSC-011, ¶ 14, 133 N.M. 661, 667, 68 P.3d 901, 907; Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. 506, 510, 709 P.2d 675, 679, disapproved of on other grounds by Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 146 N.M. at 264, 208 P.3d at 909).  "Procedural unconscionability," by contrast, "is determined by analyzing the circumstances surrounding the contract's formation, such as whether it was an adhesive contract and the relative bargaining power of the parties."  Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 144 N.M.

Case 1:21-cv-00263-JB-SCY   Document 46   Filed 01/31/23   Page 61 of 202

at 470, 188 P.3d at 1221 (citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679).

"'The weight given to procedural and substantive considerations varies with the circumstances of each case.'" Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 20, 144 N.M. at 470, 188 P.3d at 1221 (quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679). "While there is a greater likelihood of a contract's being invalidated for unconscionability if there is a combination of both procedural and substantive unconscionability, there is no absolute requirement in our law that both must be present to the same degree or that they both be present at all." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 146 N.M. at 263, 208 P.3d at 908 (citing Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 22, 144 N.M. at 470, 188 P.3d at 1221 (invalidating an arbitration clause without a finding of procedural unconscionability where "there has been such an overwhelming showing of substantive unconscionability"); Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679; 7 Joseph M. Perillo, Corbin on Contracts § 29.1, at 377 (2002)(observing that there is "no basis in the text" of Article 2 of the Uniform Commercial Code for concluding that the defense of unconscionability cannot be invoked unless the contract or clause is both procedurally and substantively unconscionable)). Moreover, "[p]rocedural and substantive unconscionability often have an inverse relationship. The more substantively oppressive a contract term, the less procedural unconscionability may be required for a court to conclude that the offending term is unenforceable." Cordova v. World Fin. Corp. of NM, 2009-NMSC-021, ¶ 24, 146 N.M. at 263, 208 P.3d at 908 (citing Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1106 (9th Cir. 2003); 1 E. Allan Farnsworth, Farnsworth on Contracts § 4.28, at 585 (3d ed. 2004)("A

- 61 -

court will weigh all elements of both substantive and procedural unconscionability and may conclude that the contract is unconscionable because of the overall imbalance.")).

       **1.**    **Procedural Unconscionability.**

"Procedural unconscionability may be found where there was inequality in the contract formation."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d 658, 669 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 146 N.M. at 262-63, 208 P.3d at 907-08).  A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent."  Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 103 N.M. at 510, 709 P.2d at 679.  See Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 99 N.M. 660, 668, 662 P.2d 661, 669 (concluding that a contract may be unconscionable if there is "'an absence of meaningful choice on the part of one of the parties'")(quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965)(Wright, J.), cert. denied 99 N.M. 644, 662 P.2d 645 (1983)(table).[12]  Whether a party has meaningful choice "is determined by examining the circumstances surrounding the

---

[12]The Supreme Court of New Mexico has cited favorably Bowlin's, Inc. v. Ramsey Oil Co., Inc. for a number of propositions, including that: (i) determining a contract's unconscionability is a matter of law and reviewed de novo, see Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 19, 144 N.M. at 470, 188 P.3d 1215, 1221; (ii) when terms that are unreasonably favorable to one party may make a contract unconscionable, see Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 23, 103 N.M. at 511, 709 P.2d at 680; (iii) lack of meaningful choice requires an examination of the circumstances surrounding contract formation, see Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679; and (iv) "[b]usinessmen and middle-class purchasers are not ordinarily victims of the kinds of gross advantage-taking that constitute unconscionability," Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 21, 103 N.M. at 511, 709 P.2d at 680.  The Court has not identified any negative treatment by the Supreme Court of New Mexico or by other New Mexico courts regarding Bowlin's, Inc. v. Ramsey Oil Co., Inc.'s propositions.  Given the Supreme Court of New Mexico's willingness to cite favorably Bowlin's, Inc. v. Ramsey Oil Co., Inc., the Court predicts that, were the Supreme Court of New Mexico to consider squarely these same issues, the Supreme Court of New Mexico would reach the same results as the Court of Appeals of New Mexico and the Court have reached.

contract formation, including the particular party's ability to understand the terms of the contract and the relative bargaining power of the parties."  Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679 (citing Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, 99 N.M. 660, 662 P.2d 661; In re Friedman, 64 A.D.2d 70, 85, 407 N.Y.S.2d 999, 1008 (N.Y. App. Div. 1978); Williams v. Walker-Thomas, 350 F.2d at 445; and Bennett v. Behring Corp., 466 F. Supp. 689, 696 (S.D. Fla. 1979)(Gonzalez, J.), appeal dismissed, 629 F.2d 393 (5th Cir. 1980)). Consequently, "[a]nalyzing procedural unconscionability requires the court to look beyond the four corners of the contract and examine factors 'including the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other.'"  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 27, 146 N.M. at 262-63, 208 P.3d at 907-08).  See City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d 1132, 1154 (D.N.M. 2009)(Browning, J)("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors, including the use of high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties.")(citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679); Evangelical Luther Good Samaritan Soc'y v. Moreno, 277 F. Supp. at 1235 (in concluding that an arbitration provision was not procedurally unconscionable, considering whether that provision was "too vague for [defendant] to have made an informed decision about accepting or rejecting" the agreement); Laurich v. Red Lobster Restaurants, LLC., 295 F. Supp. 3d 1186, 1218 (D.N.M. 2017)(Browning, J.)(in concluding that an arbitration provision was not procedurally unconscionable, concluding that the employee alleging unconscionability was familiar generally with an arbitration clause' implications,

"because she had agreed to and worked under a similar arbitration agreement for six years before [her employer] asked her to enter into a new one").

"When assessing procedural unconscionability, courts should consider whether the contract is one of adhesion."  Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 150 N.M. 398, 412, 259 P.3d 803, 817.  An adhesion contract is a standardized contract that a transacting party with superior bargaining strength offers to a "weaker party on a take-it-or-leave-it basis, without opportunity for bargaining."  Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 150 N.M. at 412, 259 P.3d at 817 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 146 N.M. at 265, 208 P.3d at 910).  Specifically, the Supreme Court of New Mexico explains that a court may identify an adhesion contract only where a party establishes the following three elements: (i) "the agreement must occur in the form of a standardized contract prepared or adopted by one party for the acceptance of the other"; (ii) "the party proffering the standardized contract must enjoy a superior bargaining position because the weaker party virtually cannot avoid business under the particular contract terms"; and (iii) the contract must be offered to the weaker party on a take-it-or-leave-it basis, without opportunity for bargaining."  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 146 N.M. at 265, 208 P.3d at 910.  "Adhesion contracts generally warrant heightened judicial scrutiny because the drafting party is in a superior bargaining position."  Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 150 N.M. at 412, 259 P.3d at 817 (citing Wis. Auto Title Loans, Inc. v. Jones, 714 N.W.2d 155, 170, 290 Wis. 2d 514, 543-44 (Wis. 2006)).  "Although not all adhesion contracts are unconscionable, an adhesion contract is procedurally unconscionable and unenforceable 'when the terms are patently unfair to the weaker party.'"  Rivera v. Am. Gen. Fin.

Servs., Inc., 2011-NMSC-033, ¶ 44, 150 N.M. at 412, 259 P.3d at 817 (quoting Cordova v. World

Fin. Corp. of N.M., 2009-NMSC-021, ¶ 33, 146 N.M. at 265, 208 P.3d at 910).

      For example, in State ex rel. King v. B & B Investment Group, Inc., the Supreme Court of

New Mexico decided whether loan contracts offered by certain payday lenders were

unconscionable.  2014-NMSC-024, ¶ 27, 329 P.3d at 669-70.  The Supreme Court of New Mexico

concluded that substantial evidence supported "the finding of procedural unconscionability as

understood in common law."  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27,

329 P.3d at 669-70  The Supreme Court of New Mexico predicates its holding that the loan

contracts at issue are procedurally unconscionable on facts regarding contract formation, including

that

> the relative bargaining strength and sophistication of the parties is unequal.
> Moreover, borrowers are presented with Hobson's choice[13]: either accept the
> quadruple-digit interest rates, or walk away from the loan.  The substantive terms
> are preprinted on a standard form, which is entirely nonnegotiable.  The interest
> rates are set by drop-down menus in a computer program that precludes any
> modification of the offered rate.  Employees are forbidden from manually
> overriding the computer to make fee adjustments without written permission from
> the companies' owners: manual overrides "will be considered in violation of
> company policy and could result with . . . criminal charges brought against the
> employee and or termination."

State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (no citation

given for quotation)(ellipsis in original).  The Supreme Court of New Mexico further concludes

that, on these facts, the payday loan contracts at issue are contracts of adhesion, because the

"contracts are prepared entirely by Defendants, who have superior bargaining power, and are

---

      [13]A Hobson's choice is "an apparently free choice when there is no real alternative . . . [or]
the necessity of accepting one of two or more equally objectionable alternatives."  Hobson's
choice,   Merriam-Webster,   https://www.merriam-webster.com/dictionary/Hobson%27s%20
choice (last visited December 5, 2022).

offered to the weaker party on a take-it-or-leave-it basis." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669.  The Supreme Court of New Mexico adds that, "although they will not be found unconscionable in every case, an adhesion contract is procedurally unconscionable and unenforceable when the terms are patently unfair to the weaker party." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 44, 150 N.M. at 412, 259 P.3d at 817).

By contrast, in Bowlin's, Inc. v. Ramsey Oil Co., Inc., the Court of Appeals of New Mexico considers whether a clause requiring a retail gas company to notify its supplier of any delivery shortages within two days of taking delivery was unconscionable.  See 1983-NMCA-038, ¶ 23, 99 N.M. at 668, 662 P.2d at 669.  The Court of Appeals of New Mexico addresses the party's understanding, the contract's sophistication, and the possibility of coercion, and concludes that, because the retailer fully understood the contract's term, and because "the contract was entered into between 'experienced and sophisticated business concerns,'" there is no reason to find unconscionability.  Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 23, 99 N.M. at 668, 662 P.2d at 669 (citing lower court's Conclusion 17).  The Court of Appeals of New Mexico also notes that unconscionability is more likely to sound as a defense where an individual consumer is concerned, explaining that "'[t]he courts have not generally been receptive to pleas of unconscionability by one merchant against another.'"  Bowlin's, Inc. v. Ramsey Oil Co., Inc., 1983-NMCA-038, ¶ 21, 99 N.M. at 668, 662 P.2d at 669 (citing J. White & R. Summers, Uniform Commercial Code 149 (2d ed. 1980)).  See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, No. CIV 05-1331 JB/LCS, 2006 WL 4061187, at *9-10 (D.N.M. Sept. 12, 2006)(Browning, J.).

In <u>La Frontera Ctr., Inc. v. United Behavioral Health, Inc.</u>, 268 F. Supp. 3d 1167 (D.N.M. 2017)(Browning, J.), the Court considered whether an arbitration agreement was procedurally unconscionable where the plaintiff contented that its only two choices were "either [to] would operate in New Mexico pursuant to a deal in which La Frontera's funding was channeled from HSD through United Health pursuant to the terms of a Participating Provider Agreement with United Health or . . . not [to] be paid to operate in New Mexico." 268 F. Supp. 3d at 1220. The Court concluded that this "argument is insufficient to demonstrate that the Participating Provider Agreement is procedurally unconscionable -- i.e., that the inequality between United Health and La Frontera with respect to contract formation was so gross that La Frontera effectively had no choice but to execute the agreement." 268 F. Supp. 3d at 1221 (citing <u>Guthmann v. La Vida Llena</u>, 1985-NMSC-106, ¶ 21, 103 N.M. at 511, 709 P.2d at 680. It reached this conclusion, because

> La Frontera is a sophisticated entity with bargaining power that made a business decision to operate in New Mexico. La Frontera effectuated its choice to operate in New Mexico by assenting to an arrangement with United Health that HSD's payment for La Frontera's services would flow from HSD through United Health. La Frontera's agreement with United Health emphasized that it contained a mandatory arbitration clause.

268 F. Supp. 3d at 1221.

## 2.   <u>Substantive Unconscionability</u>.

Substantive unconscionability requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns' to determine 'the legality and fairness of the contract terms themselves.'" <u>Dalton v. Santander Consumer USA, Inc.</u>, 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quoting <u>Cordova v. World Fin. Corp. of N.M.</u>, 2009-NMSC-021, ¶ 22, 146 N.M. at 262, 208 P.3d at 907). Accordingly, when examining a contract for substantive

unconscionability, courts must "examine the terms on the face of the contract and to consider the practical consequences of those terms."   Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621-22 (citing State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 32, 329 P.3d at 670 ("[S]ubstantive unconscionability can be found by examining the contract terms on their face.")).   "Thus, the party bearing the burden of proving substantive unconscionability need not make any particular evidentiary showing and can instead persuade the factfinder that the terms of a contract are substantively unconscionable by analyzing the contract on its face."   Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 622.

"When terms are unreasonably favorable to one party a contract may be held to be substantively unconscionable." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 23, 103 N.M. at 511, 709 P.2d at 680.[14]  The Supreme Court of New Mexico notes in Guthmann v. La Vida Llena:

---

[14]New Mexico courts previously have determined that "the threshold for such a holding is very high, as the 'terms must be such as, "no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other."'" Monette v. Tinsley, 1999-NMCA-040, ¶ 19, 126 N.M. 748, 752, 975 P.2d 361, 365 (quoting Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 23, 103 N.M. at 511, 709 P.2d at 680 (quoting In re Friedman, 64 A.D.2d at 84))(ellipsis added in Guthmann v. La Vida Llena). The Supreme Court of New Mexico, however, has "specifically disapprove[d]" of the standard that identifies as unconscionable a contract that "'only someone out of his or her senses, or delusional, would enter into.'" Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 146 N.M. at 264, 208 P.3d at 909 (no citation given for quotation). Specifically, the Supreme Court of New Mexico has stated:

> While this dramatically expressive characterization concededly has made it into New Mexico case law, such as *Guthmann* [*v. La Vida Llena*], 103 N.M. at 511, 709 P.2d 675 at 680, if literally applied it would be inconsistent with all the New Mexico cases that have struck down contracts for unconscionability, as well as most of those from other jurisdictions. Our law has never really required that a person seeking relief from an unconscionable contract must first establish that he or she actually had to have been a madman or a fool to sign it. It is sufficient if the provision is grossly unreasonable and against our public policy under the circumstances. The repetition of this unhelpful terminology from a bygone age

> In determining reasonableness or fairness, the primary concern must be with the terms of the contract considered in light of the circumstances existing when the contract was made. The test is not simple, nor can it be mechanically applied. The terms are to be considered "in the light of the general commercial background and the commercial needs of the particular trade or case." Corbin suggests the test as being whether the terms are "so extreme as to appear unconscionable according to the mores and business practices of the time and place."

1985-NMSC-106, ¶ 23, 103 N.M. at 511, 709 P.2d at 680 (quoting Bowlin's, Inc. v. Ramsey Oil Co., 1983-NMCA-038, ¶ 22, 99 N.M. at 668, 662 P.2d at 669 (quoting Williams v. Walker-Thomas Furniture Co., 350 F.2d at 450)). Further, for a court to hold that a contract is substantively unconscionable, the court must conclude that one or more of the contract's terms was grossly unfair "at the time the contract was formed." Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 24, 103 N.M. at 511, 709 P.2d at 680.

With respect to arbitration agreements specifically, the Supreme Court of New Mexico has held that arbitration agreements are substantively unconscionable and thus unenforceable where the arbitration agreement contains a unilateral carve out that explicitly exempts from mandatory arbitration those judicial remedies that a lender is likely to need, while providing no such exemption for the borrower. See Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶¶ 51-54, 150 N.M. at 413-14, 259 P.3d at 818-19; Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 146 N.M. at 265, 208 P.3d at 910. In Cordova v. World Finance Corporation of New Mexico, for example, the Supreme Court of New Mexico stated that "[c]ontract provisions that unreasonably benefit one party over another are substantively unconscionable." 2009-NMSC-021,

---

only serves to confuse the unconscionability issues without serving any constructive purpose.

Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 146 N.M. at 264-65, 208 P.3d at 909-10. Given the Supreme Court of New Mexico's disapproval of this language, the Court will not rely on it to identify substantive unconscionability.

¶ 25, 146 N.M. at 263, 208 P.3d at 908.  In that case, a loan contract included a purportedly bilateral arbitration clause containing a unilateral carve-out provision that exempted the lender from mandatory arbitration when the lender sought remedies, "including[,] but not limited to, judicial foreclosure or repossession" in the event of a default by the borrower.  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 3, 146 N.M. at 259, 208 P.3d at 904 (internal quotation marks omitted).  The Supreme Court of New Mexico held that the arbitration clause was "grossly unreasonable" and against New Mexico public policy, because the agreement required require the borrower to arbitrate any of the borrower's claims while reserving to the lender "the exclusive option of seeking its preferred remedies through litigation."  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 20, 146 N.M. at 262, 208 P.3d at 907.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was substantively unconscionable.  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 32, 146 N.M. at 265, 208 P.3d at 910.

Next, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico confronted a similar loan contract in which an arbitration agreement required the borrower to arbitrate any claims against the lender while exempting from mandatory arbitration the lender's "self-help or judicial remedies" concerning the property securing the transaction and any claims that the lender might have "[i]n the event of a default." 2011-NMSC-033, ¶ 3, 150 N.M. at 402-03, 259 P.3d at 807-08.  As in Cordova v. World Finance Corp. of New Mexico, 2009-NMSC-021, ¶ 32, 146 N.M. at 265, 208 P.3d at 910, in Rivera v. American General Financial Services, Inc., the Supreme Court of New Mexico again held that an arbitration agreement is substantively unconscionable, because the arbitration clause allowed the lender to "retain[] the right to obtain through the judicial system the only remedies it [is] likely to need," while "forcing [the borrower] to arbitrate any claim she may have." 2011-NMSC-033, ¶ 53, 150 N.M. at 413-14, 259 P.3d at

818-19.  Accordingly, the Supreme Court of New Mexico held that the arbitration agreement was unreasonably one-sided and, therefore, unenforceable qua substantively unconscionable.  Rivera v. American General Financial Services, Inc., 2011-NMSC-033, ¶ 54, 150 N.M. at 413-14, 259 P.3d at 818-19.

By contrast, in Dalton v. Santander Consumer USA, Inc., the Supreme Court of New Mexico held that an arbitration agreement between a lender and a borrower that included a bilateral exception for small claims less than $10,000.00 was not substantively unconscionable, "even if one party is substantively more likely to bring small claims actions . . . ."  2016-NMSC-035, ¶ 21, 385 P.3d at 624.  See 2016-NMSC-035, ¶ 22, 385 P.3d at 625 ("We are hesitant to adopt a holding that might discourage bilateral small claims carve-outs, and thereby curtail the availability of small claims proceedings to New Mexico consumers . . . .").  The Supreme Court of New Mexico stated that "[g]ross unfairness is a bedrock principle of our unconscionability analysis," 2016-NMSC-035, ¶ 21; 385 P.3d at 624, and refused to conclude that an arbitration agreement that exempts, for both parties, claims less than $10,000.00 from mandatory arbitration is either unreasonably one-sided or grossly unfair, see 2016-NMSC-035, ¶¶ 21-25; 385 P.3d at 624-25.  See also Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *10.

### NEW MEXICO LAW REGARDING BREACH-OF-CONTRACT CLAIMS

A contract is a legally enforceable promise that must consist of an offer, an acceptance, consideration, and mutual assent.  See N.M. R. Ann., Civ. UJI 13-801.  A person may breach a contract by failing to perform a contractual obligation when the performance is required, unless that performance is otherwise excused.  See N.M. R. Ann., Civ. UJI 13-822.  Under New Mexico law, "[t]he elements of a breach-of-contract action are the existence of a contract, breach of the

contract, causation, and damages." Abreu v. N.M. Children, Youth and Families Dep't,

797 F. Supp. 2d 1199, 1247 (D.N.M. 2011)(Browning, J.).

> [A] complaint on breach of contract must allege: (1) the existence of a valid
> and binding contract; (2) the plaintiff's compliance with the contract and his
> performance of the obligations under it; (3) a general averment of the performance
> of any condition precedent; and (4) damages suffered as a result of defendant's
> breach.

McCasland v. Prather, 1978-NMCA-098, ¶ 7, 92 N.M. 192, 194, 585 P.2d 336, 338.[15] See Ormrod

v. Hubbard Broadcasting, Inc., 328 F. Supp. 3d 1215, 1230 (D.N.M. 2018)

(Browning, J.)(concluding that plaintiff "did not breach any contract, because no contract exists");

Am. Mech. Solutions, L.L.C. v. Northland Process Piping, Inc., 184 F. Supp. 3d 1030, 1075-76

(D.N.M. 2016)(Browning, J.)(concluding that defendants were entitled to summary judgment,

because plaintiffs had not presented required expert testimony to establish that defendant's alleged

breach caused plaintiff's damages); Kottke Cattle, LLC v. Zia Agricultural Consulting, LLC, No.

CIV 21-1004 JB, 2021 WL 4894197, at *15 (D.N.M. October 20, 2021)(Browning, J.).

Applying these principles in Armijo v. New Mexico Department of Transportation,

No. CIV 08-0336 JB/ACT, 2009 WL 1329192 (D.N.M. April 6, 2009)(Browning, J.), the Court

has concluded that a plaintiff's allegations failed to state a claim for breach of contract. In support

of the breach-of-contract claim, the plaintiff asserted that "the Department would follow state

employment policies and procedure, and that the Department terminated him in breach of those

policies without just cause." 2009 WL 1329192, at *7. The Court notes that the plaintiff did not

---

[15]The Supreme Court of New Mexico has cited positively McCasland v. Prather, quoting
this proposition. See W. Com. Bank v. Gillespie, 1989-NMSC-046, ¶ 8, 108 N.M. 535, 538, 775
P.2d 737, 740. Accordingly, the Court predicts that, were the Supreme Court of New Mexico to
establish affirmatively a breach-of-contract claim's elements, it would reach the same conclusion
as McCasland v. Prather reached.

"indicate what contractual provisions or employment policies the Department breached," and did not say "to what his employment contract entitles him or of what the Department deprived him." 2009 WL 1329192, at *7. The Court concluded that there was "not enough . . . to determine whether, if taken as true, the Complaint's allegations would support claims for breach of contract." 2009 WL 1329192, at *8. On the other hand, the Court previously has determined that a pro se plaintiff sufficiently alleged that his counsel breached a contract for legal representation by alleging that his former counsel promised to represent the plaintiff at forfeiture proceedings, that the plaintiff paid the counsel, and that the counsel failed to represent the plaintiff. See Archuleta v. City of Roswell, 898 F. Supp. 2d 1240, 1257-1259 (D.N.M. 2012)(Browning, J.). The Court previously has concluded that, for a third-party beneficiary to enforce a breach-of-contract claim, the third party must meet the same elements as a material breach, and must show that the third party "receive[d] a benefit from the promisor's performance that the promisee intended for the third party to receive" and that "the contract manifests the intent to grant the third party an independent cause of action to enforce the promise." Shay v. RWC Consulting Grp., No. CIV 13-0140 JB/ACT, 2014 WL 3421068, at *30 (D.N.M. June 30, 2014)(Browning, J.)(citing Callahan v. N.M. Fed'n of Teachers-TVI, 2006-NMSC-010, ¶¶ 19-21, 139 N.M. at 208, 131 P.3d at 58; Restatement (Second) of Contracts § 304 (1981)).

"Additionally, in spite of the general bar on punitive damages for breach-of-contract cases, the Supreme Court of New Mexico has recognized that punitive damages may be recoverable under some circumstances for a breach of contract." Anderson Living Trust v. ConocoPhillips Co., LLC, No. CIV 12-0040 JB/LFG, 2013 WL 3456913, at *42 (D.N.M. June 28, 2013)(Browning, J.). The Supreme Court of New Mexico states in Romero v. Mervyn's: "Our previous cases clearly establish that, in contract cases not involving insurance, punitive damages

may be recovered for breach of contract when the defendant's conduct was malicious, fraudulent, oppressive, or committed recklessly with a wanton disregard for the plaintiff's rights." 1989-NMSC-081, ¶ 23, 109 N.M. at 255, 784 P.2d at 998.  Punitive damages are not available when they are "predicated solely on gross negligence.  In addition to, or in lieu of, such negligence, there must be evidence of an 'evil motive' or a 'culpable mental state.'" Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 25, 118 N.M. 203, 211, 880 P.2d 300, 308 (no citation given for quotation).  The Supreme Court of New Mexico has defined "reckless disregard" sufficient for an award of punitive damages as "when the defendant *knows* of potential harm to the interests of the plaintiff but nonetheless 'utterly fail[s] to exercise care' to avoid the harm." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 118 N.M. at 211, 880 P.2d at 308 (no citation given for quotation)(emphasis and alteration in Paiz v. State Farm Fire & Cas. Co.).  A defendant does not act with reckless disregard to a plaintiff's rights merely by failing "to exercise even slight care," absent the requisite "culpable or 'evil' state of mind." Paiz v. State Farm Fire & Cas. Co., 1994-NMSC-079, ¶ 26, 118 N.M. at 211, 880 P.2d at 308 (no citation given for quotation).  The New Mexico Civil Jury Instructions define the elements necessary for an award of punitive damages for a breach of contract as follows:

> If you find that _____ (name of party making claim for punitive damages) should recover compensation for damages, and if you further find that the conduct of _____ (name of party whose conduct gives rise to a claim for punitive damages) was [malicious], [reckless], [wanton], [oppressive], or [fraudulent], then you may award punitive damages.

N.M. R. Ann., Civ. UJI 13-861.

## LAW REGARDING IMPLIED CONTRACTS WITH NEW MEXICO AND IMPLIED EMPLOYMENT CONTRACTS

The State of New Mexico's sovereign immunity extends to breach-of-contract actions.  The New Mexico Legislature has waived the State's immunity, however, to allow a limited category of such actions to be brought against a State agency: "Governmental entities are granted immunity from actions based on contract, except actions based on a valid written contract." N.M.S.A. § 37-1-23(A).  The sovereign immunity that § 37-1-23(A) reflects is constitutionally valid.  Cf. Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 18 n.2, 110 N.M. 173, 178 n.2, 793 P.2d 855, 860 n.2 ("[T]he common law now recognizes a constitutionally valid statutory imposition of sovereign immunity, and such immunity must be honored by the courts where the legislature has so mandated.").  In our federalist system, the federal courts, too, must recognize a State's assertion of sovereign immunity.  See Alden v. Maine, 527 U.S. 706, 714-27 (1999). Governmental entities in New Mexico are not immune, however, from suit in actions based on a "valid written contract."  N.M.S.A. § 37-1-23(A).

As a general proposition, the law recognizes three contract forms: (i) express contracts; (ii) implied-in-fact contracts; and (iii) quasi-contracts, which are variously referred to as implied-in-law contracts, unjust enrichment, and quantum meruit.  See Hydro Conduit Corp. v. Kemble, 1990-NMSC-061, ¶ 21, 110 N.M. at 179, 793 P.2d at 861 (quoting Restatement of the Law of Contracts § 5, cmt. (a) (1932)); Black's Law Dictionary at 321-22 (7th ed. 1999)(defining "express contract" as a contract "whose terms the parties have explicitly set out," and an "implied-in-fact" as one "that the parties presumably intended [to constitute a contract], either by tacit understanding or by the assumption that it existed.").  The Supreme Court of New Mexico has held that "the State is immune from liability in quantum meruit, implied contract, or unjust enrichment."

Eaton, Martinez & Hart, P.C. v. Univ. of N.M. Hosp., 1997-NMSC-015, ¶ 12, 123 N.M. 76, 79,

934 P.2d 270, 273.  Similarly, § 37-1-23A does not waive sovereign immunity for oral contracts

or oral promises.  See Trujillo v. Gonzales, 1987-NMSC-119, ¶ 9, 106 N.M. 620, 622, 747 P.2d

915, 917.  The New Mexico courts also have held that, except for employment contracts,

§ 37-1-23(A) does not waive immunity to allow breach-of-contract actions against governmental

entities based on implied-in-fact contracts, unless the implied-in-fact contract arises in the

employment context and includes written terms, such as a written personnel policy.  See Garcia v.

Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 14, 121 N.M. 728, 732, 918 P.2d 7,

11 (holding that, on the facts of that case, § 37-1-23(A) "incorporates an implied employment

contract that includes written terms as set forth in a personnel policy"); Campos De Suenos, Ltd.

v. County of Bernalillo, 2001-NMCA-043, ¶¶ 24-28, 130 N.M. 563, 570-71, 28 P.2d 1104, 1111-

1113 (construing Garcia v. Middle Rio Grande Conservancy District, 1996-NMSC-029, 121 N.M.

728, 918 P.2d 7, and limiting its holding to the employment context), cert. denied, 130 N.M. 484,

27 P.3d. 476 (1996))[16]; Sessions v. New Mexico, No. 20-cv-606 MV/KRS, 2022 WL 14812844,

at *7 (D.N.M. October 26, 2022)(Vazquez, J.)("[A]n implied contract, 'without a supportive

writing memorializing its terms, may [not] be deemed a 'valid written contract' for purposes of

defeating immunity.'")(quoting Quarrie v. Board of Regents of N.M. Inst. Of Mining & Tech.,

No. A-1-CA-37163, 2020 WL 3440519, at *5 (N.M. Ct. App. June 17, 2020))(alteration added in

Sessions v. New Mexico).

---

[16]The Court previously has predicted that the Supreme Court of New Mexico, if it confronted the issue, would limit New Mexico's sovereign immunity waiver for implied-in-fact contracts to instances where there is already an existing contractual relationship in accordance with Campos De Suenos, Ltd. v. County of Bernalillo.  See Lee v. Univ. of N.M., 449 F. Supp. 3d 1071 (D.N.M. 2020)(Browning, J.).  For a recitation of the Court's reasoning, see infra, at 80-91.

In New Mexico, "an employment contract is for an indefinite period and is terminable at the will of either party unless the contract is supported by consideration beyond the performance of duties and payment of wages or there is an express contractual provision stating otherwise." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. 665, 68, 857 P.2d 776, 779 (citing Melnick v. State Farm Mut. Auto. Ins. Co., 1988-NMSC-012, ¶ 14, 106 N.M. at 730, 749 P.2d at 1109, cert. denied, 448 U.S. 822 (1988)).  At-will employment relationships "can be terminated by either party at any time for any reason or no reason, without liability." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779.  "New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779.

A promise, or offer, that supports an implied contract might be found in written representations such as an employee handbook, in oral representations, in the conduct of the parties, or in a combination of representations and conduct. See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 6, 108 N.M. 424, 426-27, 773 P.2d 1231, 1233-34. "Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined." Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 108 N.M. at 427, 773 P.2d at 1234 (citing Forrester v. Parker, 1980-NMSC-014, ¶¶ 4-5, 93 N.M. 781, 782, 606 P.2d 191, 192). Whether an employment relationship has been modified is a question of fact. See Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶ 7, 106 N.M. 664, 666, 748 P.2d 507, 509. "An implied contract is created only where an employer creates a reasonable expectation. The

reasonableness of expectations is measured by just how definite, specific, or explicit has been the representation or conduct relied upon." Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 24, 115 N.M. at 672, 857 P.2d at 783.  If the alleged employer's promise is not sufficiently explicit, the courts will not find an implied contract.  See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779.

> "Evidence relevant to this factual decision includes the language used in the personnel manual as well as the employer's course of conduct and oral representations regarding it.  We do not mean to imply that all personnel manual[s] will become part of employment contracts.  Employers are certainly free to issue no personnel manual at all or to issue a personnel manual that clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason.  Such actions instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual.  However, if an employer does choose to issue a policy statement, in a manual or otherwise, and, by its language or by the employer's actions, encourages reliance thereon, the employer cannot be free to only selectively abide by it.  Having announced a policy, the employer may not treat it as illusory."

Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶ 7, 106 N.M. at 666-67, 748 P.2d at 509-10 (quoting Leikvold v. Valley View Community Hosp., 141 Ariz. 544, 548, 688 P.2d 170, 174 (1984)).

"Whether an employer's words and conduct support a reasonable expectation on the part of employees that they will be dismissed only in accordance with specified procedures or for specified reasons generally is a question of fact for the jury." Mealand v. E. N.M. Med. Ctr., 2001-NMCA-089, ¶ 9, 131 N.M. 65, 69, 33 P.3d 285, 289.[17]  "[B]ecause an employee's

---

[17]The Supreme Court of New Mexico elsewhere has announced that "[w]hether an employee handbook has modified the employment relationship is a question of fact 'to be discerned from the totality of the parties' statements and actions regarding the employment relationship.'" Lukoski v. Sandia Indian Mgmt. Co., 1988-NMSC-002, ¶ 7, 106 N.M. at 666, 748 P.2d at 510 (quoting Wagenseller v. Scottsdale Mem'l Hosp., 147 Ariz. 370, 383, 710 P.2d 1025, 1038 (1985)(en banc)).  In the construction context, for example, the Supreme Court of New

expectation based on an employer's words or conduct must meet a certain threshold of objectivity, an employer may be entitled to judgment as a matter of law if the employee's expectations are not objectively reasonable."   West v. Wash. Tru Solutions, LLC, 2010-NMCA-001, ¶ 7, 147 N.M. 424, 426, 224 P.3d 651, 653.[18]   In deciding whether to grant summary judgment, the question is whether a reasonable jury could find that the words and conduct support an objectively reasonable expectation that the employees would be dismissed only in accordance with specified procedures and for specified reasons.   See Mealand v. E. N.M. Med. Ctr., 2001-NMCA-089, ¶ 9, 131 N.M. at 69, 33 P.3d at 289.   "[E]ven where a personnel manual purports to disclaim any intentions of forming contractual obligations enforceable against an employer, a fact finder may still look to the totality of the parties' statements and actions, including the contents of a personnel manual, to determine whether contractual obligations were created."   Beggs v. City of Portales, 2009-NMSC-023, ¶ 20, 146 N.M. 372, 377, 210 P.3d 798, 803.   The Court has dismissed an

---

Mexico similarly has "h[e]ld that as long as reasonable minds may differ it is a question of fact for the trial court to determine issues of 'due diligence' and 'unreasonable' or 'unacceptable delay.' 'What constitutes a reasonable time, under the evidence, is a question of fact.'" W. Com. Bank v. Gillespie, 1989-NMSC-046, ¶ 7, 108 N.M. 535, 538, 775 P.2d 737, 740 (quoting Smith v. Galio, 1980-NMCA-134, ¶ 5, 95 N.M. 4, 7, 617 P.2d 1325, 1328).   When considering the issue of perfecting title, the Supreme Court of New Mexico has stated "[r]easonable time for vendor to perfect title is a question of fact, not law."   Lloyd v. Southwest Underwriters, 1946-NMSC-006, ¶ 3, 50 N.M. 66, 71, 169 P.2d 238, 241 (quoting Smith v. David, 168 Ga. 511, 148 S.E. 265 (1929)). Accordingly, the Court predicts that, were the Court to consider whether an employer's words and conduct support an employee's reasonable expectation to specific termination procedures, it would follow Mealand v. E. N.M. Med. Ctr. and determine that matter is a question of fact.

[18]The Supreme Court of New Mexico has stated that, when it reviews a lower court's determination whether a police officer's actions were objectively reasonable, it does so de novo, because that determination is "a determination of legal questions."   State v. Duran, 2005-NMSC-034, ¶ 19, 138 N.M. 414, 519, 120 P.3d 836, 841.   The Court predicts that, were the Supreme Court of New Mexico to consider whether, in this context, an employee's expectations were not objectively reasonable, it would decide that issue in line with West v. Wash. Tru Solutions, LLC and review that issue de novo as a question of law.

implied-contract claim based on a policies and procedures handbook where the relevant handbook statements were "not definite, specific, or explicit as to what the . . . Defendants would do regarding safety, other than to express their general policy to promote a safe workplace.  The statements do not outline a procedure that [company] Personnel promised to follow to ensure a safe workplace." Lopez v. Am. Baler Co., No. CIV 11-0227 JB, 2014 WL 1285448, at *25 (D.N.M. March 27, 2014)(Browning, J.).

In Gerald v. Locksley, the Court reviewed whether the plaintiff, an assistant football coach for the University of New Mexico, had a contract that the University's Athletics Policies and Procedures covered.  See 785 F. Supp. 2d 1074, 1140 (D.N.M. 2011)(Browning, J.).  His contract with U.N.M. stated that his "appointment is governed by applicable policies as stated in the University's Intercollegiate Policies and Procedures Manual."  785 F. Supp. 2d at 1140.  The Court concluded that U.N.M.'s policies and procedures, in comparison to those in Ruegsegger v. Western New Mexico University Board of Regents, were "similarly broad, suggestive, and 'of a non-promissory nature and merely a declaration of defendant's general approach.'"  735 F. Supp. 2d at 1143 (quoting Ruegsegger v. Bd. of Regents of W.N.M. Univ., 2007-NMCA-030, ¶ 30, 141 N.M. 306, 313, 154 P.3d 681, 688).

In Lee v. Univ. of N.M., the Court reviewed the New Mexico State courts' caselaw at the intersection between implied employment contracts generally and implied contracts with New Mexico:

> New Mexico courts have recognized, in some instances, an implied written contract satisfies [§ 37-1-23(A)'s valid written contract] requirement in the employment context.  See Handmaker v. Henney, 1999-NMSC-043, 992 P.2d 879; Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, 918 P.2d 7. But see Trujillo v. Gonzalez, 1987-NMSC-119, 747 P.2d 915 (concluding that Taos County was immune from a breach of an oral promise to hire the plaintiff for two years); Campos de Suenos, Ltd. v. Cty. of Bernalillo, 2001-NMCA-043, 28 P.3d

1104 (declining to extend <u>Garcia v. Middle Rio Grande Conservancy Dist.</u> beyond the employment context).  The Honorable Michael D. Bustamante, then-Judge for the Court of Appeals of New Mexico, noted a divide between <u>Campos de Suenos, Ltd. v. Cty. of Bernalillo</u>, 2001-NMCA-043, 28 P.3d 1104, and <u>Trujillo v. Gonzalez</u>, 1987-NMSC-119, 747 P.2d 915 – both of which seemingly recognized sovereign immunity for implied contracts -- and <u>Handmaker v. Henney</u>, 1999-NMSC-043, 992 P.2d 879 and <u>Garcia v. Middle Rio Grande Conservancy Dist.</u>, 1996-NMSC-029, 918 P.2d 7 -- which did not.  <u>See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.</u>, 2004-NMCA-050, ¶ 31, 92 P.3d 667, 674.  After analyzing these cases' facts, he concluded that New Mexico courts generally upheld sovereign immunity for the state when "address[ing] issues surrounding the creation of new contractual relationships" but that sovereign immunity is likely waived in cases "involv[ing] disagreements about the details of an existing employment relationship evidenced by a writing." <u>Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.</u>, 2004-NMCA-050, ¶ 37, 92 P.3d at 674 (Bustamante, J., concurring).  <u>See id.</u> at ¶¶ 32-26.

The Supreme Court of New Mexico adopted Judge Bustamante's analysis on appeal -- stating that courts should recognize sovereign immunity where parties dispute whether a contract was formed but not dismiss claims based on sovereign immunity when courts had to perform contract interpretation.  <u>See Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.</u>, 2005-NMSC-030, ¶ 10, 120 P.3d at 445 (quoting <u>Univ. of N.M. Police Officer's Ass'n v. Univ. of N.M.</u>, 2004-NMCA-050, ¶ 37, 92 P.3d at 674 (Bustamante, J., concurring)).  In light of this favorable citation, the Court concludes that the Supreme Court of New Mexico, if it confronted the issue, would limit New Mexico's sovereign immunity waiver for implied-in-fact contracts to instances where there is already an existing contractual relationship, as the Court of Appeals of New Mexico has done to date.  <u>See Quarrie v. N.M. Inst. of Mining & Tech.</u>, 2014 WL 11456616, at *2)("No New Mexico court has allowed an implied contract to override a claim of governmental immunity outside of the employment context.").

<u>Lee v. Univ. of N.M.</u>, 449 F. Supp. 3d at 1152-53.

## <u>LAW REGARDING PROPERTY AND LIBERTY INTERESTS AND DUE PROCESS</u>

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a State to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain

reasons.  See, e.g., County of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  "The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment." Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.

1.    **Property Interests**.

"Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)); Paul v. Davis, 424 U.S. at 710 ("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").  "In the context of a public employee . . . the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it."  Farthing v. City of

Shawnee, Kan., 39 F.3d at 1135 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577;

Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d 1160, 1164 (10th Cir. 1992)).

"A legitimate claim of entitlement may be grounded in various sources of state law, including

'state statutes, local ordinances, established rules, or mutually explicit understandings.'" Farthing

v. City of Shawnee, Kan., 39 F.3d at 1135 (quoting Dickeson v. Quarberg, 844 F.2d 1435, 1437

(10th Cir. 1988); citing Carnes v. Parker, 922 F.2d 1506, 1509 (10th Cir. 1991)).  "If a plaintiff

can prove he has a property interest in his employment, a state cannot deprive him of that interest

without due process."  Dickeson v. Quarberg, 844 F.2d at 1438.

　　　"Whether appellant has a sufficient property interest in his employment is a matter of state

law."  Calhoun v. Gaines, 982 F.2d 1470, 1474 (10th Cir. 1992)(citing Bishop v. Wood, 426 U.S.

341, 344 (1976); Archer v. Sanchez, 933 F.2d 1526, 1529 (10th Cir.1991)).  "'[A] property interest

is determined by whether the terms of employment created by contract, federal statute, city charter

or an employee manual create a sufficient expectancy of continued employment to constitute a

property interest which must be afforded constitutionally guaranteed due process.'"  Graham v.

City of Okla. City, Okla., 859 F.2d 142, 146 (10th Cir. 1988)(quoting Vinyard v. King, 728 F.2d

428, 432 (10th Cir. 1984))(alteration added in Graham v. City of Okla. City, Okla.); Chavez-

Rodriguez v. City of Santa Fe, 2008 WL 5992271, at *12 (D.N.M. October 9, 2008)(Browning, J.)

(concluding that "New Mexico recognizes a property interest in public employment, but that it is

an interest tied to the financial benefits that flow from the position, and not in other aspects of a

job, such as the title, prestige, or level of power and responsibility accompanying a particular

position").  "Taken alone, the personnel policy or employee manual might create a property

interest."  Graham v. City of Okla. City, Okla., 859 F.2d at 146.

2.      **Liberty Interests**.

The Supreme Court has stated that "there can be no doubt that the meaning of 'liberty'
must be broad indeed."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572.

> Without doubt, it denotes not merely freedom from bodily restraint but also
> the right of the individual to contract, to engage in any of the common occupations
> of life, to acquire useful knowledge, to marry, establish a home and bring up
> children, to worship God according to the dictates of his own conscience, and
> generally to enjoy those privileges long recognized . . . as essential to the orderly
> pursuit of happiness by free men.

408 U.S. at 572 (quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).  In Board of Regents of
State Colleges v. Roth, the Supreme Court notes in dicta that a state might abridge a liberty interest
if, in declining to renew an employment contract, the state makes charges of dishonesty or
immorality or imposes "a stigma or other disability that foreclosed [an employee's] freedom to
take advantage of other employment opportunities."  408 U.S. at 573.

In Paul v. Davis, the Supreme Court "held that defamation, standing alone, was not
sufficient to establish a claim for deprivation of a liberty interest."  Renaud v. Wyo. Dep't of
Family Servs., 203 F.3d 723, 726 (10th Cir. 2000)(citing Paul v. Davis, 424 U.S. at 708-10).
"'[T]he defamation had to occur in the course of the termination of employment.'"  Renaud v.
Wyo. Dep't of Family Servs., 203 F.3d at 726 (quoting Paul v. Davis, 424 U.S. at 710).  The
Supreme Court addressed a case in which local police chiefs included the plaintiff's photograph in
a "flyer" of "active shoplifters" after the petitioner had been arrested for shoplifting.  424 U.S. at
697.  The authorities eventually dismissed the shoplifting charge, and the plaintiff filed suit under
42 U.S.C. § 1983 against the police chiefs, alleging that the officials' actions inflicted a "stigma"
to his reputation, because "the 'active shoplifter' designation would inhibit him from entering
business establishments for fear of being suspected of shoplifting and possibly apprehended, and

would seriously impair his future employment opportunities." 424 U.S. at 697. The Supreme

Court rejected the plaintiff's claim, holding that injury to reputation by itself is not a liberty interest

that the Fourteenth Amendment to the Constitution of the United States protects. 424 U.S. at

708-09. The Supreme Court

> pointed out that [its] reference to a governmental employer stigmatizing an
> employee in *Board of Regents of State Colleges v. Roth*, 408 U.S. 564 . . . (1972),
> was made in the context of the employer discharging or failing to rehire a plaintiff
> who claimed a liberty interest under the Fourteenth Amendment. Defamation, by
> itself, is a tort actionable under the laws of most States, but not a constitutional
> deprivation.

Siegert v. Gilley, 500 U.S. 226, 234 (1991).

In Siegert v. Gilley, the Supreme Court revisited the question whether defamation can

amount to a constitutional violation. A former government employee brought an action against a

former supervisor alleging that his former supervisor, in response to a request for information on

job performance, wrote a defamatory letter that deprived him of his constitutionally protected

liberty interest in his reputation without due process. See 500 U.S. at 227-29. The former

supervisor's letter stated

> that he "consider[ed] Dr. Siegert to be both inept and unethical, perhaps the least
> trustworthy individual I have supervised in my thirteen years at [St. Elizabeths]."
> . . . . After receiving this letter, the Army Credentials Committee told Siegert that
> since "reports about him were 'extremely unfavorable' . . . the committee
> was . . . recommending that [Siegert] not be credentialed."

500 U.S. at 228 (alterations in original). Siegert argued "that if the defendant acted with malice in

defaming him, what he describes as the 'stigma plus' test of Paul v. Davis is met." Siegert v.

Gilley, 500 U.S. at 234 (no citation given for quotation). The Court rejected Siegert's argument

and held that he had not stated a liberty-interest claim, stating that its "decision in Paul v. Davis

did not turn . . . on the state of mind of the defendant, but on the lack of any constitutional protection for the interest in reputation." 500 U.S. at 234. The Supreme Court stated:

> The facts alleged by Siegert cannot, in the light of our decision in *Paul v. Davis*, be held to state a claim for denial of a constitutional right. This is not a suit against the United States under the Federal Tort Claims Act -- such a suit could not be brought, in the light of the exemption in that Act for claims based on defamation, see 28 U.S.C. § 2680(h) -- but a suit against Siegert's superior at St. Elizabeths Hospital. The alleged defamation was not uttered incident to the termination of Siegert's employment by the hospital, since he voluntarily resigned from his position at the hospital, and the letter was written several weeks later. The statements contained in the letter would undoubtedly damage the reputation of one in his position, and impair his future employment prospects. But the plaintiff in *Paul v. Davis* similarly alleged serious impairment of his future employment opportunities as well as other harm. Most defamation plaintiffs attempt to show some sort of special damage and out-of-pocket loss which flows from the injury to their reputation. But so long as such damage flows from injury caused by the defendant to a plaintiff's reputation, it may be recoverable under state tort law but it is not recoverable in a *Bivens* action.

Siegert v. Gilley, 500 U.S. at 233-34.

In Workman v. Jordan, 32 F.3d 475 (10th Cir. 1994), the Tenth Circuit applied Supreme Court precedent to delineate a four-part test that a plaintiff must satisfy to demonstrate a deprivation of his liberty interest:

> [A plaintiff] does have a liberty interest in his good name and reputation as it affects his protected property interest in continued employment. *Paul v. Davis*, 424 U.S. 693, 701 . . . (1976); *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981). However, [a plaintiff] must show how the government infringed upon this liberty interest. First, to be actionable, the statements must impugn the good name, reputation, honor, or integrity of the employee. *Board of Regents v. Roth*, 408 U.S. at 573 . . . . Second, the statements must be false. *Codd v. Velger*, 429 U.S. 624, 628 . . . (1977); *Flanagan v. Munger*, 890 F.2d 1557, 1571-72 (10th Cir. 1989); *Wulf v. City of Wichita*, 883 F.2d 842, 869 (10th Cir. 1989). Third, the statements must occur in the course of terminating the employee or must foreclose other employment opportunities. *Paul*, 424 U.S. at 710 . . . ; *Sullivan v. Stark*, 808 F.2d 737, 739 (10th Cir. 1987). And fourth, the statements must be published. *Bishop v. Wood*, 426 U.S. 341, 348 . . . (1976).

Workman v. Jordan, 32 F.3d at 480-81.  See Melton v. City of Okla., 928 F.2d 920, 926-27 (10th Cir. 1991)(en banc)(holding that these elements are not disjunctive, but must all be satisfied).

The first element requires that a plaintiff prove that "the defendant made a statement impugning his or her good name, reputation, honor, or integrity."  Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 526 (10th Cir. 1998).  The statement must make a "false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment." Palmer v. City of Monticello, 31 F.3d 1499, 1503 (10th Cir. 1994)("[A]n accusation that a police officer falsified a speeding ticket qualifies as a stigmatizing charge which amply supports that element of a liberty interest violation.").  Such accusations involve charges of "dishonesty or immorality." Palmer v. City of Monticello, 31 F.3d at 1503.  See Melton v. City of Okla., 928 F.2d at 927 n.11 ("Stigma [is] sufficient if it involves dishonesty, serious felony, manifest racism, serious mental illness, or the like."  (citing Green v. St. Louis Housing Auth., 911 F.2d 65, 69 (8th Cir. 1990)).  Cf. Hill v. Dep't of Air Force, 844 F.2d 1407, 1412 (10th Cir. 1988)(noting that the denial of a security clearance does not violate a liberty interest, because "[a] clearance does not equate with passing judgment upon an individual's character"); Sipes v. United States, 744 F.2d 1418, 1422 (10th Cir. 1984)(rejecting a liberty-interest claim, because the "plaintiff was discharged for being tardy, failing to schedule leave . . . , and for engaging in 'horseplay.'  These reasons, even assuming they were made public by the Government, do not call into question plaintiff's good name, reputation, honor and integrity.").

The "third element should have been phrased conjunctively: the statement must occur in the course of terminating the employee and must foreclose other employment opportunities." Castillo v. Hobbs Mun. Sch. Bd., 315 F. App'x 693, 697 (10th Cir. 2009)(citing Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 728 n.1)).  The Tenth Circuit has stated that, although, "[a]t

first blush, it appears that this prong of the test can be met either by statements made in the course of terminating an employee or, in the alternative, by any other statements that might foreclose other employment opportunities," the requirement that "the statements must occur in the course of terminating the employee or must foreclose other employment opportunities" are not alternative bases for establishing a liberty-interest claim, because "*Paul* clearly requires that the defamation occur in the course of the termination of employment," and "*Sullivan* did not abrogate or minimize this requirement." Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 728 n.1.

To determine if a statement was made "in the course of terminating the employee," a court must consider the nature and the timing of an allegedly defamatory statement, and the statement need not be made before or during the termination. Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 727. In Renaud v. Wyoming Department of Family Services, the Tenth Circuit states:

> Timing is certainly one consideration in determining whether stigmatizing statements are made in the course of the termination of employment. We agree with Plaintiff that publication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment. That the allegedly defamatory statements occurred several days following the announcement of Plaintiff's termination does not, of itself, defeat his claim. Rather, we agree with the Ninth Circuit's common-sense approach examining the nature of the alleged defamation, as well as its timing, to determine whether it occurred in the course of the termination. *See Campanelli* [*v. Bockrath*, 100 F.3d 1476, 1483 (9th Cir. 1996)]. Roughly contemporaneous statements about the reasons for termination are not the same as roughly contemporaneous statements on other matters. What is relevant to our analysis is the "manner in which a public employee is terminated," *Miller* [*v. City of Mission, Kansas*, 705 F.2d 368, 373 (10th Cir. 1983)], and the statements made "incident to the termination." *Siegert*, 500 U.S. 226 at 234. We therefore hold that a court must examine both the nature and the timing of an allegedly defamatory statement to determine whether it has been made in the course of an employee's termination.

Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 727.

In some circumstances, reinstatement can defeat a liberty-interest claim. In McCarty v. City of Bartlesville, 8 F. App'x 867 (10th Cir. 2001), the Tenth Circuit held that the plaintiffs could

not prevail on their liberty-interest claim, because they were reinstated in the same position with

back pay and benefits:

> [T]he McCartys are unable to establish that an actual deprivation occurred. The McCartys were discharged but subsequently rehired with full backpay and benefits. We acknowledge that their rehire does not mean that they will be welcomed without reservation by their colleagues and superiors, but the loss of prospective job opportunities is too speculative to support a deprivation of a liberty interest claim under § 1983. *See Phelps v. Wichita-Eagle Beacon*, 886 F.2d 1262, 1269 (10th Cir. 1989)("[D]amage to 'prospective employment opportunities' is too intangible to constitute a deprivation of a liberty or property interest."); *see also Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550, 1559 (10th Cir. 1993) (noting the same). The McCartys' liberty interest claim necessarily fails.

McCarty v. City of Bartlesville, 8 F. App'x at 872 (second alteration in original). See Castillo v.

Hobbs Mun. Sch. Bd., 315 F. App'x at 697 ("Mr. Castillo[, who was terminated from a school

administrator position,] has failed to establish the third element . . . . Not only was Mr. Castillo

offered a position as a first-grade teacher in Hobbs, but he secured a position as an administrator

with a school in Raton."). Reinstatement to a different position, however, does not necessarily

defeat a liberty-interest claim and does not moot a plaintiff's claim. A name-clearing hearing, on

the other hand, is the usual remedy for a liberty-interest claim. See Salazar v. City of Albuquerque,

No. CIV 10-0645 JB/ACT, 2014 WL 6065603, at *35 (D.N.M. October 27,

2014)(Browning, J.)(citing .Evers v. Regents of Univ. of Colo., 509 F.3d 1304, 1308 (10th Cir.

2007)).

    The Tenth Circuit held in Watson v. University of Utah Medical Center, 75 F.3d 569 (10th

Cir. 1996), that an employers' statement that forecloses employment in a plaintiff's chosen field

may satisfy Workman v. Jordan's third element:

> Finally, plaintiff made a showing that defendants' actions foreclosed her future employment opportunities in her chosen field as a labor and delivery nurse. Although she was able to secure employment as a nurse, it was not as a labor and

delivery nurse as a result of dissemination of information concerning her troubles in the relatively close-knit hospital community in Salt Lake City.

We believe plaintiff has set out a claim of a liberty deprivation -- she has raised an issue of material fact whether "her dismissal resulted in the publication of information which was false and stigmatizing -- information which had the general effect of curtailing her future freedom of choice or action." *Asbill v. Housing Auth. of Choctaw Nation*, 726 F.2d 1499, 1503 (10th Cir. 1984). Thus, she has made a showing that she was entitled to notice and a due process hearing to clear her name. *See Roth*, 408 U.S. at 573 n. 12 . . . ("The purpose of such notice and hearing is to provide the person an opportunity to clear [her] name.").

Watson v. Univ. of Utah Med. Ctr., 75 F.3d at 579-80 (final alteration added in Watson v. Univ. of Utah Med. Ctr.).

The Tenth Circuit employs a demanding standard for showing that other employment opportunities are foreclosed when a plaintiff "was not terminated incident to an alleged defamation." Stidham v. Peace Officer Standards & Training, 265 F.3d 1144, 1155 (10th Cir. 2001). In Sandoval v. City of Boulder, Colorado, 388 F.3d 1312 (10th Cir. 2004), the Tenth Circuit asserted that a plaintiff who voluntarily resigns must be "categorically ineligible for other employment in either the public or the private sector":

Further, the derogatory statements of which she complains were not made in the course of terminating her employment, since she resigned on her own accord. In *Stidham v. Peace Officer Standards and Training*, this court recognized the narrow interpretation of "foreclosing other employment opportunities" adopted by the Supreme Court in *Siegert v. Gilley*, 500 U.S. 226 . . . (1991), and held that the plaintiff had not alleged the deprivation of a protected liberty interest even where the defamatory statements had injured his reputation and thereby harmed his ability to obtain new employment. 265 F.3d 1144, 1154 (10th Cir.2001). Sandoval states that she has applied for, and been rejected from, approximately 100 positions for which she is qualified. *Workman* and *Siegert* require, however, that other employment opportunities must be "foreclosed" -- not merely made difficult to obtain because of damage done to the plaintiff's reputation -- if the derogatory statements were not made in the context of the defendant terminating her employment, and she does not claim that the negative information that emerged from the BRCC investigation has made her categorically ineligible for other employment in either the public or the private sector.

Sandoval v. City of Boulder, Colo., 388 F.3d at 1329.

On the last element, "the plaintiff must prove that . . . the statement was published." Tonkovich v. Kansas Bd. of Regents, 159 F.3d at 526. If a plaintiff does not establish that a statement is published, he or she cannot state a valid liberty-interest claim. See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 547 n.13 (1985)("As the Court of Appeals found, the failure to allege that the reasons for the dismissal were published dooms this claim."); Lancaster v. Indep. Sch. Dist. No. 5, 149 F.3d 1228, 1235 (10th Cir. 1998)("Also fatal to plaintiff's liberty-interest claim is the fact that the defendants made no public statements disparaging Lancaster or harming his standing or associations in the community."); Sipes v. United States, 744 F.2d at 1421 ("We conclude that plaintiff's termination did not implicate a liberty interest for two reasons. First, there is no evidence that the allegedly stigmatizing evidence was made public by the Government."). "A person who establishes a liberty-interest deprivation is entitled to a name-clearing hearing." Evers v. Regents of Univ. of Colo., 509 F.3d 1304, 1308 (10th Cir. 2007).

## LAW REGARDING QUALIFIED IMMUNITY

Government officials performing "discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. at 232). "One of the purposes of the *Harlow* qualified immunity standard is to protect public officials from the 'broad-ranging discovery' that can be 'peculiarly disruptive of effective

government.'"  Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)(quoting Harlow v. Fitzgerald, 457 U.S. at 817).

Section 1983 creates a cause of action for a plaintiff to seek money damages from State officials who have violated his or her constitutional or statutory rights.  See 42 U.S.C. § 1983. Under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971)("Bivens"), a plaintiff may seek money damages from federal officials who have violated his or her constitutional rights.[19]  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  Officials may assert qualified immunity to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties."  Anderson v. Creighton, 483 U.S. at 638.

If a government official has not violated a "clearly established" right, the official is shielded from personal liability.  Harlow v. Fitzgerald, 575 U.S. at 818.  Qualified immunity therefore "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Qualified immunity protects officers who have

---

[19]The Supreme Court, however, has extended Bivens to only a handful of constitutional rights.  See Davis v. Passman, 442 U.S. 228, 248 (1979)(finding an implied cause of action for violations of the equal protection principles enmeshed within the due process clause of the Fifth Amendment to the United States Constitution, U.S. Const. amend V); Carlson v. Green, 446 U.S. 14 (1980)(extending Bivens to allow for damages for violations of the cruel-and-unusual punishment clause of the Eighth Amendment to the United States Constitution).  The Supreme Court has expressed hesitation about federal courts extending Bivens into new contexts.  See Hernandez v. Mesa, 140 S. Ct. 735, 750 (2020)("When evaluating whether to extend Bivens, the most important question 'is "who should decide" whether to provide for a damages remedy, Congress or the courts?' The correct 'answer most often will be Congress'" (quoting Ziglar v. Abbasi, 137 S. Ct. 1843, 1857 (2017), and Bush v. Lucas, 462 U.S. 367, 380 (1983))).

"reasonable, but mistaken beliefs," and who operate at the laws' sometimes "hazy border." Saucier

v. Katz, 533 U.S. 194, 205 (2001).  A court

> can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior
> case law has not clearly settled the right, and so given officials fair notice of it, the
> court can simply dismiss the claim for money damages.  The court need never
> decide whether the plaintiff's claim, even though novel or otherwise unsettled, in
> fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).  A series of policy considerations guide the Tenth

Circuit's qualified-immunity analysis:  "(1) protecting against 'unwarranted timidity on the part of

public officials;' (2) ensuring 'that talented candidates are not deterred by the threat of damages

suits from entering public service;' and (3) guarding against employees being distracted from their

duties."  Estate of Jensen by Jensen v. Clyde, 989 F.3d 848, 856 (10th Cir. 2021)(citing Richardson

v. McKnight, 521 U.S. 399, 408 (1997)).

Qualified immunity therefore shields government officials from liability when "their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v.

Fitzgerald, 457 U.S. at 818).   When a defendant asserts qualified immunity, it "creates a

presumption that they are immune from suit" and not just a presumption that they are immune

from liability.  Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016).  When a defendant asserts

qualified immunity, therefore, the plaintiff must demonstrate: (i) that the defendant's actions

violated his or her constitutional or statutory rights; and (ii) that the right was clearly established

at the time of the alleged misconduct, such that "every reasonable officer would have understood"

as much.  Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020).  See

Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico,

214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.), aff'd 863 F.3d 1226 (10th Cir. 2017).

1.      **The Procedural Approach to Qualified Immunity**.

The Supreme Court has clarified the proper procedure for lower courts to evaluate a qualified-immunity defense.  Before the Supreme Court's decision in Pearson v. Callahan, the Supreme Court directed lower courts to decide, first, whether the facts alleged or shown by the plaintiff make out a constitutional violation, and, if so, then decide whether the right at issue was clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. at 200.  The Supreme Court's decision in Pearson v. Callahan, however, made the "*Saucier* two-step" advisory rather than mandatory, noting that Saucier v. Katz's "'rigid order of battle'" had faced criticism from lower courts on "'practical, procedural, and substantive grounds.'"  Pearson v. Callahan, 555 U.S. at 234 (quoting Pierre N. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N.Y.U.L. Rev. 1249, 1275, 1277 (2006)).  Although the Supreme Court recognizes that the Saucier v. Katz rule was "beneficial" and "often appropriate," lower courts may now exercise their "sound discretion" when deciding "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 555 U.S. at 236-37.

In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and courts of appeals with "what may seem to be an essentially academic exercise."  Pearson v. Callahan, 555 U.S. at 237.  The Supreme Court explains that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the 'older, wiser judicial counsel "not to pass on questions of constitutionality . . . unless such adjudication is unavoidable."'"  Pearson v. Callahan, 555 U.S. at 241 (quoting Scott v. Harris, 550 U.S. 372, 388 (2007)(Breyer, J.,

concurring)(quoting Spector Motor Serv., Inc. v. McLaughlin, 323 U.S. 101, 105 (1944)))(alteration added in Scott v. Harris).   See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[20] qualified immunity's clearly established prong: when (i) the constitutional violation question "is so fact bound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decision making," because of inadequate briefing; (vi) discussing both elements risks "bad decision making," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the

---

[20]In Camreta v. Greene, the Supreme Court states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.   In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), then-Judge Gorsuch, writing for the Tenth Circuit, interprets Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.   See Kerns v. Bader, 663 F.3d at 1180-81 (10th Cir. 2011).   The Supreme Court, however, has not stressed the seven circumstances as mandatory.   Instead, it recently has reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."   District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).   This language suggests that the inquiry is still discretionary, although the Court should exercise its discretion carefully.

wisdom of passing on the first constitutional question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-707. See Kerns v. Bader, 663 F.3d at 1181.[21]

---

[21]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5. On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:

> Section 1983 was originally § 1 of the Civil Rights Act of
> 1871 . . . and was enacted for the express purpose of "enforc(ing)
> the Provisions of the Fourteenth Amendment." The predecessor of
> § 1983 was thus an important part of the basic alteration in our
> federal system wrought in the Reconstruction era through federal
> legislation and constitutional amendment.

407 U.S. at 238-39. Congress did not say it would remedy only violations of
"clearly established" law, but that

> [e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or the District
> of Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to <u>the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws,</u> shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress, except
> that in any action brought against a judicial officer for an act or
> omission taken in such officer's judicial capacity, injunctive relief
> shall not be granted unless a declaratory decree was violated or
> declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added). The Supreme Court established the qualified
immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials
were not liable for constitutional violations where they reasonably believed that
their conduct was constitutional. <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1
v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment School
Search Cases</u>, 24 B.Y.U.J. Pub. L. 313, 329 (2010). The Supreme Court first
introduced the "clearly established" prong in reference to an officer's good faith
and held that a compensatory award would only be appropriate if an officer "acted
with such an impermissible motivation or with such disregard of the [individual's]
clearly established constitutional rights that his action cannot reasonably be
characterized as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322
(1975). In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective
test, the clearly established prong became a part of the qualified immunity test. <u>See</u>
457 U.S. at 818 ("We therefore hold that government officials performing
discretionary functions generally are shielded from liability for civil damages
insofar as their conduct does not violate clearly established statutory or
constitutional rights."). It seems ironic that the federal courts would restrict a
congressionally mandated remedy for constitutional violations -- presumably the
rights of innocent people -- and discourage case law development on the civil
side -- and restrict case law development to motions to suppress, which reward only
the guilty and is a judicially created, rather than legislatively created, remedy.
Commentators have noted that, "[o]ver the past three decades, the Supreme Court

has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, No. 13-0183, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).

    The other problem with the "clearly established" prong is that it is hardly clear what is established.  It is an odd little test.  "Clearly" is not self-defining, and it is unclear what "clearly" adds to the word "established."  The very test has made the fuzzy doctrine a minefield for district courts and Courts of Appeals.  What is established to a district court may not be "clearly" established for appellate judges.  Even intra-circuit, it is not always clear what law the circuit court will use to determine whether a right is clearly established.  See Tyler Finn, Qualified Immunity Formalism: "Clearly Established Law" and the Right to Record Police Activity, 119 Col. L.R. 445, 452 n.55 (2019)(citing cases from three circuits, noting that each relies on variable sources of law to determine whether a right is clearly established).  This imprecise test is no way to run a federal court system.

"Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[22]   See Camreta v. Greene, 563 U.S. at 707 ("In general, courts

_____

[22]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.   It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.   Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.   The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.   In practice, Saucier v. Katz works better.

The "Saucier two-step" encourages courts to articulate the constitutional rights at issue.   Before Pearson v. Callahan made the "Saucier two-step" discretionary, it faced criticism from numerous Supreme Court members.   Associate Justice of the United States Supreme Court Stephen Breyer wrote, before Pearson v. Callahan, that he "would end the failed Saucier experiment now." Morse v. Frederick, 551 U.S. 393, 432 (2007)(Breyer, J., concurring in the judgment and dissenting in part).   Joined by Associate Justices of the United States Supreme Court Ruth Bader Ginsburg and Stephen Breyer, Associate Justice of the United States Supreme Court John Paul Stevens criticized Saucier v. Katz because it was an "unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity." Bunting v. Mellon, 541 U.S. 1019, 1019 (2004).   Joined by Chief Justice of the United States William Rehnquist, Associate Justice of the United States Supreme Court Antonin Scalia wrote: "We should either make clear that constitutional determinations are not insulated from our review . . . or else drop any pretense at requiring the ordering in every case." Bunting v. Mellon, 541 U.S. at 1025 (Scalia, J., dissenting from the denial of certiorari).

Judicial resources are valuable and scarce, but they should not be conserved at the expense of protecting constitutional rights.   In addition to being easier in practice, Saucier v. Katz also increases the frequency and depth with which courts articulated constitutional law.   See Nancy Leong, The Saucier Qualified Immunity Experiment, An Empirical Analysis, 36 Pepp. L. Rev. 667 (2009).   Chief Justice Rehnquist opined that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." Wilson v. Layne, 526 U.S. 603, 609 (1999).   The evidence to support Chief Justice Rehnquist's assertion, however, is mixed. See Paul W. Hughes, Not a Failed Experiment: Wilson-Saucier Sequencing and the Articulation of Constitutional Rights, 80 U. Colo. L. Rev. 401, 404 (2009)("[T]he proof of the pudding is in the eating; levels of constitutional articulation increased dramatically following the Court's development of the Wilson-Saucier sequencing doctrine.").   See also Leong, 36 Pepp. L. Rev. at 670 (finding that mandatory sequencing "leads to the articulation of more constitutional law, but

_____

should think hard, and then think hard again, before turning small cases into large ones."). The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182.  See also Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.      Clearly Established Rights.

A right is "clearly established" when it is "'sufficiently clear that every reasonable official employee would have understood that what he is doing violates that right.'"  Mullenix v. Luna, 577 U.S. 7, 11 (2015)(quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).   A clearly established right is "generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colorado Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).   "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Saucier v. Katz, 533 U.S. at 202)(alteration in Holland ex rel Overdorff v. Harrington, but not in Saucier v. Katz).  A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather

---

not the expansion of constitutional rights").  See also Greg Sobolski & Matt Steinberg, Note, An Empirical Analysis of Section 1983 Qualified Immunity Actions and Implications of Pearson v. Callahan, 62 Stan. L. Rev. 523 (2010).  The bottom line is that a trial court often -- if not frequently -- needs to decide whether the constitutional right was violated before deciding if it was clearly established.

than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).  In other words, existing precedent must have placed the constitutional or statutory question "beyond debate." Ashcroft v. al-Kidd, 563 U.S. at 741.

The Supreme Court requires that courts not define the constitutional right at issue "'at a high level of generality.'" White v. Pauly, 580 U.S. 73, 79 (2017)(quoting Ashcroft v. al-Kidd, 563 U.S. at 742).  The Supreme Court refers to this rule as a "longstanding principle." White v. Pauly, 580 U.S. at 79.  Nevertheless, the clearly established law must be "particularized" to the case's facts. Anderson v. Creighton, 483 U.S. at 640.  If the clearly established law at issue is not sufficiently particularized, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Anderson v. Creighton, 483 U.S. at 639.  "[G]eneral statements of the law" are not "inherently incapable" of clearly establishing a right, because they can sometimes give "fair and clear warning" to officers. United States v. Lanier, 520 U.S. 259, 271 (2017). See White v. Pauly, 580 U.S. at 79 (reiterating this principle).  Importantly, the "unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. at 640. See Brosseau v. Haugen, 543 U.S. 194, 199 (2004)("Of course, in an obvious case, these standards can 'clearly establish' the answer, even without a body of relevant case law.")(citing Hope v. Pelzer, 536 U.S. 730, 738 (2002)(noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established)).  A court, therefore, must "inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances." Green v. Padilla, 484 F. Supp. 3d 1098, 1134 (D.N.M. 2020)(Browning, J.)(citing City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019)).

In the Tenth Circuit, until recently, this rule meant that a right is clearly established only when there is a factually similar "'Supreme Court or Tenth Circuit decision on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains.'" Truman v. Orem City, 1 F. 4th 1227, 1235 (10th Cir. 2021)(quoting Thomas v. Kaven, 765 F.3d 1183, 1194 (10th Cir. 2014)).  Although a plaintiff asserting a violation of a clearly established right in most circumstances must point to a case that is sufficiently factually similar, the Supreme Court has recently clarified that this match is not always required.  See Taylor v. Riojas, 141 S. Ct. 52, 54 (2020)("Taylor").  The Supreme Court, in a short per curiam opinion, suggests an objective, "no reasonable correctional officer" standard when it holds that "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time."  Taylor, 141 S. Ct. at 53.  In Taylor, corrections officers housed an inmate in "shockingly unsanitary cells."  Taylor, 141 S. Ct. at 53.  One cell was covered "nearly floor to ceiling, in 'massive mounts' of feces: all over the floor, the ceiling, the window, the walls, and even 'packed inside the water faucet.'"  141 S. Ct. at 53 (quoting Taylor v. Stevens, 946 F.3d 211, 218 (5th Cir. 2019)).  Correctional officers confined the plaintiff in this cell for four days, but the plaintiff did not eat or drink, because he feared that his food and water would be contaminated.  See 141 S. Ct. at 53.  Correctional officers then moved the plaintiff to a second cell that was "frigidly cold," and was equipped with "only a clogged drain in the floor to dispose of bodily wastes."  141 S. Ct. at 53.  The plaintiff held his bladder for more than twenty-four hours before finally involuntarily relieving himself, which caused the clogged drain to overflow and "raw sewage to spill across the floor."  141 S. Ct. at 53.  Because the plaintiff was

not provided a bed and was confined without clothes, the plaintiff was "left to sleep naked in sewage." 141 S. Ct. at 53.

The United States Court of Appeals for the Fifth Circuit held that these confinement conditions violated the Eighth Amendment's ban on cruel-and-unusual punishment, but it granted the corrections officers qualified immunity because the law was not clearly established. See Taylor, 141 S. Ct. at 53 (citing Taylor v. Stevens, 946 F.3d at 222). The Fifth Circuit concluded that the corrections officials did not have "fair warning" that confining the plaintiff in these conditions would be unconstitutional. 946 F.3d at 222 (quoting Hope v. Pelzer, 536 U.S. at 741). The Supreme Court reversed, holding that the Fifth Circuit erred when it granted qualified immunity on this basis. See Taylor, 141 S. Ct. at 53. Although the plaintiff could not identify a case on point, the Supreme Court noted that -- even in the absence of a case clearly establishing the law -- "no reasonable correctional officer could have concluded that, under the extreme circumstances of this case, it was constitutionally permissible to house [the plaintiff] in such deplorably unsanitary conditions for such an extended period of time." Taylor, 141 S. Ct. at 53. See Truman v. Orem City, 1 F. 4th at 1240 (summarizing the Supreme Court's conclusion and stating that the Supreme Court "made clear that [the plaintiff] did not have to" identify a case on point).

For decades, lower courts have tried diligently and faithfully to follow the unwritten signals of superior courts.[23] One such unwritten signal is that "a nigh identical case must exist for the law

---

[23]As former Tenth Circuit judge, and now Stanford law school professor, Michael McConnell, has noted, much of what lower courts do is read the implicit, unwritten signs that the superior courts send them through their opinions. See Michael W. McConnell, Address at the Oliver Seth American Inn of Court: How Does the Supreme Court Communicate Its Intentions to the Lower Courts: Holdings, Hints and Missed Signals (Dec. 17, 2014).

to be clearly established."  Caldwell v. University of N.M. Bd. of Regents, No. 20-CIV-0003

JB/JFR, 2020 WL 7861330, at *33 n.14 (D.N.M. Dec. 31, 2020)(Browning, J.).[24]  As numerous

_____

[24]The Court notes, as it has elsewhere, see, e.g., Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14, that qualified immunity is a problematic doctrine.  This flaw is particularly true of the Supreme Court's approach before Taylor.  "Factually identical or highly similar factual cases are not . . . the way the real world works."  Caldwell v. University of N.M. Bd. of Regents, 2020 WL 7861330, at *33 n.14.

Many cases have so many facts that are unlikely to ever occur again in a significantly similar way.  See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern.").  The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work.  It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions.  It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case.  It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?"  Thus, when the Supreme Court grounds its clearly established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018), yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting).  The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence effectively to eliminate § 1983 claims against State actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.  See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.); Benjamin S. Levine, "Obvious Injustice" and Qualified Immunity: The Legacy of Hope v. Pelzer, 68 U.C.L.A.L. Rev. 842, 848 & n.23 (citing the Court's conclusion in Parsons v. Velasquez, No. CIV 20-0074 JB/KK, 2021 WL 3269457, at *38 n.136 (D.N.M. July 30, 2021), that the Supreme Court intends to create an absolute shield for law enforcement officers, to support the claim that there is a "growing hostility toward plaintiffs in the [Supreme] Court's qualified immunity jurisprudence").

In most circumstances, a prior plaintiff must have been subjected to almost identical treatment, and a court must have found that law to have been clearly established for a subsequent plaintiff to get around the obstacle that qualified immunity creates.  See Stephen R. Reinhardt, The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences, 113 Mich. L. Rev. 1219, 1245 (2015)("[T]he Court has through

_____

qualified immunity created such powerful shields for law enforcement that people whose rights are violated, even in egregious ways, often lack any means of enforcing rights."). See also White v. Pauly, 580 U.S. at 79 (criticizing the Tenth Circuit below, because it "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment"). In most of those situations, officials can escape liability for violating someone's statutory or constitutional rights, because a prior court has not addressed the issue. As United States Circuit Judge for the Court of Appeals for the Fifth Circuit Don Willett notes, this creates a Catch-22. See Zadeh v. Robinson, 902 F.3d 483, 499 (5th Cir. 2018)(Willett, J., concurring)(opinion withdrawn on rehearing). Specifically, plaintiffs "must produce precedent even as fewer courts are producing precedent. Important constitutional questions go unanswered precisely because those questions are yet unanswered. Courts then rely on that judicial silence to conclude there's no equivalent case on the books." Zadeh v. Robinson, 902 F.3d at 499 (Willet, J., concurring). In short, "[n]o precedent = no clearly established law = no liability. An Escherian Stairwell. Heads defendants win, tails plaintiffs lose." Zadeh v. Robinson, 902 F.3d at 499 (Willet, J., concurring).

The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute notes in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Pauly v. White, No. 17-1078 Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2 (U.S. Supreme Court, filed March 2, 2018)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as Justice Clarence Thomas has argued, the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], [and] we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. 1843, 1871 (2017)(Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. 335, 342 (1986); and citing Burns v. Reed, 500 U.S. 478 (1991)(third alteration added in Ziglar v. Abbasi). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, in a day when police shootings and excessive force cases are in the news, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, always to decide the clearly established prong first and then

Courts of Appeals recently have noted, however, Taylor clarifies that it is no longer the case that an almost-identical case must exist.  See Truman v. Orem City, 1 F. 4th at 1241 ("Just like any reasonable corrections officer should have understood the inmate in Taylor's conditions . . . offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that false information offends the Constitution."); Moderwell v. Cuyahoga County, 997 F.3d 653, 660 (6th Cir. 2021)(explaining that the Supreme Court held in Taylor that "there does not need to be a case directly on point" when no reasonable officer could have concluded that the challenged action was constitutional); Taylor v. Ways, 999 F.3d 478, 492 (7th Cir. 2021)(noting that Taylor reaffirmed that "the Supreme Court does not demand a case directly on point"); Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021)(citing Taylor for the proposition that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of

---

always to say that the law is not clearly established stunts constitutional law's development.  See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015).  And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, Stan. L. Rev. Online (2017) -- seems to be in agreement with the Court, see, e.g., Casey v. City of Fed. Heights, 509 F.3d 1278, 1286 (10th Cir. 2007), the Supreme Court's per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Aldaba v. Pickens, 844 F.3d 870, 874 (10th Cir. 2016); Rife v. Jefferson, 742 F. App'x 377 (10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555 (10th Cir. 2017); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017), and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(Baldock, J.)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(Matheson, J.)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

relevant case law" (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004))).  See Joanna C.

Schwartz, Qualified Immunity and Federalism All the Way Down, 109 Geo. L.J. 305, 351

(2020)("The Court's decision in *Taylor* sends the signal to the lower courts that they can deny

qualify immunity without a prior case on point."); Lawrence Rosenthal, Defending Qualified

Immunity, 72 S.C.L. Rev. 547, 593 & n.193 (2020)("More recently, however, the Court has

stressed that on egregious facts, qualified immunity should be denied regardless whether there are

factually similar precedents.").

There are, therefore, two possible interpretations of Taylor.  First, Taylor could simply

clarify that the holding in Hope v. Pelzer, 536 U.S. at 741 -- that identifying an earlier case with

"'fundamentally similar' facts can provide especially strong support for a conclusion that the law

is clearly established," but that it is "not necessary to such a finding" -- is still good law even

though it has fallen out of favor among lower courts.  This reading of Taylor would mean there is

a narrow exception to the standard requirement that a plaintiff identify an earlier case on point

which applies only in case with "extreme circumstances" or "particularly egregious" facts.  Taylor,

141 S. Ct. at 53-54.  Second, Taylor could mean that a court now must ask whether the conduct at

issue is particularly egregious such that no reasonable officer could have concluded that their

actions are constitutional, and, if they are egregious, then there does not need to be a case clearly

establishing the law.

Most Courts of Appeals have adopted the second interpretation.  Nonetheless, there is

confusion both between and within the Courts of Appeals about Taylor's scope.  Compare Bates

v. Schwarzenegger, 832 F. App'x. 509, 511 (9th Cir. 2020)(mem.)(citing Taylor for the

proposition that the "Supreme Court has repeatedly, including very recently, reaffirmed and

applied the doctrine of qualified immunity"), with Rico v. Ducart, 980 F.3d 1292, 1307 (9th Cir.

2020)(Silver, J., concurring in part and dissenting in part)(explaining that, in <u>Taylor</u>, "the Court held that the prisoner's rights were so obvious that 'ambiguity in the caselaw' could not create any doubt" that the officer's conduct was unconstitutional (citing <u>Taylor</u>, 141 S. Ct. 52, 53, n.2)).  Since <u>Taylor</u>, courts have asked not just whether the law was clearly established through a factually similar case from that Circuit or from the Supreme Court, but also whether the conduct at issue was "particularly egregious" such that "no reasonable officer could have concluded that" their actions were constitutionally permissible.  <u>Taylor</u>, 141 S. Ct. at 53.  <u>See</u> <u>Truman v. Orem City</u>, 1 F. 4th at 1235.  In other words, in addition to asking whether the officer theoretically was on notice that they were acting unlawfully,[25] the court also must ask whether the conduct at issue was "particularly egregious" -- an apparently objective question.  <u>McCoy v. Alamu</u>, 141 S. Ct. 1364, 1364 (mem.)(2021)(vacating and remanding in light of <u>Taylor</u> even though the conduct at issue was likely not "particularly egregious").[26]

---

[25]The Court reiterates, as it discussed above, that one of the most basic premises of the law of qualified immunity -- that an officer is aware either actually or potentially that their conduct is unlawful because they know the holdings of both watershed constitutional decisions and the lower court decisions that apply them -- does not hold up to empirical scrutiny.  <u>See</u> Joanna C. Schwartz, <u>Qualified Immunity's Boldest Lie</u>, 88 U. Chi. L. Rev. 605, 610 (2021)(finding that, although police departments regularly inform officers about "watershed" decisions, officers are "not regularly informed about court decisions interpreting those decisions in different factual scenarios -- the very types of decisions that are necessary to clearly establish the law about the constitutionality of uses of force"); <u>Manzanares v. Roosevelt Cnty. Adult Detention Center</u>, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018)(Browning, J.).

[26]Professor Colin Miller of the University of South Carolina School of Law notes that there are only two likely interpretations of the Supreme Court's summary disposition of <u>McCoy v. Alamu</u>: (i) that the Court remanded so that the Fifth Circuit could consider whether the case involved "extreme circumstances" or "particularly egregious facts" like those in Taylor; and (ii) that the Supreme Court remanded so that the Fifth Circuit can reconsider without looking for analogous prior precedent and instead "determine whether any reasonable officer should have realized" that the conduct violated the plaintiff's constitutional rights.  Colin Miller, <u>The End of Comparative Qualified Immunity</u>, 99 Tex. L. Rev. Online 217, 224 (2021).  Miller argues that this second interpretation is more likely to be correct, because it "would be difficult to characterize"

The Third Circuit, for example, notes that <u>Taylor</u> did not affect whether three State legislators who took a public stand against the sale of State-owned property and then tried to pass a law divesting the State's ability to sell it were entitled to qualified immunity, because the legislators' actions were "not so outrageous that 'no reasonable . . . officer could have concluded' they were permissible under the Constitution." <u>HIRA Educ. Servs. N. Am. v. Augustine</u>, 991 F.3d 180, 191 n.7 (3d Cir. 2021)(quoting <u>Taylor</u>, 141 S. Ct. at 53). The United States Court of Appeals for the Seventh Circuit, too, concludes that <u>Taylor</u> means an officer is not entitled to qualified immunity if his or her conduct is "particularly egregious." <u>Lopez v. Sheriff of Cook Cnty.</u>, 993 F.3d 981, 991 (7th Cir. 2021). In <u>Lopez v. Sheriff of Cook County</u>, the Seventh Circuit found that an off-duty correctional officer who shot and then used as a human shield a man who fired his gun into the air near a crowd after a scuffle did not act "so egregious[ly] that any reasonable officer would know they [were] violating the Constitution notwithstanding the lack of an analogous decision."[27]  993 F.3d at 991. The United States Court of Appeals for the Ninth Circuit also

---

the officer's conduct as "'particularly egregious' without making a similar finding about most other unconstitutional behavior by government officers who seek qualified immunity." Miller, 99 Tex. L. Rev. Online at 224 (no citation for quotation).

[27]The Court does not agree with the Seventh Circuit's conclusion. An off-duty officer using someone he had just shot multiple times as a human shield to "ward off" someone else with a gun -- the human shield had moments earlier fired a gun into the air near a crowd -- is  particularly egregious such that any reasonable officer should have realized that it violates someone's constitutional rights. Lopez v. Sheriff of Cook Cnty., 993 F.3d 992. Even if the officer was trying to protect himself and the public, firing a gun near a crowd does not justify being used as flesh shield to protect an off-duty officer who had shot that same shield officer moments earlier. Numerous provisions of international law and the laws of war, see, e.g., Rome Statute of the International Criminal Court art. 8(2)(b)(xxiii), Rome, 17 July 1998, UN Doc. A/CONF.183/9 of 17 July 1998, entered into force 1 July 2002 (including in the definition of "war crimes" "[u]tilizing the presence of a civilian or other protected person to render certain points, areas or military forces immune from military operations"), prohibit such conduct. A police officer need not be familiar with international law to know that such conduct is improper, nor should someone else have been used as a human shield previously and a Court of Appeals concluded that conduct to have violated

distinguishes Taylor on the basis of the conduct's severity.  See Rico v. Ducart, 980 F.3d 1292,

1300 n.9 (9th Cir. 2020).  In Rico v. Ducart, the Ninth Circuit held that correctional officers who

performed inmate-welfare checks which, because of the prison's design, created loud noises every

forty-five minutes were entitled to qualified immunity, because the facts were not "as extreme as

those present in" Taylor.  Rico v. Ducart, 980 F.3d at 1300 n.9.  Similarly, the Ninth Circuit also

has decided that Taylor "only highlights the level of blatantly unconstitutional conduct necessary

to satisfy the obviousness principles."  O'Doan v. Sanford, 991 F.3d 1027, 1044 (9th Cir. 2021).

The other Courts of Appeals, however, have characterized Taylor as only reaffirming an

"extreme circumstances" or "obvious clarity" exception.  The Fifth Circuit, for example, has

distinguished Taylor, noting that it "involved a factually distinct claim involving unsanitary prison

conditions," so it did not apply to a case about mental healthcare in prison.  Landry v. Laborde-

Lahoz, 852 F. App'x 123, 129 (5th Cir. 2021)(mem.).[28]  The Fifth Circuit, however, like other

Courts of Appeals, has not adopted a consistent approach to Taylor.  The Fifth Circuit also has

---

clearly established law for a subsequent human shield to overcome the burden of qualified
immunity.  The Seventh Circuit found that the situation was "too fast-moving, too unpredictable,
and too volatile" for an officer to know that using as a human shield the person he had just shot
multiple times was a violation that was "so egregious that any reasonable officer would know they
are violating the Constitution notwithstanding the lack of an analogous decision."  993 F.3d at 992.
Instead, the Seventh Circuit appears to require the officer theoretically to be on notice that this
conduct was a law violation because a prior officer must have done the same thing and an earlier
court -- most likely the Seventh Circuit itself -- must have found that the use of human shields to
violate some other clearly established law.  If human shields are banned in war, they should not be
allowed on the Chicago's streets.  Any reasonable officer should know this conduct is not
acceptable conduct under the Constitution.

[28]The Court does not agree with the Fifth Circuit's reasoning on this point, although it does
not disagree with the case's result.  The Fifth Circuit reasons that Taylor did not support the
plaintiff's argument that county officials acted with deliberate indifference in violation of the
Eighth Amendment, because it was "factually distinct."  Landry v. Laborde-Lahoz, 852 F. App'x
at 129.  That Taylor is factually distinct has no bearing on the merits of a deliberate-indifference
claim but impacts its applicability to the qualified-immunity question.

noted that "it would have been 'obvious' to a reasonable officer that" several officers using their body weight to apply pressure to an unarmed man who did not resist arrest while the man was in the "maximal-restraint" position for five-and-a-half minutes so that the man stopped breathing and his lips turned blue -- while officers nearby "milled around"-- would constitute "such a severe tactic against this particular person [that it] would be constitutionally proscribed," and that the officer would "have no recourse to qualified immunity." Aguirre v. City of San Antonio, 995 F.3d 395, 403-04, 424 (5th Cir. 2020)(Jolly, J., concurring)(citing Taylor, 141 S. Ct. at 52-54). The Fifth Circuit further has cited Taylor to support its assertion that, "'in an obvious case,' general standards 'can clearly establish the answer, even without a body of relevant law.'" Roque v. Harvel, 993 F.3d 325, 335 (5th Cir. 2021)(quoting Brousseau v. Haugen, 542 U.S. 194, 199 (2004)). In Roque v. Harvel, however, the Fifth Circuit did not say what those "general standards" might be, from where they might come, or where a court might look for them, and then proceeded to characterize qualified-immunity law as requiring a case on point in almost all circumstances. 993 F.3d at 335.[29] More recently, however, the Fifth Circuit has acknowledged that Taylor excuses

---

[29]The Fifth Circuit's treatment of Taylor and the clearly established analysis is not consistent. In Tucker v. City of Shreveport, 998 F.3d 165 (2021), the Fifth Circuit did not cite Taylor, but writes:

> Consequently, "[q]ualified immunity is justified unless *no* reasonable officer could have acted as [the defendant officers] did here, or *every* reasonable officer faced with the same facts would *not* have [acted as the defendant officers did]." *Mason v. Faul*, 929 F.3d 752, 764 . . . (5th Cir. 2019), *cert. denied*, __ U.S. __, 141 S. Ct. 116, 207 (2020)(citing *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 590 . . . (2018)("The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that 'every reasonable official' would know.")).

Tucker v. City of Shreveport, 998 F.3d at 176-77 (ellipses added, other alterations and emphasis in Tucker v. City of Shreveport)(footnote omitted). The Fifth Circuit's analysis in Tucker v. City

a plaintiff from "their obligation to identify an analogous case in 'extreme circumstances' where the constitutional violation is 'obvious.'"   Cope v. Cogdill, 3 F.4th 198, 206 (5th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53-54).   The Fifth Circuit stressed, however, that this bar is a "high standard," because the facts must be "'particularly egregious.'"   Cope v. Cogdill, 3 F.4th at 205-06 (quoting Taylor, 141 S. Ct. at 53-54).

Most relevant here, the Tenth Circuit also has not given Taylor consistent treatment.   For example, the Tenth Circuit treated Taylor as an example of the rule of United States v. Lanier, that a "general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful," if it gives "fair and clear warning" that the conduct violates the plaintiff's constitutional rights.   United States v. Lanier, 520 U.S. at 271.   See Routt v. Howry, 835 F. App'x. 379, 382 (10th Cir. 2020).   This treatment of Taylor asks about the relationship between a "general constitutional rule already identified in the decisional law" and the "conduct in question," and asks whether that rule is applies with "obvious clarity."   United States v. Lanier, 520 U.S. at 271 (emphasis added).   Elsewhere, the Tenth Circuit states: "It suffices that 'the alleged unlawfulness [is] apparent in light of preexisting law.' That is, 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in

---

of Shreveport confuses the reasonableness of the officers' behavior with the clarity of the precedent that clearly establishes the law.   See 998 F.3d 165.   As Taylor suggests, an officer can act particularly egregiously and not be entitled to qualified immunity even if no precedent clearly establishes the law.   See 141 S. Ct. at 54; Ramirez v. Guadarrama, 2 F.4th 506, 523 (5th Cir. 2021)(mem.)(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts.").

question.'" Huff v. Reeves, 996 F.3d 1082, 1088 (10th Cir. 2021)(first quoting Riggins v. Goodman, 572 F.3d at 1101, then quoting Taylor, 141 S. Ct. at 53-54).

In Frasier v. Evans, however, the Tenth Circuit writes that "under certain 'extreme circumstances' general constitutional principles established in the caselaw may give reasonable government officials fair warning that their conduct is constitutionally or statutorily unlawful." Frasier v. Evans, 992 F.3d 1003, 1015 (10th Cir. 2021)(quoting Taylor, 141 S. Ct. at 53). The Tenth Circuit continues by noting that the situation before them -- several police officers surrounding a man who asked one of the officers for a statement about the force the officer had just used on a "uncooperative suspect," and then one of the officers grabbing the tablet and searching it for a video of the encounter -- was "not such a rare case" as Taylor or Hope v. Pelzer. Frasier v. Evans, 992 F.3d at 1021-22. In other words, rather than having to point to an existing case with sufficiently analogous facts, a plaintiff instead can defeat a claim for qualified immunity by meeting Taylor's "extreme circumstances" or "particularly egregious" standard. Frasier v. Evans, 992 F.3d at 1015.

More recently, the Tenth Circuit has held that, even without a prior precedent clearly establishing the law, a prosecutor providing materially false information to a medical examiner that influences his expert opinion whether a homicide occurred -- and then putting that medical examiner on the stand to testify about that false information -- is "'obviously egregious.'" Truman v. Orem City, 1 F.4th at 1240 (quoting Pierce v. Gilchrist, 359 F.3d at 1298). The Tenth Circuit, in Truman v. Orem City, comparing the facts directly to those in Taylor, continues: "Just like any reasonable correctional officer should understand the inmate in Taylor's conditions of confinement offended the Constitution, so too should any reasonable prosecutor understand that providing a medical examiner fabricated evidence and then putting him on the stand to testify based on that

false information offends the Constitution." 1 F.4th at 1241.  In reaching its conclusion in Truman v. Orem City, the Tenth Circuit reiterates that its qualified-immunity analysis is "'not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." Truman v. Orem City, 1 F.4th at 1235 (quoting Reavis v. Frost, 967 F.3d 978, 992 (10th Cir. 2020)).  Because the Tenth Circuit concludes that "the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer was clearly established at the time of the prosecutor's conduct," 1 F.4th at 1239, it further concludes that the plaintiff plausibly alleged a fabrication-of-evidence claim against the prosecutor,  see 1 F.4th at 1241.  This treatment of Taylor does not just ask about the relationship between a "general constitutional rule already identified in the decisional law" and whether it applies with "obvious clarity" to the conduct, Routt v. Howry, 835 F. App'x at 382 (quoting United States v. Lanier, 520 U.S. at 271), but instead focuses on the objective "particularly egregious" standard, which applies even without any general constitutional principles that courts have already promulgated, because "no reasonable officer" could have concluded the conduct to be lawful,  Taylor, 141 S. Ct. at 53.

The Court does its best to follow diligently and faithfully the superior courts' unwritten signals, but, here, the signals are not clear.[30]  The Court, therefore, will proceed with both lines of

_____

[30]The Court agrees with the Tenth Circuit's treatment of Taylor in Truman v. Orem City, i.e., that Taylor marginally expands the standard in United States v. Lanier and Hope v. Pelzer, and stands for the proposition that an officer is not entitled to qualified immunity when their conduct is "particularly egregious" such that "any reasonable officer should have realized" that their conduct offends the Constitution. Taylor, 141 S. Ct. at 54. See Moderwell v. Cuyahoga Cnty., 997 F.3d 653, 660 (6th Cir. 2021)("[W]hen 'no reasonable correctional officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." (quoting Taylor, 141 S. Ct. at 53)).  The Court concludes this treatment to be correct, especially in light of the Supreme Court's summary disposition in McCoy v. Alamu, 141 S. Ct. at 1364.  See Ramirez v. Guadarrama, 2 F.4th at 523

analysis. An officer therefore is entitled to qualified immunity unless a plaintiff can demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established either (a) by a factually similar Supreme Court or Tenth Circuit case on point, see Thomas v. Kaven, 765 F.3d at 1194, or, in rare cases, by "general constitutional principles," Routt v. Howry, 835 F. App'x. at 382, at the time of the alleged misconduct, or (b) because the conduct was "particularly egregious" such that "any reasonable officer should have realized" it was unlawful, Taylor, 141 S. Ct. at 54. See Estate of Smart by Smart v. City of Wichita, 951 F.3d 1161, 1178 (10th Cir. 2020)(quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016))("'To overcome this presumption,' the plaintiffs bear the burden of 'show[ing] that (1) the officers' alleged conduct violated a constitutional right, and (2) [that right] was clearly established at the time of the violation, such that every reasonable official would have understood, that such conduct constituted a violation of that right.'" (alterations in Estate of Smart by Smart v. City of Wichita). See also Riggins v. Goodman, 572 F.3d at 1107 ("When a defendant asserts qualified immunity at summary judgment . . . the plaintiff [must] . . . demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity."); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1079.

---

(Willett, J., dissenting from the denial of rehearing en banc)("The Supreme Court's reliance on Taylor [in McCoy v. Alamu] confirms that the Court does not consider that case an anomaly, but instead a course correction signaling lower courts to deny immunity for clear misconduct, even in cases with unique facts."); Miller, supra, at 222-23; Jennifer E. Laurin, Reading Taylor's Tea Leaves: The Future of Qualified Immunity, 17 Duke J. Const. L. & Pub. Pol'y 241, 272 & n.145 (2022)(citing the Court's opinion in Ortiz v. New Mexico, No. CIV 18-0028 JB/LF, 2021 WL 3115577, at *75 (D.N.M. Jul. 22, 2021), to suggest that lower courts may review the clearly-established analysis at a higher level of generality). On the other hand, given the Court's view on qualified immunity, the Court hopes that the lower courts punch the hole in the defense's line of reasoning, so that it is so wide that the nation can run a truck through it.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie, a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem'l Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[31] If the Court finds only an opinion from the Court of Appeals of New

---

[31]In performing its Erie-mandated duty to predict what a State supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.). Courts, obviously, should be reticent to formulate an Erie prediction that conflicts with Statecourt precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old State supreme court precedent usually binds State trial courts. The factors to which a federal court should look before making an Erie prediction that a State supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the State supreme court decision from which the federal court is considering departing -- the younger the State case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the State courts -- especially the State supreme court -- have placed on the State decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the State decision articulates, especially if the State supreme court explicitly has called an older case's holding into question; (iv) changes in the State supreme court's composition, especially if mostly dissenting justices from the earlier State decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a State supreme court case that a federal court Erie predicts will be overruled likely

Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in

making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same

way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298,

1332 (D.N.M. 2010)(Browning, J.)(noting that, where the only opinion on point is "from the Court

of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what

the Supreme Court of New Mexico would do if the case were presented to it")(citing Wade v.

EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state

decision exists, the federal court must attempt to predict what the state's highest court would do,"

and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the

relevant state"))).[32]   The Court also may rely on Tenth Circuit decisions interpreting New Mexico

---

is very old, neglected by subsequent State court cases -- perhaps because it is in a dusty corner of
the common law which does not get much attention or have much application -- and clearly wrong.

[32]The Supreme Court has addressed what the federal courts may use when there is not a
decision on point from the state's highest court:

> The highest state court is the final authority on state law (Beals v. Hale, 4.
> How. 37, 54 [(1846)]; Erie . . . , 304 U.S. [at] 78 . . . ), but it is still the duty of the
> federal courts, where the state law supplies the rule of decision, to ascertain and
> apply that law even though it has not been expounded by the highest court of the
> State. See Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 209 . . . [(1938)]. An
> intermediate state court in declaring and applying the state law is acting as an organ
> of the State and its determination, in the absence of more convincing evidence of
> what the state law is, should be followed by a federal court in deciding a state
> question. We have declared that principle in West v. American Telephone and
> Telegraph Co., 311 U.S. 223 (1940), decided this day. It is true that in that case an
> intermediate appellate court of the State had determined the immediate question as
> between the same parties in a prior suit, and the highest state court had refused to
> review the lower court's decision, but we set forth the broader principle as
> applicable to the decision of an intermediate court, in the absence of a decision by
> the highest court, whether the question is one of statute or common law.

. . . .

- 117 -

law.  See Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[33]

Ultimately, "the Court's task is to predict what the state supreme court would do."  Wade v.

---

We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court (Erie R.R. Co. v. Hilt, 247 U.S. 97, 100 . . . [(1918)]; Erie R.R. Co. v. Duplak, 286 U.S. 440, 444 . . . [(1932)]), and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940).  The Supreme Court has softened this position over the years: federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Com. Travelers, 333 U.S. 153, 159 (1948)).  See 17A James W. Moore et al., Moore's Federal Practice  § 124.20[2]  (2022)("Moore's")("Thus, federal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently.").

[33]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and State court interpretations of State law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a State's law in the ensuing years, then parties litigating State law claims will be subject to a different body of substantive law, depending on whether they litigate in State court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply State court interpretations of State law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according State court decisions issued in the ensuing years more weight.  On the other hand, when the State law is unclear, it is desirable for there at least to be uniformity among federal judges as to its proper interpretation.  Otherwise, different federal judges within the same Circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to

adopt differing interpretations of a State's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent State court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the State's highest court, on one end, and independently interpreting the State law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it generally is more concerned about systemic inconsistency between the federal courts and the State courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the State law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the State's common law in making his or her determination -- the same as a State judge would.  Systemic inconsistency between the federal courts and State courts, on the other hand, not only threatens federalism's principles, but litigants more easily may manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting State law, and the State courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the State forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in State law.  Tenth Circuit decisions interpreting a particular State's law on a specific issue are further apart in time than the collective district courts are.  More importantly, the Tenth Circuit typically does not address such issues with the frequency that the State's courts do.  Accordingly, Tenth Circuit precedent can lag behind developments in State law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular State's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the State law of the State in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one State.  It is perhaps a more workable design for each district court to keep track of legal developments in the State law of its own State(s) than it is for the Tenth Circuit to monitor separate legal developments in eight States.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of State law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the State law was on the day the

opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a State law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based <u>only</u> on State court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening State court cases.

When interpreting State law, the Tenth Circuit does not and cannot issue a case holding that $x$ is the law in New Mexico; it holds that the <u>proper interpretation</u> of New Mexico law, at the time the opinion is released, is $x$. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on State law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting State law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to consider independently the whole body of State law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of State law is at tension with <u>Erie</u>, giving independent substantive effect to federal judicial decisions -- <u>i.e.</u>, applying federal law -- in a case brought in diversity.

<u>Erie</u>'s purpose is well-known and simple, and the Court should not complicate it beyond recognition: the goal is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or State forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." 17A <u>Moore's</u> § 124.22[3] (citing <u>Comm'r v. Estate of Bosch</u>, 387 U.S. at 465 ("'[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'" (quoting <u>West v. Am. Tel & Tel. Co.</u>, 311 U.S. 223 (1940)))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in State and federal court -- the Honorable Milton I. Shadur, United States District Judge for the United States District Court for the Northern District of Illinois, looks to State procedural rules to determine in which State appellate circuit the suit would have been filed were it not in federal court, and then applies the State law as that circuit court interprets it, <u>see</u> <u>Abbott Labs. v. Granite State Ins.</u>, 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the State supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in State court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. <u>See</u> <u>Allstate Ins. v. Menards, Inc.</u>, 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation,

built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by State supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- validly may come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of State law.

The Erie doctrine results in federal cases that interpret State law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (States must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting State law often become stale.  New State court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of State law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of State law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- additionally might compel the determination that any intervening case law definitively and directly must contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive

EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley v. Titus, 762 F. Supp. 2d at 1332; Rimbert

v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.).

## LAW REGARDING MOTIONS TO STAY

A court has broad discretion in managing its docket, which includes decisions regarding

issuing stays for all or part of a proceeding.  See Clinton v. Jones, 520 U.S. 681, 706 (1997)("The

District Court has broad discretion to stay proceedings as an incident to its power to control its

own docket.")(citing Landis v. N. Am. Co., 299 U.S. 248, 254 (1936)).

---

definition.  In fact, Wankier v. Crown Equipment Corp. quotes Koch v. Koch Industries, Inc.'s
relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not
> required to prove a safer, feasible alternative design, we are bound to follow the
> rule of Allen [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case
> interpreting an issue of Utah law], as was the district court. "Following the doctrine
> of stare decisis, one panel of this court must follow a prior panel's interpretation of
> state law, absent a supervening declaration to the contrary by that state's courts or
> an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at
> 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.
    Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's highest
court.'"  (quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)(emphasis added in Kokins v.
Teleflex, Inc.)).
    The Tenth Circuit has set forth a stringent restriction on its district courts' ability
independently to administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be
at tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting State law] is persuasive."  17A Moore's § 124.22[4] (citing
State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the
Tenth Circuit's interpretation of Erie binds the Court, and the Court will do its best to apply
faithfully the Tenth Circuit's interpretation of Erie.

> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

Landis v. N. Am. Co., 299 U.S. at 254-55.  Recognizing that district courts must exercise moderation in issuing stays, the Supreme Court has noted that there are no strict rules for the district court to apply, because "[s]uch a formula . . . is too mechanical and narrow."  Landis v. N. Am. Co., 299 U.S. at 255.

The party seeking a stay generally faces a difficult burden.  See Clinton v. Jones, 520 U.S. at 708 ("The proponent of a stay bears the burden of establishing its need."); S2 Automation LLC v. Micron Technology, Inc., No. CIV 11-0884 JB/WDS, 2012 WL 3150412, at *2 (D.N.M. July 23, 2012)(Browning, J.)(citing Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d 1477, 1484 (10th Cir.1983)).  "In particular, where a movant seeks relief that would delay court proceedings by other litigants he must make a strong showing of necessity because the relief would severely affect the rights of others."  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484.  "The underlying principle clearly is that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'"  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (quoting Klein v. Adams & Peck, 436 F.2d 337, 339 (2d Cir. 1971))(alteration added in Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.).

The Tenth Circuit has acknowledged a district court's discretion in issuing discovery stays. In Cole v. Ruidoso Municipal Schools, 43 F.3d 1373 (10th Cir. 1994), the defendants argued "that they had an absolute right to a stay of discovery" after they filed a motion for qualified immunity,

and appealed to the Tenth Circuit because the district court imposed conditions on the stay. 43 F.3d at 1386.  The Tenth Circuit rebuffed the strict rules that the defendants suggested:

> As a general rule, discovery rulings are within the broad discretion of the trial court.  *Willner v. Budig*, 848 F.2d 1032, 1035-36 (10th Cir. 1988), *cert. denied sub nom. Willner v. Universiy of Kansas*, 488 U.S. 1031 . . . (1989).  The trial court's decision on discovery matters "will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances."  *United States v. Ortiz*, 804 F.2d 1161, 1164 n.2 (10th Cir. 1986).

Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386.

Whether to issue a discovery stay depends greatly on each case's facts and progress.  In S2 Automation LLC v. Micron Technology, Inc., the Court granted in part and denied in part the Motion to Stay Discovery, Extend Pretrial Deadlines, Vacate Trial Setting and for Protective Order.  See 2012 WL 3150412, at *1.  The Court denied the motion to the extent it requested a discovery stay, because, "[u]ltimately, a stay is unnecessary."  2012 WL 3150412, at *3.  The parties had made "significant progress on the disputed matters," and the Court had "issued rulings on many of the motions that Micron Technology contended needed to be resolved before the case proceeded."  2012 WL 3150412, at *3.  Instead of granting the discovery stay, the Court extended deadlines that it had previously set in the case based on the case's increasing complexity.  See 2012 WL 3150412, at *3.  In Walker v. THI of N.M. at Hobbs Ctr., No. CIV 09-0060 JB/KBM, 2011 WL 2728326 (D.N.M. June 28, 2011)(Browning, J.), the Court evaluated whether to stay deposition discovery until thirty days after it ruled on the motions to dismiss two of the defendants, which would determine whether those defendants would remain in the suit and participate in discovery.  See 2011 WL 2728326, at *1.  The plaintiffs argued that the Court had already extended discovery deadlines and that issuing a stay would require rescheduling deadlines.  See 2011 WL 2728326, at *1.  The Court noted that counsel for the two defendants who were subject to the

motions to dismiss had already indicated that they would not participate in deposition discovery. See Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728326, at *2.  The Court denied the motion to stay, because it did "not see a benefit to staying discovery." Walker v. THI of N.M. at Hobbs Ctr., 2011 WL 2728326, at *2.  See Benavidez v. Sandia Nat'l Lab'ys, No. CIV 15-0922 JB/LF, 2016 WL 6404798 (D.N.M. September 27, 2016)(Browning, J.)(denying stay when "[t]here [was] no reason to put the Defendants to the trouble and expense of having to wait and file another motion -- largely regarding the same issues that are already before the Court in the pending Motion to Dismiss -- while the Plaintiffs get all of their ducks in a row").

On the other hand, the Court has found "compelling" motions to stay when the movant "requests to stay his own efforts to obtain relief." Howard v. City of Albuquerque, 349 F. Supp. 3d 1137, 1148 (D.N.M. 2018)(Browning, J.).  In Howard v. City of Albuquerque, the Court concludes that discovery delays were "reasonable given the doubts about Howard's competency," and grants Howard's motion to stay pending related incompetency proceedings before the State judge. 349 F. Supp. 3d at 1148.  Other factors that the Court considers when determining whether a stay will prejudice the non-moving party include the movant's ability to satisfy the non-moving party's discovery requests after the Court lifts the stay, the movant's stated willingness to cooperate with discovery following competency proceedings, and the non-moving party's ability to relitigate competency issues before the district court.  See Howard v. City of Albuquerque, 349 F. Supp. 3d at 1148.

The Court also has granted motions to stay when State official defendants move to stay discovery pending a decision on qualified immunity.  See, e.g., Saenz v. Lovington Mun. School Dist., No. CIV 14-1005, 2015 WL 1906140 at *12 (D.N.M. April 6, 2015)(Browning, J.).  The Court particularly is inclined to stay discovery when defendants raise a qualified immunity defense

at the motion-to-dismiss stage.  See Saenz v. Lovington Mun. School Dist., 2015 WL 1906140 at

*10 ("Ordinarily, once a defendant files a motion to dismiss that raises qualified immunity, the

Court should stay discovery.")(citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

Additionally, because, at the motion-to-dismiss stage, the Court may consider only the facts which

the plaintiff alleges in his or her complaint, it is less inclined to permit additional discovery that it

otherwise would not consider at that stage. See Saenz v. Lovington Mun. School Dist., 2015 WL

1906140 at *11 ("[T]he only use that discovery could provide in responding to the MTD would be

to allow Saenz to more fully understand her claims and then amend the Complaint.  This use is not

an appropriate use of discovery in response to a qualified immunity defense.").

## LAW REGARDGING ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides: "The Judicial power of the United States shall not be

construed to extend to any suit in law or equity, commenced or prosecuted against one of the

United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S.

Const. amend. XI.  The Supreme Court has construed Eleventh Amendment immunity to prohibit

federal courts from entertaining suits against States brought by their own citizens or citizens of

another State without their consent.  See Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299,

304 (1990).  State agencies are likewise provided immunity as "an arm of the state."  Mt. Healthy

City Bd. of Ed. v. Doyle, 429 U.S. 274, 280-81 (1977).  See Williams v. Bd. of Regents of Univ.

of N.M., 990 F. Supp. 2d 1121, 1142-43 (D.N.M. 2014)(Browning, J.).

### 1.    The Consent and Abrogation Exceptions to Eleventh Amendment Immunity.

Exceptions to a State's Eleventh Amendment immunity are few.  A State may voluntarily

waive, however, its immunity.  See Edelman v. Jordan, 415 U.S. 651, 673 (1974).  Congress also

may abrogate Eleventh Amendment immunity pursuant to section 5 of the Fourteenth Amendment,

where the statute explicitly manifests Congress' intent to waive the States' immunity.  See Fitzpatrick v. Bitzer, 427 U.S. 445, 456 (1976).  Congress did not abrogate, however, Eleventh Amendment immunity when enacting 42 U.S.C. § 1983.  See Quern v. Jordan, 440 U.S. 332, 340 (1979).  Section 1983 creates a cause of action against any person who, acting under color of state law, abridges rights created by the Constitution and federal law.  See 42 U.S.C. § 1983. Consequently, Eleventh Amendment immunity extends to State governments under that statute, and claims pursuant thereto in the federal courts are barred as a matter of law.  See Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d at 1143.

### 2.      Removal as a Waiver of Sovereign Immunity.

When a State removes a case to federal court, it invokes federal jurisdiction and waives Eleventh Amendment immunity.  See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 624 (2002).  In Lapides v. Board of Regents, the Supreme Court held that "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum."  535 U.S. at 624.  The Supreme Court noted: "'[I]t is easy enough to presume that an attorney authorized to represent the State can bind it to the jurisdiction of the federal court (for Eleventh Amendment purposes) by the consent to removal.'"  535 U.S. at 624 (quoting Wis. Dep't of Corr. v. Schacht, 524 U.S. 381, 397 (1998)(Kennedy, J., concurring)).

While Lapides v. Board of Regents arguably was limited to the context of State law claims for which the State explicitly waived immunity to suit in State court, the Tenth Circuit has held that consent to remove a case to federal court also constitutes waiver in the context of federal claims.  See Estes v. Wyoming Dep't of Transp., 302 F.3d 1200, 1206 (2002).  In other words, when a State removes federal law claims from State court to federal court, the State unequivocally

invokes the jurisdiction of the federal court.  See Estes v. Wyoming Dep't of Transp., 302 F.3d at 1206.

In Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d 1259 (D.N.M. 2009)(Browning, J.), the Court addressed the issue "whether removal constitutes a waiver of immunity if private attorneys, representing state agencies or officials, rather than the state's Attorney General, carry out removal."  646 F. Supp. 2d at 1264.  The Court determined that, "at least where counsel for the state agency are authorized to carry out the representation, their act of removing a case to federal court will be sufficiently authoritative to constitute a waiver of Eleventh Amendment immunity."  646 F. Supp. 2d at 1264.  The Court explained that, in Lapides v. Board of Regents, the Supreme Court "framed and decided the issue without reference to whether the state agency's counsel must be the Attorney General."  Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d at 1265.  Reviewing the cases on which the Supreme Court relied in Lapides v. Board of Regents, the Court noted that the focus was not on the identity of the officer or on whether the officer had the authority to waive immunity, but "was on the right to represent the state in the matter in question."  Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d at 1267.  "In sum, if the Defendants' counsel has the authority, under State law, to represent the Defendants -- who are State agencies -- then counsel may waive the Eleventh Amendment immunity defense by consenting to remove this case to federal court."  646 F. Supp. 2d at 1268.  Turning to whether the defendants' counsel had such authority, the Court noted that Risk Management Division, a division of the General Services Department, has the statutory authority to hire legal counsel, and that Risk Management's advisory board includes the Attorney General or his designee; thus, "the Risk Management Division does not operate totally divorced from the Attorney General's authority and supervision."  646 F. Supp. 2d at 1268.  The Court determined

that the New Mexico Children, Youth, & Families Department's private counsel are authorized to represent CYFD and can waive Eleventh Amendment immunity on CYFD's behalf.   See 646 F. Supp. 2d at 1268.  Additionally, CYFD's counsel obtained a commission from the Attorney General, which indicated that the Attorney General consented "not only to private counsels' representation in this case, but to their litigating the case in federal court."  646 F. Supp. 2d at 1269.  Counsel in that case also "agreed to obtain the Attorney General's express waiver of the State's Eleventh Amendment immunity."  646 F. Supp. 2d at 1270.  The Court determined that New Mexico had validly waived its Eleventh Amendment immunity, exercised jurisdiction, and denied the motion to remand in that case.  See 646 F. Supp. 2d at 1270.

In Armijo v. State, Department of Transportation, the Court again held that a State department waives Eleventh Amendment immunity by consenting to remove the case to federal court.  See Armijo v. State, Department of Transportation, 2009 WL 1329192, at *4.  Noting that "[n]either party has contended that the attorney representing the Department lacks authority to represent the Department in this case," the Court said it "presumes the representation is valid and finds that counsel had the authority to remove this case to federal court."  2009 WL 1329192, at *5.  See Williams v. Bd. of Regents of Univ. of N.M., 990 F. Supp. 2d at 1143-44.

**3.      Ex Parte Young.**

Although not properly characterized as an exception to a State's Eleventh Amendment immunity, the doctrine announced in Ex parte Young, 209 U.S. 123, 128 (1908), allows for suits against State officials under certain circumstances.  See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d 602, 607-08 (10th Cir. 1998)("The Ex parte Young doctrine is not actually an exception to Eleventh Amendment state immunity because it applies only when the lawsuit involves an action against state officials, not against the state.").  In Ex parte Young, the

Supreme Court held that the Eleventh Amendment bar generally does not apply to State officials defending suit in federal court which seeks only prospective relief from violations of federal law. Ex parte Young, 209 U.S. at 28.   The Ex parte Young doctrine allows suit to proceed against defendant State officials if the following requirements are met: (i) the plaintiffs are suing State officials rather the State itself; (ii) the plaintiffs have alleged a non-frivolous violation of federal law; (iii) the plaintiffs seek prospective equitable relief rather than retroactive monetary relief from the State treasury; and (iv) the suit does not implicate special sovereignty interests.   See Elephant Butte Irrigation Dist. of N.M. v. Dep't of the Interior, 160 F.3d at 609 (10th Cir. 1998); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1086.

### LAW REGARDING SUPPLEMENTAL JURISDICTION

The federal courts are "courts of limited jurisdiction." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal courts "possess only that power authorized by [the] Constitution and statute." Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). Among the powers that Congress has bestowed upon the courts is the power to hear controversies arising under federal law -- federal-question jurisdiction -- and controversies arising between citizens of different states -- diversity jurisdiction.   See 28 U.S.C. §§ 1331-32.   Section 1367 additionally grants the federal courts power to hear claims over which the court otherwise lacks original jurisdiction, if those claims are part of the same constitutional case as claims over which the court has original jurisdiction.  See 28 U.S.C. § 1367(a).

1.    **Congressional Authority to Exercise Supplemental Jurisdiction.**

Although a statutory basis is necessary for federal courts to exercise jurisdiction over a controversy, "it is well established -- in certain classes of cases -- that, once a court has original jurisdiction over some claims in the action, it may exercise supplemental jurisdiction over

additional claims that are part of the same case or controversy." Exxon Mobil Corp. v. Allapattah
Servs., Inc., 545 U.S. at 552.   The Supreme Court long has subscribed to the concept of
supplemental jurisdiction recognized in two common-law doctrines, pendent jurisdiction and
ancillary jurisdiction; § 1367's passage codified those forms of jurisdiction, and additionally
permits courts to hear cases under pendent-party jurisdiction,[34] which the Supreme Court
previously had disallowed in Finley v. United States, 490 U.S. 545 (1989).   Federal courts may
exercise pendent jurisdiction over state law claims when "state and federal claims . . . derive from
a common nucleus of operative fact."   United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).
Supplemental jurisdiction gives federal courts the flexibility to hear a cause of action after the
introduction of third parties, whose insertion into the litigation does not have the support of any
independent grounds for federal jurisdiction, when those parties share a common interest in the
outcome of the litigation and are logical participants in it.   See Owen Equip. & Erection Co. v.
Kroger, 437 U.S. 365, 375 n.18 (1978).

In 1988, the Honorable William H. Rehnquist, then-Chief Justice of the United States,
created the Federal Courts Study Committee to analyze the federal court system and to recommend
reforms.   See James v. Chavez, No. CIV 09–0540, 2011 WL 6013547, at *5 (D.N.M. November
21, 2011)(Browning, J.).   In response to the Committee's findings regarding pendent, ancillary,

---

[34]Pendant-party jurisdiction occurs when "a plaintiff with a federal claim against one
defendant appends a state law claim, arising from a common nucleus of facts, against *another
defendant*, who could not otherwise be sued in a federal court."   Richard H. Fallon, Jr., John F.
Manning, Daniel J. Meltzer, & David L. Shapiro, Hart and Wechsler's The Federal Courts and
The Federal System 867 (7th ed. 2015)(emphasis in original)("Hart and Wechsler").   Ancillary
jurisdiction refers to supplemental jurisdiction in diversity cases.   See Hart and Wechsler at 1447.
Pendent jurisdiction refers to supplemental jurisdiction in federal question cases.   See Hart and
Wechsler, supra, at 861.

and pendent-party jurisdiction, Congress codified the doctrines when it passed the Judicial

Improvements Act of 1990:

> [I]n any civil action of which the district courts have original jurisdiction,
> the district courts shall have supplemental jurisdiction over all other claims that are
> so related to claims in the action within such original jurisdiction that they form
> part of the same case or controversy under Article III of the United States
> Constitution.  Such supplemental jurisdiction shall include claims that involve the
> joinder or intervention of additional parties.

28 U.S.C. § 1367(a).  In enacting 28 U.S.C. § 1367, Congress conferred upon federal district courts

"supplemental forms of jurisdiction . . . [that] enable them to take full advantage of the rules on

claim and party joinder to deal economically -- in single rather than multiple litigation -- with

matters arising from the same transaction or occurrence."  Report of the Federal Courts Study

Committee, Part II.2.B.2.b. (April 2, 1990), reprinted in 22 Conn. L. Rev. 733, 787 (1990).

### 2.   The District Courts' Discretion to Exercise Supplemental Jurisdiction.

The Tenth Circuit has followed the Supreme Court's lead in classifying supplemental

jurisdiction not as a litigant's right, but as a matter of judicial discretion.  See Estate of Harshman

v. Jackson Hole Mountain Resort Corp., 379 F.3d 1161, 1165 (10th Cir. 2004)(citing City of Chi.

v. Int'l Coll. of Surgeons, 522 U.S. 156, 173 (1997)).  In circumstances where the supplemental

jurisdiction statute may support supplemental jurisdiction, the district court retains discretion to

decline to exercise that jurisdiction.  The traditional analysis, based on the Supreme Court's

opinion in United Mine Workers v. Gibbs, compelled courts to consider "judicial economy,

convenience and fairness to litigants" when deciding whether to exercise supplemental

jurisdiction.  383 U.S. at 726.

Similarly, the supplemental jurisdiction statute enumerates four factors that the court

should consider:

(1)     the claim raises a novel or complex issue of State law,

(2)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3)     the district court has dismissed all claims over which it has original jurisdiction, or

(4)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).  In applying these factors, district courts should seek to exercise supplemental jurisdiction in an effort to "vindicate values of economy, convenience, fairness, and comity . . . ." Estate of Harshman v. Jackson Hole Mountain Resort Corp., 379 F.3d at 1164.  Numerous courts have acknowledged that § 1367(c) necessarily changed the district courts' supplemental jurisdiction discretion analysis and that, unless one of the conditions of § 1367(c) exists, courts are not free to decline jurisdiction.  See Itar-Tass Russian News Agency v. Russian Kurier, Inc., 140 F.3d 442, 447 (2d Cir. 1998)("[S]ection 1367 has indeed altered Gibbs' discretionary analysis."); McLaurin v. Prater, 30 F.3d 982, 985 (8th Cir. 1994)("The statute plainly allows the district court to reject jurisdiction over supplemental claims only in the four instances described therein."); Exec. Software N. Am. v. U.S. Dist. Ct., 24 F.3d 1545, 1557 (9th Cir. 1994)("By codifying preexisting applications of Gibbs in subsections (c)(1)-(3), however, it is clear that Congress intended the exercise of discretion to be triggered by the court's identification of a factual predicate that corresponds to one of the section 1367(c) categories."), overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp., 533 F.3d 1087 (9th Cir. 2008); Palmer v. Hosp. Auth., 22 F.3d 1559, 1569 (11th Cir. 1994)("[S]upplemental jurisdiction must be exercised in the absence of any of the four factors of section 1367(c) . . . ."); Bonadeo v. Lujan, No. CIV 08-0812, 2009 WL 1324119, at *8 (D.N.M. Apr. 30, 2009)(Browning, J.)("28 U.S.C. § 1367(c) changed the district

courts' supplemental jurisdiction discretion analysis to prohibit courts from declining jurisdiction unless one of the conditions of 28 U.S.C. § 1367(c) exists.").

The Tenth Circuit has held that district courts should presume to decline jurisdiction over State claims when federal claims no longer remain: "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 2011)(quoting Smith v. City of Enid ex rel. Enid City Comm'n, 149 F.3d 1151, 1156 (10th Cir. 1998)). This proclamation is consistent with the Supreme Court's statement that

> [n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

United Mine Workers of Amer. v. Gibbs, 383 U.S. at 726 (footnote omitted).

The Court has previously stated that a district court should usually decline to exercise supplemental jurisdiction when 28 U.S.C. § 1367(c) applies. See Armijo v. New Mexico, No. CIV 08-0336, 2009 WL 3672828, at *4 (D.N.M. Sept. 30, 2009)(Browning, J.)("The Supreme Court and the Tenth Circuit have not only acknowledged such a result, they have encouraged it."). The Tenth Circuit has recognized that a district court does not "abuse [its] discretion" when it declines to exercise supplemental jurisdiction over a claim "under 28 U.S.C. § 1367(c)(3) . . . where it 'has dismissed all claims over which it has original jurisdiction[.]'" Muller v. Culbertson, 408 F. App'x 194, 197 (10th Cir. 2011)(unpublished)(quoting 28 U.S.C. § 1367(c)(3))(second alteration in Muller v. Culbertson, but not in 28 U.S.C. § 1367(c)(3)). The Tenth Circuit vacated a district court's ruling on State law supplemental claims when that court dismissed the case's federal claims for lack of subject-matter jurisdiction, stating "[i]f a district court dismisses the federal claims on

the merits, it can as a matter of discretion exercise supplemental jurisdiction.  But when a district court dismisses the federal claims for lack of subject matter jurisdiction, it lacks such discretion and must dismiss the supplemental claims without prejudice."  Estate of Cummings v. United States, 651 F. App'x 822, 828 (10th Cir. 2016)(citing Estate of Harshman v. Jackson Hole Mountain Resort Grp., 379 F.3d at 1167; Scott v. Pasadena Unified Sch. Dist., 306 F.3d 646, 664 (9th Cir. 2002)).

## ANALYSIS

Four motions presently are before the Court: Dr. Howes' Remand Motion, the Defendants' MTD, Dr. Howes' Stay Motion, and the Defendants' Strike Motion.  The Court will consider each of them in turn.  Because the Court concludes that Dr. Howes is not a third-party beneficiary able to enforce the Services Contract, the Court will deny the Remand Motion.  Because the Court concludes that Dr. Howes has not stated claims for property and liberty interest violations, that Dr. Massaro and Grogan are entitled to qualified immunity, and that Dr. Howes has not stated contract law claims, the Court will grant the MTD.  Because the Court has denied the Remand Motion and already has considered the parties' arguments regarding the MTD, the Court will deny the Stay Motion.  Finally, because the Court grants Dr. Howes retroactive leave to amend the Removed Complaint, the Court will deny the Strike Motion.

## I.    THE COURT WILL DENY THE REMAND MOTION.

In the Remand Motion, Dr. Howes argues that the NMDOH and Locumtenens' Services Contract "contains a clear and mandatory forum provision which gives exclusive jurisdiction to the Courts of the State of New Mexico . . . [and] renders removal to federal court improper."  Remand Motion at 3.  He argues that he "is a clear third-party beneficiary of this contract" and, therefore, "has standing to enforce this forum provision."  Remand Motion at 4.  Accordingly,

Dr. Howes requests that the Court remand the case to State court, and award him attorney's fees and costs resulting from the removal.  See Remand Motion at 4-5.  The Defendants, on the other hand, argue that Dr. Howes is not party to the Services Contract, and that the forum selection clause is only "for the benefit of the parties to the contract, the State and Locumtenans."  Remand Response at 3.  The Defendants, therefore, request that the Court deny the Remand Motion.  See Remand Response at 4.

### A.   THE SERVICES CONTRACT'S FORUM SELECTION CLAUSE IS MANDATORY.

Before evaluating whether the Services Contract's forum selection clause is mandatory or permissive, and whether Dr. Howes has standing to enforce the provision, the Court first must determine which law to apply in evaluating the forum selection clause at issue here.  "Federal law, specifically 28 U.S.C. § 1404(a), governs the District Court's decision whether to give effect to the parties' forum selection clause."  Stewart Org. v. Ricoh Corp., 487 U.S. at 32.  There is a distinction, however, between what law governs the enforceability of a forum selection clause and what law governs the interpretation of a forum selection clause.  See Yavuz v. 61 MM, Ltd., 465 F.3d at 430.  The Court previously has concluded that, "although New Mexico has not addressed forum-selection clauses in particular, its decisions relating to choice-of-law provisions indicate that New Mexico would apply the same rule as the Tenth Circuit as well."  Knight Oil Tools, Inc. v. Unit Petroleum Co., 2005 WL 2313715, at *9.  Accordingly, the Court will apply the Tenth Circuit's legal precedent in analyzing the Services Contract's forum selection clause.

The particular forum selection clause at issue in this case is the following:

27.   Applicable Law

The laws of the State of New Mexico shall govern this Agreement, without giving effect to its choice of law provisions.  Venue shall be proper only in a New

> Mexico court of competent jurisdiction in accordance with NMSA 1978, § 38-3-l(G).  By execution of this Agreement, Contractor acknowledges and agrees to the jurisdiction of the courts of the State of New Mexico over any and all lawsuits arising under or out of any term of this Agreement.

Services Contract ¶ 27, at 12.  The Services Contract states that Locumtenens "agrees to the jurisdiction of the courts of the State of New Mexico," but it does not include in that sentence an exclusive term.  Services Contract ¶ 27, at 12.  Where only jurisdiction is specified, courts generally will not enforce the clause unless the parties also have indicated their intent to make venue exclusive.  See K & V Sci. Co. v. BMW, 314 F.3d at 499.  The Court concludes, however, that this clause also specifies venue "'with mandatory or obligatory language.'"  K & V Sci. Co. v. BMW, 314 F.3d at 499 (quoting Paper Express, Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d at 757).  Specifically, it provides that "[v]enue shall be proper only in a New Mexico court of competent jurisdiction in accordance with NMSA 1978, § 38-3-1(G)," Services Contract ¶ 27, at 12 (emphasis added).

Having interpreted the forum selection clause as mandating venue in "a New Mexico court," however, the question remains whether the forum selection clause places venue in the New Mexico State courts or whether it also contemplates placing venue in the New Mexico federal courts.  Services Contract ¶ 27, at 12.  The Court concludes that this clause should be read as conferring mandatory venue in New Mexico State courts, because any other reading would render the phrase "in accordance with NMSA 1978, § 38-3-1 (G)" meaningless.  Services Contract ¶ 27, at 12.  See K & V Sci. Co. v. BMW, 314 F.3d at 499-500 (citing Frietsch v. Refco, Inc., 56 F.3d 825, 827 (7th Cir. 1995)(concluding that the clause "place of jurisdiction . . . is the registered office of the trustee [in Germany], to the extent permissible under the law," is a mandatory forum selection clause, because the phrase "to the extent permissible under the law" would have no

meaning if a party could sue anywhere he wanted).  N.M.S.A. § 38-3-1 is titled "County in which

civil action in district court may be commenced," and states that "[a]ll civil actions commenced in

the district courts shall be brought and shall be commenced in counties as follows and not

otherwise[.]"  N.M.S.A. § 38-3-1.  Subsection (G) then specifies the appropriate venue for suits

against state officers:

> Suits against any state officers as such shall be brought in the court of the
> county in which their offices are located, at the capital or in the county where a
> plaintiff, or any one of them in case there is more than one, resides, except that suits
> against the officers or employees of a state educational institution as defined in
> Article 12, Section 11 of the constitution of New Mexico, as such, shall be brought
> in the district court of the county in which the principal office of the state
> educational institution is located or the district court of the county where the
> plaintiff resides.

N.M.S.A. § 38-3-1(G).[35]  Section 38-3-1(G)'s language refers explicitly to the State district courts,

and, thus, the Services Contract's forum selection clause is analogous to the forum selection clause

---

[35]The Court notes that, in the absence of a forum selection clause with mandatory language, § 38-3-1(G) on its own does not strip the federal courts of jurisdiction to hear cases brought against State officials, and the Court hears cases brought against State officials regularly.

> In all cases, where a general right is . . . conferred, it can be enforced in any
> Federal court within the State having jurisdiction of the parties.  It cannot be
> withdrawn from the cognizance of such Federal court by any provision of State
> legislation that it shall only be enforced in a State court.  The statutes of nearly
> every State provide for the institution of numerous suits, such as for partition,
> foreclosure, and the recovery of real property in particular courts and in the counties
> where the land is situated, yet it never has been pretended that limitations of this
> character could affect, in any respect, the jurisdiction of the Federal court over such
> suits where the citizenship of one of the parties was otherwise sufficient.  Whenever
> a general rule as to property or personal rights, or injuries to either, is established
> by State legislation, its enforcement by a Federal court in a case between proper
> parties is a matter of course, and the jurisdiction of the court, in such case, is not
> subject to State limitation.

Chicago & N.W.R. Co. v. Whitton, 80 U.S. 270, 286 (1871).  See Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d at 666-67 ("[T]he scope of a federal court's subject matter jurisdiction is governed exclusively by acts of Congress.  And when Congress grants subject matter

that the Tenth Circuit upheld as mandatory in <u>Milk 'N' More, Inc. v. Beavert</u>.  There, the forum

selection clause states that "venue shall be proper . . . in Johnson County, Kansas."  <u>Milk 'N'</u>

<u>More, Inc. v. Beavert</u>, 963 F.2d at 1343.  Here, instead of a single county in which the parties may

bring suit, the parties rely on § 38-3-1(G)'s language to identify the appropriate county, which may

vary depending on the relevant State office's location.  <u>See</u> Services Contract ¶ 27, at 12; N.M.S.A.

§ 38-3-1(G).  Moreover, the Tenth Circuit has considered the question whether "the U.S. district

courts are courts *of* the various states in which they are located."  <u>Am. Soda, LLP v. U.S. Filter</u>

<u>Wastewater Grp., Inc.</u>, 428 F.3d 921, 925 (10th Cir. 2005)(emphasis in original).  In <u>American</u>

<u>Soda, LLP v. U.S. Filter Wastewater Group, Inc.</u>, the Tenth Circuit concludes that "the federal

court located in Colorado is not a court *of* the *State* of Colorado but rather a court *of* the *United*

*States of America*."  428 F.3d at 926 (emphases in original).  Thus, the Court concludes that the

Services Contract's forum selection clause mandates venue in the New Mexico State courts and

precludes the suit being in the New Mexico federal court.

---

jurisdiction, no other entity -- not the litigants and not the states -- can divest a federal court of the
same.")(citing <u>Marshall v. Marshall</u>, 547 U.S. 293, 313 (2006); <u>Tenn. Coal, Iron & R.R. Co. v.
George</u>, 233 U.S. 54, 360 (1914); <u>Chicago & N.W.R. Co. v. Whitton</u>, 80 U.S.at 286; <u>Odom v.
Penske Truck Leasing Co.</u>, 893 F.3d 739, 742 (10th Cir. 2018)).  Section 38-3-1(G) provides the
proper venue when the parties bring an action in State court; it does not prohibit them from
bringing the action in federal court in the first instance, if the parties can establish original and/or
supplemental jurisdiction.  Although this provision on its own does not prevent the Court from
exercising jurisdiction over a case against State officials, that the NMDOH and Locumtenens
reference it in the forum selection clause using mandatory language leads the Court to conclude
that the provision is mandatory.  <u>See K & V Scientific Co. v. BMW</u>, 314 F.3d at 499 (stating that,
when venue is specified, such as when the parties designate a particular county or tribunal, and
mandatory or obligatory language accompanies the designation, courts will enforce a forum
selection clause as mandatory).

**B.     DR. HOWES IS NOT AN INTENDED THIRD-PARTY BENEFICIARY TO THE SERVICES CONTRACT.**

Having determined that the forum selection clause is mandatory, the Court must next determine whether Dr. Howes is able to enforce the clause in this case.  Dr. Howes was able to review the Services Contract for the first time after the Defendants attached it to the MTD.  See Remand Motion at 4 n.2.  Having been able to review the Services Contract, Dr. Howes asserts that he "was a skilled employee who was provided because of this contract, and as such, is a clear third-party beneficiary of this contract," and, therefore, he "has standing to enforce this forum provision."[36]  Remand Motion at 4.  The Defendants, conversely, emphasize language in the forum selection clause that, not Dr. Howes, but the "'*Contractor acknowledges and agree*s to the jurisdiction of the court of the State of New Mexico,'" Remand Response at 3 (quoting Services Contract ¶ 27, at 12), and argue that the forum selection clause, therefore, is "for the benefit of the parties to the contract," namely, New Mexico and Locumtenens, and that Dr. Howes is not an intended third-party beneficiary of that language, Remand Response at 3.

Dr. Howes relies on several federal cases -- one from the Court and one from the United States District Courts for the Eastern District of Pennsylvania, the District of New Jersey, and the Eastern District of Oklahoma -- to support his claim that he is a third-party beneficiary with the right to enforce the forum selection clause.[37]  For example, he cites to Presidential Hospitality,

---

[36]Accordingly, he asserts that he "intends to seek leave to amend his complaint to reflect his clear status as a third-party beneficiary."  Remand Motion at 4 n.2.

[37]Specifically, Dr. Howes cites Presidential Hosp., Ltd. Liab. Co. v. Wyndham Hotel Grp., Ltd. Liab. Co., 333 F. Supp. 3d at 1225 (quoting Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211), First Fin. Mgmt. Grp., Inc. v. Univ. Painters of Baltimore, Inc., No. 11-5821, 2012 WL 1150131, at *3 (E.D. Pa. April 5, 2012)(Baylson, J.), Affiliated Mortg. Prot., LLC v. Tareen, 2007 WL 203947, at *4, and Lowrimore v. Severn Trent Envtl. Servs., No.

LLC v. Wyndham Hotel Group, LLC, for the proposition that "a forum selection clause may bind a non-signatory 'if the connection between the agreement and the non-signatory is sufficiently strong -- i.e., if the party is closely related to the dispute such that it becomes foreseeable that it will be bound.'" Presidential Hosp., LLC v. Wyndham Hotel Grp., LLC, 333 F. Supp. 3d at 1225 (quoting Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211). This quotation is, however, an incomplete representation of the Court's thinking on this issue. The Court in Presidential Hospitality, LLC v. Wyndham Hotel Group, LLC, notes that this rule derives from "the prevailing winds from" Courts of Appeals outside the Tenth Circuit, and, later in the same paragraph, notes that "[t]he Court, nevertheless, rejected the rule noting that it is wary of 'applying contracts and forum selection clauses to people who did not sign the contract.'" 333 F. Supp. 3d at 1225 (quoting Presbyterian Healthcare Servs. v. Goldman, Sachs & Co., 122 F. Supp. 3d at 1211).

In any event, Dr. Howes' reliance on federal case law is inapposite, as the Court will apply State contract law to determine the rights of non-signatories, in accordance with the Services Contract's choice-of-law provision. See Services Contract ¶ 27, at 12 ("The laws of the State of New Mexico shall govern this Agreement, without giving effect to its choice of law provisions."). The Tenth Circuit has stated that, "when a court interprets a contract, as a general matter it applies the law that the parties selected in their contract." Yavuz v. 61 MM, Ltd., 465 F.3d at 427 (citing Restatement (Second) of Conflict of Laws § 187).

> "Because conflicts of law are inevitable in a federal system, parties to a contract are empowered to and frequently do choose a particular state's law to apply to the execution and interpretation of the contract. Absent special circumstances, courts usually honor the parties' choice of law because two 'prime objectives' of

---

CIV-15-475-RAW, 2016 U.S. Dist. LEXIS 24242, at *7 (E.D. Okla. Feb. 29, 2016)(White, J.). See Remand Reply at 1-2.

> contract law are 'to protect the justified expectations of the parties and to make it possible for them to foretell with accuracy what will be their rights and liabilities under the contract.'  Restatement § 187 cmt. e."

Yavuz v. 61 MM, Ltd., 465 F.3d at 428 (quoting Boyd Rosene & Assocs v. Kan. Muni. Gas Agency, 174 F.3d 1115, 1121 (10th Cir. 1999)).  See Kornfeld v. Kornfeld, 321 F. App'x 745, 750 n.3 (10th Cir. 2009)("In the settlement agreement, the parties agreed that Oklahoma law governs any disputes regarding the validity, construction, and enforcement of the settlement agreement, so we apply the substantive law of Oklahoma.")(citing Yavuz v. 61 MM, Ltd., 465 F.3d at 428); Elna Sefcovic, LLC v. TEP Rocky Mountain, LLC, 953 F.3d at 673 n.13 ("Because the *Lindauer* [settlement agreement] contains a choice-of-law provision declaring that Colorado law govern its interpretation, we apply Colorado law to interpret the forum selection provision.")(citing Yavuz v. 61 MM, Ltd., 465 F.3d at 428); Orderly Health, Inc. v. NewWave Telecom & Techs., No. 20-1441,  2021 WL 4592268, at *2 (10th Cir. October 6, 2021)(unpublished)("Section 8(a) of the [Letter of Intent] provides that it 'shall be governed by the substantive laws of the State of Delaware without regard to conflict of law principles.'  Suppl. App. at 5.  Therefore, Delaware law applies here.")(citing Yavuz v. 61 MM, Ltd., 465 F.3d at 427-28).  Accordingly, the Court will apply New Mexico State law in determining whether Dr. Howes is an intended third-party beneficiary to the Services Contract.

Under New Mexico State law, as a general rule, "one who is not a party to a contract cannot maintain suit upon it."  Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 112 N.M. at 49, 811 P.2d at 82.  Despite this general rule, a third party may be a beneficiary of a contract, and may, as a beneficiary, have enforceable rights against another party to the contract.  See Fleet Mortg. Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 112 N.M. at 49, 811 P.2d at 82.  To be an intended third-party beneficiary, Dr. Howes must "show that the parties to the contract intended to benefit him."

Tarin's, Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 129 N.M. at 191, 3 P.3d at 686.  "The paramount indicator of third party beneficiary status is a showing that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries."  Valdez v. Cillessen & Son, Inc., 1987-NMSC-015, ¶ 34, 105 N.M. at 581, 734 P.2d at 1264 (citing McKinney v. Davis, 1972-NMSC-077, 84 N.M. 352, 503 P.2d 332).

Dr. Howes has not demonstrated that the Services Contract's parties intended to benefit him.  He asserts that he "is one of the contract medical personnel who worked at a DOH facility because of this contract.  As a contractor under this contract, he is a clear third-party beneficiary for this contract . . . ."  Remand Motion at 4.  Dr. Howes, however, is not a contractor under the Services Contract's terms.  Instead, the Services Contract states that "THIS AGREEMENT is made and entered into by . . . **LOCUMTENENS.COM** herein after referred to as the 'contractor.'"  Services Contract at 1 (flush text)(bold in original).  Instead, Dr. Howes is one of the "Psychiatrists, Certified Psychiatric Nurse Practitioners or Psychiatric Clinical Nurse Specialists," which Locumtenens will provide "as needed by the agency, to both In-Patient and Out-Patient facilities of the agency," and who are "independent contractors."  Services Contract ¶¶ 2(1), (6), at 2, 4.  Presumably, these medical professionals will receive compensation for their work; however, the Services Contract does not contemplate this compensation, providing instead:

> The Procuring Agency [NMDOH] shall pay to the Contractor in full payment for services satisfactorily performed at the rate range of **$250.00 to $290.00** per hour for a Psychiatrist, **$160.00** per hour for a Certified Psychiatric Nurse Practitioners [sic] and **$160.00** per hour for a Psychiatric Clinical Nurse Specialists [sic], such compensation not to exceed $164,000.00.

Services Contract ¶ 3 at 4 (bold in original, underline emphasis added).[38]  This language does not direct Locumtenens to divert any of the NMDOH's payments to the contracted medical professionals, although such payment occurs presumably through separate contracts between the individual professionals and Locumtenens.  See Amended Complaint ¶ 10, at 3 ("As for every assignment, Dr. Howes signed a 'Services addendum' with AP-Contractor.Com\Locumtenans for professional services to unspecified clients . . . ").  In fact, the Services Contract expressly disclaims certain benefits -- including insurance -- for the medical professionals that Locumtenens provides:

> The contractor, and contractor's agents and employees, shall not accrue leave, retirement, insurance, bonding, use of state vehicles, or any other benefits afforded to employees of the State of New Mexico as a result of this agreement. The contractor acknowledges that all sums received hereunder are personally reportable by it for income tax purposes as self-employment or business income and are reportable for self-employment tax.

Services Contract ¶ 9, at 7.[39]

---

[38]The parties adjusted the payment rates and added new payment rates for weeknight, weekend, and holiday work in an addendum, dated April 20, 2020.  The adjusted payment rates do not impact the Court's analysis.  See Services Contract, Addendum ¶ 3, at 23.

[39]The only benefit which the Services Contract provides contracted medical professionals – one which Dr. Howes does not mention at all, either in his three complaints, in his briefing, or at the oral argument -- is the following:

26.     New Mexico Employees Health Coverage

A.      If Contractor has, or grows to, six (6) or more employees who work, or who are expected to work, an average of at least 20 hours per week over a six (6) month period during the term of the contract, Contractor certifies, by signing this agreement, to have in place, and agree to maintain for the term of the contract, health insurance for those employees and offer that health insurance to those employees if the expected annual value in the aggregate of any and all contracts between Contractor and the State exceed $250,000 dollars.

Services Contract ¶ 26(A), at 11.  Although Dr. Howes has not alleged facts regarding the number of Locumtenens' employees or the aggregate contract value between New Mexico and

Locumtenens, this provision evidences an intent to benefit Locumtenens' employees.  Dr. Howes does not allege, however, that this benefit was "contemplated by the promisee as one of the motivating causes of his making the contract," which the Supreme Court of New Mexico has adopted as one of two ways "[a] third party who is not a promisee and who gave no consideration [can have] an enforceable right by reason of a contract made by two others," the other being where the third party is a creditor and "the contract calls for a performance by the promisor in satisfaction of the obligation."  McKinney v. Davis, 1972-NMSC-077, ¶ 8, 84 N.M. at 354, 503 P.2d at 334 (quoting Permian Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, 63 N.M. 1, 312 P.2d 533).

Additionally, while Dr. Howes could assert a claim to health insurance as an intended third-party beneficiary, the Court has not identified any caselaw to suggest that, because a third party receives an intended benefit from one contract provision, it entitles them to enforce every other provision in that contract, unless the contract as a whole is for the third party's benefit or binds explicitly the third party.  See Great Am. Ins. Co. of N.Y. v. W. States Fire Protection Co., 730 F. Supp. 2d at 1323 ("That subcontractors are named in the Contract as persons against whom subrogation is waived convinces the Court that subcontractors are intended to be third-party beneficiaries of the subrogation waiver.")(emphasis added); THI of New Mexico at Vida Encantada, LLC v. Lovato, 848 F. Supp. 2d at 1327 (concluding that a nursing home resident was a third-party beneficiary, because "she was the named resident . . . the terms of the Admission Agreement refer to benefits . . . [and her] care was the essential purpose of the agreement); Jerry Erwin Assocs., Inc. v. Estate of Asher by and through Zangara, 290 F. Supp. 3d at 1250 (concluding that plaintiff, who sought to enforce an arbitration agreement, was a third-party beneficiary of the arbitration agreement, because the agreement stated explicitly it bound certain third parties).  When a contract in its entirety does not provide that a party is a third-party beneficiary, however, courts consider generally the third-party-beneficiary issue when a party claims to be a third-party beneficiary of a contract provision and that same contract provision's breach is at issue. See, e.g., Valdez v. Cillessen & Son, Inc., 1987-NMSC-015, ¶ 36, 105 N.M. at 582, 734 P.2d at 1265.(in a case where plaintiff asserted he was an intended third-party beneficiary of a workmen's compensation provision and sued for breach of that provision, reversing lower court's summary judgment grant); McKinney v. Davis, 1972-NMSC-077, ¶ 3, 84 N.M. at 353, 503 P.2d at 333 (in a case where plaintiff asserted he was an intended third-party beneficiary of a workmen's compensation provision and sued for breach of that provision, holding that plaintiff was not a third-party beneficiary); Skyline Potato Co. v. Hi-Land Potato Co., 188 F. Supp. 3d 1097, 1154 (D.N.M. 2016)(Browning, J.)(in a case where defendant asserted it was a third-party beneficiary of an attorney's fee provision, and sued to enforce that provision, concluding that the defendant was not a third-party beneficiary).  The Restatement (Second) of Contracts also discusses intended beneficiaries referring primarily to individual promises instead of contracts.

Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

The Services Contract's plain language suggests that the NMDOH and Locumtenens' purpose in contracting is for Locumtenens to provide employees to the NMDOH to provide psychiatric services.  See Services Contract ¶ 2, at 2.  The Contract is explicit that the Psychiatrists,

_____

Restatement (Second) of Contracts § 302.  New Mexico State courts rely regularly on the Restatement (Second) of Contracts in deciding contract law claims.  In Tarin's, Inc. v. Tinley, for example, which the Court has predicted the Supreme Court of New Mexico would follow, see supra, at 36 n.9, the Court of Appeals of New Mexico cites the Restatement (Second) of Contracts for the proposition that "[o]nly intended beneficiaries can seek enforcement of a contract as third-party beneficiaries."  2000-NMCA-048, ¶ 13, 129 N.M. at 191, 3 P.3d at 686 (citing Restatement (Second) of Contracts §§ 304, 315).

The Supreme Court of New Mexico also has used similar promise-related language in evaluating whether the plaintiffs in an action are third-party beneficiaries of a collective bargaining agreement, noting that a plaintiff seeking to establish third-party beneficiary status must assert that one of the signatories to the contract at issue made a promise to the second party and then broke that promise.  See Callahan v. New Mexico Fed'n of Teachers-TVI, 2006-NMSC-010, ¶ 21, 130 N.M. at 208, 131 P.3d at 58 ("In order to state a claim, instead of relying on the general notion that TVI and Union Defendants entered into a collective bargaining agreement that pertains to Plaintiffs' employment, Plaintiffs would need to assert a promise that Union Defendants made to TVI and subsequently broke.").

The Court concludes that it would be unlikely that the Supreme Court of New Mexico developed its third-party beneficiary jurisprudence intending to allow, for example, an independent contractor like Dr. Howes, upon whom the Services Contract may confer a health insurance benefit – although Dr. Howes has not made such an allegation -- to enforce Locumtenens' promise to the NMDOH to "maintain . . . financial statements for a period of no less than six years and [to] make the financial statements and the CPA's audit or opinion available to the Agency upon reasonable request."  Services Contract ¶ 16, at 8.  If Dr. Howes had brought suit alleging that Locumtenens improperly had withheld health benefits from him, the Court would conclude that he is a third-party beneficiary to that provision and, thus, could bring suit to enforce it.  In such a circumstance, it would grant the Remand Motion.  In the present action, however, Dr. Howes alleges due-process-violation, breach-of-contract, and breach-of-implied-covenant-of-good-faith-and-fair-dealing claims that revolve around Dr. Howes' contention that the Services Contract restricts the NMDOH's ability to terminate his employment, and that the NMDOH terminated his employment in violation of such a provision.  See Amended Complaint ¶¶ 8-78, at 2-11.  As the Court discusses below, the Services Contract does not contain any such provision or otherwise mention conditions related to the termination of Dr. Howes' employment, and any restriction on Dr. Howes' termination comes instead from his employment contract with Locumtenens.  Accordingly, the Court concludes that, although Dr. Howes may be a third-party beneficiary to the health insurance provision if Locumtenens employs more than six employees, that third-party beneficiary status does not extend to the Services Contract's entirety, and he, therefore, may not rely on the forum selection clause in this action.  Thus, the Court will deny the Remand Motion.

Certified Psychiatric Nurse Practitioners and Psychiatric Clinical Nurse Specialists themselves are considered independent contractors, and that the NMDOH does not employ them.  See Services Contract ¶ 2(6), at 4.  Further, the Services Contract does not confer directly any pecuniary benefit on Dr. Howes as a result of his employment, because it contemplates payments from the NMDOH to Locumtenens directly, and not to any of the independently contracted medical professionals. See Services Contract ¶ 3, at 4.  Additionally, except for requiring Locumtenens to have health insurance in place under specific circumstances, the Services Contract also precludes explicitly independent contractors from "accru[ing] leave, retirement, insurance, bonding, use of state vehicles, or any other benefits afforded to employees of the State of New Mexico."  Services Contract ¶ 9, at 7.  Allegations that the Contract resulted in Dr. Howes' employment and provides him the ability to opt-in to health insurance are not the same as allegations that benefitting Dr. Howes was "contemplated by the promisee as one of the motivating causes of his making the contract."  McKinney v. Davis, 1972-NMSC-077, ¶ 8, 84 N.M. at 354, 503 P.2d at 334 (quoting Permian Basin Inv. Corp. v. Lloyd, 1957-NMSC-048, 63 N.M. 1, 312 P.2d 533).  Consequently, the Court concludes that Dr. Howes has not alleged adequately that he is the Services Contract's intended third-party beneficiary, but is instead an incidental beneficiary.  The Court will deny the Motion to Remand, because Dr. Howes is not a signatory or a third-party beneficiary to the Services Contract, and, therefore, cannot enforce the mandatory forum selection clause.

## II.    **THE COURT WILL GRANT THE MTD.**

Having determined that this case is properly before the Court, the Court turns to the Defendants' MTD.  Dr. Howes brought this action in State court setting forth the following four counts: (i) a § 1983 claim, alleging that Grogan, in his individual capacity, violated Dr. Howes' procedural and substantive due process rights to: (a) his liberty interest in his reputation and

employment at NMBHI, and (b) his property interest in his professional license, when Grogan terminated Dr. Howes' employment, see Removed Complaint ¶¶ 25-40, at 4-6; (ii) a § 1983 claim, alleging that Dr. Massaro, in his individual capacity, violated Dr. Howes' procedural and substantive due process rights to: (a) his liberty interest in his reputation and employment at NMBHI, and (b) his property interest in his professional license, when Dr. Massaro made the decision to terminate Dr. Howes' employment, see Removed Complaint ¶¶ 41-49, at 6-7; (iii) a contract claim that all the Defendants, in their official capacities, breached an implied contract between Dr. Howes and the NMDOH when they terminated Dr. Howes' employment, see Removed Complaint ¶¶ 50-59, at 7-8; and (iv) a contract claim that all the Defendants, in their official capacities, wrongfully terminated Dr. Howes' employment, and, so doing, breached the implied covenant of good faith and fair dealing when they made defamatory statements about Dr. Howes' work and licensure status to Locumtenens, see Removed Complaint ¶¶ 60-67, at 8-9.[40]

---

[40]Dr. Howes modifies slightly his allegations and claims in the Amended Complaint. Among some smaller changes, he adds language to emphasize that his termination was unexpected, and that the accusation that he had been practicing medicine without a license is an accusation that he is committing a felony and may have lasting repercussion. See Amended Complaint ¶¶ 18, 20, at 4; id. ¶ 31, at 5; id. ¶ 50, at 7. He makes the most significant changes to Count III, where he switches his liability theory from a breach-of-implied-contract claim to a breach-of-contract claim, asserts that he is a third-party beneficiary to the Services Contract, asserts that the Services Contracts' provisions regarding the parties' rights to terminate the Services Contract are unconscionable adhesion contract provisions, and asserts that the Defendants, therefore, could not terminate lawfully Dr. Howes' employment under the Services Contract. See Amended Complaint ¶¶ 59-64, at 9. As discussed above, Dr. Howes is not a third-party beneficiary to the Services Contract, and, thus, even if the Court were to determine that the particular provisions which he highlights are unconscionable, analysis which the Court undertakes below, see supra, at 158-65, he does not have standing to bring these claims. Nevertheless, the Court considers below Dr. Howes' original breach-of-implied contract claim and his modified breach-of-contract claim.

The MTD states four grounds on which the Court should dismiss the Removed Complaint: (i) Dr. Howes fails to state a claim on which relief can be granted for his § 1983 claims, because he cannot show that he has a property or liberty interest; (ii) Dr. Massaro and Grogan are entitled to qualified immunity on Dr. Howes' § 1983 claims; (iii) Dr. Massaro and Grogan are not proper Defendants for Dr. Howes' contract claims; and (iv) Dr. Howes did not have an express written contract with New Mexico, and so cannot prevail on his breach-of-contract, wrongful-termination, and breach-of-the-implied-covenant-of-good-faith-and-fair-dealing claims.  See MTD at 1-2.  The Court first will review Dr. Howes' § 1983 claims against Dr. Massaro and Grogan, and will analyze whether Dr. Howes' Removed Complaint states a claim for a violation of his due process property and liberty interests, and whether qualified immunity shields Dr. Massaro and Grogan from liability for allegedly violating these interests.  The Court next will determine whether to dismiss Dr. Howes' breach-of-implied-contract claim, wrongful-termination claim, and breach-of-implied-covenant-of-good-faith-and-fair-dealing claim, because New Mexico law prohibits implied contracts with the State.

### A.   DR. HOWES HAS NOT STATED A § 1983 CLAIM AGAINST DR. MASSARO AND GROGAN FOR VIOLATING HIS DUE PROCESS RIGHTS.

The Court first analyzes Dr. Howes' claims under § 1983, i.e., that Dr. Massaro and Grogan violated Dr. Howes' due process rights to a liberty interest in his reputation and NMBHI employment, or to a property interest in his professional license.  See Removed Complaint ¶¶ 25-49, at 4-7.  Dr. Massaro and Grogan raise a qualified immunity defense, arguing that Dr. Howes does not have a property or liberty interest, and that he has not shown that such rights were clearly established when the alleged violation occurred.  See MTD at 9-10.  Accordingly, pursuant to Saucier v. Katz and Pearson v. Callahan's instruction on the order with which to

conduct a qualified immunity analysis, the Court first will analyze whether Dr. Massaro and Grogan violated Dr. Howes' constitutionally protected rights, and then whether those rights were clearly established at the time of the alleged violation.  See Saucier v. Katz, 533 U.S. at 200; Pearson v. Callahan, 555 U.S. at 236-37.

### 1.        Dr. Howes Does Not Allege Adequately a Property Interest Violation.

The main thrust of Dr. Howes' property interest claim is that he has a property interest in his professional license and contract, and that Dr. Massaro and Grogan acted under color of state law when they violated his right to procedural and substantive due process by terminating his employment without adhering to the Services Contract's thirty-day notice requirement, and without providing Dr. Howes the opportunity to be heard or respond to the allegation that he was practicing medicine without a license.  See Removed Complaint ¶¶ 28-34, 39, at 5-6 (describing the allegations against Grogan); id. ¶¶ 46-48, at 7 (describing the allegations against Dr. Massaro). In the MTD, however, the Defendants assert that Dr. Howes does not have a property interest in his employment, because he has no employment contract with the NMDOH.  See MTD at 6-7. Additionally, they point to language in the Services Contract that allows the NMDOH to terminate the Services Contract for convenience and reserves the right to change contractor representatives, i.e., the medical professionals whom Locumtenens provides to the NMDOH.  See MTD at 7.  They cite to Martin Marietta Materials, Inc. v. Kansas Department of Transportation for the proposition that an individual cannot assert a property interest arising out of a contract to which that individual is not a party, and, thus, cannot bring a procedural due process claim on that basis.  See MTD at 8 (quoting Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d at 1177).  The Defendants also note that, while an individual may have a constitutionally protected property interest in an entitlement, the Due Process Clause does not protect benefits that the government

discretionarily may confer.  See MTD at 8 (quoting Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d at 1178).

> **a.      Dr. Howes Has Not Alleged Adequately That He Has an Implied Employment Contract with New Mexico.**

The Court first will evaluate whether Dr. Howes has alleged adequately that he has an implied contract with New Mexico.  The Supreme Court of New Mexico has stated that "[c]ontracts with governmental entities must be in writing."  Carrillo v. Rostro, 1992-NMSC-054, ¶ 12, 114 N.M. 607, 612, 845 P.2d 130, 135 (citing N.M.S.A. § 37-1-23(A))(distinguishing Kestenbaum v. Pennzoil Co., 1988-NMSC-092, 108 N.M. 20, 766 P.2d 280, cert. denied, 490 U.S. 1109 (1989), which establishes that courts may identify implied employment contracts based on a totality of the circumstances analysis, because Kestenbaum v. Pennzoil Co. "involved the conduct of a private employer, not a governmental entity").  The Supreme Court of New Mexico subsequently recognized that an implied employment contract nevertheless may satisfy § 37-1-23's valid written contract requirement.  See Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 14, 121 N.M. at 732, 918 P.2d at 11.  To satisfy § 37-1-23's requirements, however, Dr. Howes must show that his interactions with New Mexico satisfy the basic contract requirements of an offer, acceptance, consideration, and mutual assent, sufficient to create what is ordinarily an at-will employment contract.  See Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶¶ 9-10, 121 N.M.at 731, 918 P.2d at 10 (citing Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶¶ 4-7, 115 N.M. at 668-69, 857 P.2d at 779-80).  He then may point to "'written representations such as *an employee handbook*, . . . oral representations, . . . the conduct of the parties, or . . . a combination of representations and conduct.'"  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 121 N.M.at

731, 918 P.2d at 10 (quoting <u>Hartbarger v. Frank Paxton Co.</u>, 1993-NMSC-029, ¶ 6, 115 N.M. at 669, 857 P.2d at 780)(emphasis added in <u>Garcia v. Middle Rio Grande Conservancy Dist.</u>). Although oral representations and conduct support a conclusion regarding an implied employment contract's creation in most circumstances, for § 37-1-23's purposes, the Supreme Court of New Mexico has not indicated that these representations satisfy the valid written contract requirement and thereby overcome State sovereign immunity.  Instead, it has held that § 37-1-23 "incorporates an implied employment contract that includes written terms as set forth in a personnel policy." <u>Garcia v. Middle Rio Grande Conservancy Dist.</u>, 1996-NMSC-029, ¶ 14, 121 N.M.at 732, 918 P.2d at 11.

Dr. Howes has not alleged or argued that he satisfies the basic contracting requirements -- offer, acceptance, consideration, and mutual assent -- because he has alleged only that he contracted directly with Locumtenens and not that he engaged in any negotiations with the NMDOH.  He also has not directed the Court's attention in his Removed Complaint or in his arguments on the MTD to any oral representations or conduct that would lead the Court, based on the totality of the circumstances, to conclude that he entered into an implied employment contract with New Mexico.  Thus, the Court concludes that Dr. Howes does not have an implied employment contract with the State.

Further, even if Dr. Howes did have an implied employment contract with New Mexico, he has not alleged the existence of any writing, other than the Services Contract, which would lead the Court to determine that his alleged implied contract with the State could overcome the sovereign immunity that § 37-1-23 provides.  The Services Contract discusses some elements of the treatment the NMDOH agrees to provide its temporary medical professionals, such as making efforts to provide them notice of schedule changes, or outlining the work's scope, <u>see</u> Services

Contract ¶ 2, at 2-4, but these provisions do not meet the standard that New Mexico law requires, at least with respect to terminating Dr. Howes' employment.  See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 108 N.M. at 427, 773 P.2d at 1234 ("Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined.").  In Garcia v. Middle Rio Grande Conservancy District, the personnel policy at issue "contains provisions relating to most every aspect of an employment relationship, including job description, compensation . . . , overtime, compensatory time, time clock violations, tardiness, sick leave and annual leave, and holidays," in addition to a "section applicable when personnel actions result in suspension, termination or demotion."  1996-NMSC-029, ¶ 14, 121 N.M. at 732, 918 P.2d at 11.  This comprehensiveness led the Supreme Court of New Mexico to conclude that the policy was "specific so that employees may reasonably rely on its provisions and may expect that the [government entity] will conform as well."  1996-NMSC-029, ¶ 14, 121 N.M. at 732, 918 P.2d at 11.

As the Court notes above in its discussion on Dr. Howes' third-party beneficiary status, see supra, at 140-47,  the Services Contract does not contain provisions that indicate an intent to benefit him or other hired medical professionals, and does not contain the same level of detail as the personnel policy in Garcia v. Middle Rio Grande Conservancy District.  In contrast, the Services Contract expressly "reserves the right to require a change in contractor representatives if the assigned representatives are not, in the opinion of the agency, serving the needs of the State of New Mexico adequately."  Services Contract ¶ 21, at 10.  Dr. Howes disputes that this provision refers to assigned medical professionals and asserts that he is not a contractor representative.  See MTD Response at 9.  The Defendants, meanwhile, rely on this clause to support their argument

that the NMDOH did not limit their ability to terminate Dr. Howes' employment.  See MTD at 7. The Services Contract does not define this term, and the parties have not provided evidence regarding the NMDOH and Locumtenens' intent regarding this clause.  Given, however, the Services Contract's use of the word assignment elsewhere, see Services Contract ¶2(1)(a)(6), at 2 (noting that hired medical professionals will "[r]eceive orientation, prior to work assignment, regarding the various forms required for job completion."), and that the contractor representatives are intended to "serv[e] the needs of the State of New Mexico," Services Contract ¶ 21, at 10, the Court concludes that this clause refers to hired medical professionals, like Dr. Howes.  Thus, even if the Court were willing to construe the Services Contract as a personnel policy, which the Court is not willing to so construe, the Court concludes that the Services Contract does not control or define the employer-employee relationship in the detail sufficient to give rise to an implied employment contract that restricts the NMDOH's ability to terminate Dr. Howes' employment. See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 108 N.M. at 427, 773 P.2d at 1234.

        **b.**      **Dr. Howes Has Not Alleged Adequately That He Has a Legitimate Claim of Entitlement to His Continued Employment, or That the Services Contract's Termination Provision Is <u>Unconscionable</u>.**

Even if Dr. Howes has an enforceable employment contract with New Mexico, the Court must next look to whether Dr. Howes has alleged a property interest in his contract or otherwise in his continued employment.  "In the context of a public employee . . . the touchstone is whether, under state law, the employee has 'a legitimate claim of entitlement' in continued employment, as opposed to a 'unilateral expectation' or 'an abstract need or desire' for it."  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577;

Koopman v. Water Dist. No. 1 of Johnson County, Kan., 972 F.2d at 1164).[41]  "A legitimate claim

of entitlement may be grounded in various sources of state law, including 'state statutes, local

_____

[41]Under the Services Contract's terms, Dr. Howes is not a public employee, but an independent contractor.  See Services Contract ¶ 2(6), at 4.  The Tenth Circuit has not decided whether an independent contractor has the same property interests in a contract as an employee. See Narotzky v. Natrona Cnty. Mem'l Hosp. Bd. of Trustees, 610 F.3d 558, 564 n.3 (10th Cir. 2010)("[W]e assume for purposes of this appeal that [the plaintiffs] are in fact employees [as opposed to independent contractors] because this court has never recognized a cause of action for the denial of procedural due process based on constructive discharge when the discharged party is an independent contractor.").  In Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668 (1996), the Supreme Court, in the First Amendment retaliatory termination context, states:

> This Court has not previously considered whether, and to what extent, the First Amendment restricts the freedom of federal, state, or local governments to terminate their relationships with independent contractors because of the contractors' speech.  We have, however, considered the same issue in the context of government employees' rights on several occasions.  The similarities between government employees and government contractors with respect to this issue are obvious.  The government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption. And, absent contractual, statutory, or constitutional restriction, the government is entitled to terminate them for no reason at all.  But either type of relationship provides a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern by those who, because of their dealings with the government, "are often in the best position to know what ails the agencies for which they work," Waters v. Churchill, 511 U.S. 661, 674 . . . (1994)(plurality opinion).  Because of these similarities, we turn initially to our government employment precedents for guidance.

Bd. of Cnty. Commr's, Wabunsee Cnty., Kan. v. Umbehr, 518 U.S. at 673-75.  The Supreme Court further notes that independent contractors likely have fewer constitutional protections than government employees.  See Bd. of Cnty. Commr's, Wabunsee Cnty., Kan. v. Umbehr, 518 U.S. at 680 ("Independent contractors appear to us to lie somewhere between the case of government employees, who have the closest relationship with the government, and our other unconstitutional conditions precedents, which involve persons with less close relationships with the government."). The Second Circuit agrees that independent contractors have fewer protections than public employees.  See Walker v. Fitzpatrick, 814 F. App'x 620, 623 (2d Cir. 2020)("[E]mployees who are not tenured and engaged in at-will employment do not enjoy any [property interest] protection -- and independent contractors have an even lower expectation of continued employment.").

ordinances, established rules, or mutually explicit understandings.'" <u>Farthing v. City of Shawnee, Kan.</u>, 39 F.3d at 1135 (quoting <u>Dickeson v. Quarberg</u>, 844 F.2d 1435, 1437 (10th Cir. 1988))(citing <u>Carnes v. Parker</u>, 922 F.2d 1506, 1509 (10th Cir. 1991)).

Dr. Howes does not allege the existence of any "state statutes, local ordinances, established rules, or mutually explicit understandings," <u>Farthing v. City of Shawnee, Kan.</u>, 39 F.3d at 1135 (quoting <u>Dickeson v. Quarberg</u>, 844 F.2d 1435, 1437 (10th Cir. 1988); citing <u>Carnes v. Parker</u>, 922 F.2d 1506, 1509 (10th Cir. 1991)), that provide him a "'legitimate claim of entitlement'" to his continued employment, <u>Farthing v. City of Shawnee, Kan.</u>, 39 F.3d at 1135 (quoting <u>Bd. of Regents of State Colls. v. Roth</u>, 408 U.S. at 577). He also does not allege that there is any

---

The Ninth Circuit has "assume[d] without deciding that independent contractors can potentially have a constitutionally protected property interest in their continued independent contractor positions with the government." <u>Blantz v. California Dep't of Corr. & Rehab</u>, 727 F.3d 917, 923-24 (9th Cir. 2013). The Ninth Circuit notes, however, that "the mere fact of an independent contractor relationship with the state is insufficient, on its own, to create a constitutionally protected property interest. There must be some source, recognized under state law, for [the independent contractor's] claimed *entitlement* to her position, not merely her unilateral expectation that it would continue." <u>Blantz v. California Dep't of Corr. & Rehab.</u>, 727 F.3d at 924 (emphasis in original). Specifically, they state that, "absent [either an affirmative grant of tenure or a guarantee from the government that termination can occur only for cause], there is no cognizable basis for an independent contractor to assert an entitlement to her continued position that is constitutionally protected. <u>Blantz v. California Dep't of Corr. & Rehab.</u>, 727 F.3d at 925.

Because independent contractors have fewer constitutional protections than government employees, they must meet a higher standard than having a "legitimate claim of entitlement" to continued employment which "may be grounded in various sources of state law." <u>Farthing v. City of Shawnee, Kan.</u>, 39 F.3d at 1135. Requiring "an affirmative grant of tenure or a guarantee from the government that termination can occur only for cause," <u>Blantz v. California Dep't of Corr. & Rehab.</u>, 727 F.3d at 925, is a higher standard that balances independent contractors' interests in upholding explicit contract rights with the government's need "to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption," <u>Bd. of Cnty. Commr's, Wabunsee Cnty., Kan. v. Umbehr</u>, 518 U.S. at 673-75. Accordingly, the Court concludes that, to demonstrate a legitimate claim of entitlement to continued employment, an independent contractor must be able to point to an affirmative grant of tenure or a government guarantee that they will terminate a contract only for cause.

"affirmative grant of tenure or a guarantee from the government that termination can occur only

for cause."   Blantz v. California Dep't of Corr. & Rehab, 727 F.3d 917, 925 (9th Cir. 2013).

Instead, he asserts that he has an implied contract with the NMDOH.   See Removed Complaint

¶ 12, at 3.   Dr. Howes does not allege, however, that his alleged implied contract affirmatively

entitles him to his continued employment.   Dr. Howes' allegations regarding a contract with

Locumtenens or the NMDOH comprise the following:

> 10.    Dr. Howes had a contract with AP-Contractor.Com for professional
> services to unspecified clients.   Locumtenans provides support and placement
> services for AP-Contractor.Com.
>
> 11.    On information and belief, AP-Contractor.Com had a contract with
> Defendants for Dr [sic] Howes' work at the Department of Health's New Mexico
> Behavioral Health Institute ("NMBHI") which began in or around May 2020.
>
> 12.    This created an implied contract for services directly between Dr. Howes
> and DOH
>
>  . . . .
>
> 51.    Dr. Howes signed a non-specific one-year service contract with "AP-
> Contractor.Com" to provide services to unnamed client or clients.
>
> 52.    On information and belief, "AP-Contractor.Com" entered into a contract
> with the New Mexico Department of Health for the services of Dr. Howes.
>
> 53.    This agreement created an implied one-year contract directly between Dr.
> Howes and the Department of Health, that was subject to good faith performance.

Removed Complaint ¶¶ 10-12, at 3.  New Mexico law provides that, "unless . . . there is an express

contractual provision stating otherwise[,] . . . [a]n at-will employment relationship can be

terminated by either party at any time for any reason or no reason, without liability."  Hartbarger

v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779 (citing Melnick v.

State Farm Mut. Auto. Ins. Co., 106 N.M. at 730, 749 P.2d at 1109).  The two exceptions that New

Mexico law recognizes include "wrongful discharge in violation of public policy (retaliatory

discharge), and an implied contract term that restricts the employer's power to discharge."
Harbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779.  The
Supreme Court of New Mexico

> has upheld findings of an implied employment contract provision that restricted the
> employer's power to discharge where the facts showed that the employer either has
> made a direct or indirect reference that termination would be only for just cause or
> has established procedures for termination that include elements such as a
> probationary period, warnings for proscribed conduct, or procedures for employees
> to air grievances.

Harbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 5, 115 N.M. at 668, 857 P.2d at 779 (listing
cases).

Dr. Howes does not allege the existence of any writing which suggests that the NMDOH
intended to restrict its power to terminate his employment to situations demonstrating just cause
or that there are established termination procedures.[42]  In fact, under the Services Contract, the
NMDOH "reserves the right to require a change in contractor representatives if the assigned
representatives are not, in the opinion of the agency, serving the needs of the State of New Mexico
adequately."  Services Contract ¶ 21, at 10.  At most, he alleges in his Amended Complaint and
argues in his MTD Response that the Services Contract's provisions regarding the parties' ability
to terminate the agreement evidence an unconscionable adhesion contract between the NMDOH

---

[42]Dr. Howes discusses the addendum to the Services Contract, which states that "the
agency: a.     may modify the Clinical Psychologists (PhD or PsyD) schedule as deemed
necessary to meet the needs of the clients. b.        shall make every effort to provide Clinical
Psychologists (PhD or PsyD) adequate and timely notice of such changes."  Services Contract,
Addendum ¶ 11, at 23.  See MTD Response at 4 ("Even were one to assume that Defendants
unilateral right to terminate for any or no reason were not unconscionable itself, the contract does
not allow them to do so without notice.").  This language is not evidence of the contracting parties'
intent to limit the NMDOH's power to terminate clinical psychologists' employment, but rather
that they agree to inform the psychologists of daily or weekly schedule changes to ensure that they
are able to meet with clients.

and Locumtenens.[43]  See Amended Complaint ¶ 63, at 9; MTD Response at 3-4.  Particularly, he

references the following clause:

> 8.      Termination
>
>      A.      Grounds.  The agency may terminate this Agreement for
>              convenience or cause.  The Contractor may only terminate
>              this Agreement based upon the Agency's uncured, material
>              breach of this Agreement.
>
>      B.      Notice: Agency Opportunity to Cure.
>
>              1.      Except as otherwise provided in Paragraphs
>                      7.A and 17, the Agency shall give Contractor
>                      written notice of termination at least thirty

---

[43]Dr. Howes makes this contention while asserting that he is an intended third-party beneficiary to the Services Contract.  The Court already has determined above that Dr. Howes is not an intended third-party beneficiary, but will analyze his unconscionability argument for completeness.  The Court previously has addressed whether a contract is unconscionable when the issue comes before it on a motion to dismiss.  See Thompson v. THI of New Mexico at Casa Arena Blanca, LLC, 2006 WL 4061187, at *13-16 (on a motion to dismiss for failure to state a claim, as well as under the Federal Arbitration Act of 1925, 9 U.S.C. §§ 1-16, and the New Mexico Uniform Arbitration Act, N.M.S.A. §§ 44-7A-1 to -32, dismissing the case because, in part, the plaintiff "failed to bring forward specific facts showing a genuine issue for trial whether the Admission agreement is invalid or unconscionable").  Although the unconscionability analysis involves factual analysis, it is not a matter of fact for a jury to decide, and the Court may decide it as a matter of law.  See Rivera v. Am. Gen. Fin. Servs., Inc., 2011-NMSC-033, ¶ 42, 150 N.M. at 411, 259 P.3d at 816 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 11, 146 N.M. at 260, 208 P.3d at 905 ("Whether a contract provision is unconscionable and unenforceable is a question of law that we review de novo."); Armijo v. Affilion, LLC, No. CIV 19-0750 KG/GJF, 2020 WL 2797685, at *6 (D.N.M. May 29, 2020)(Gonzales, J.)(finding that the "Plaintiffs' unconscionability claims do not satisfy the Rule 12(b)(6) standard to state a claim for relief"), aff'd 854 F. App'x 236, 241 (10th Cir. 2021)("[T]he district court did not err in dismissing plaintiffs' unconscionability claims."); Johnson v. Hertz Corp., Civil No. 06-43 WJ/ACT, 2006 WL 8443332, at *2 (D.N.M. November 20, 2006)(Johnson, J.)("The determination of unconscionability in contracts under the UCC-Leases and under New Mexico common law is a matter of law to be determined by the Court.")(citing N.M.S.A. § 55-2A-108(1) ("If the court as a matter of law finds a lease contract or any clause of a lease contract to have been unconscionable at the time it was made the court may refuse to enforce the lease contract"); State ex rel. State Highway & Transp. Dep't. v. Garley, 1991-NMSC-383, ¶ 32, 111 N.M. 383, 390, 806 P.2d 32, 39 (concluding that N.M.S.A. § 55-2-302, which uses nearly identical language as § 55-2A-108(1), "sets out what should be the rule under the common law doctrine of unconscionability as applied to all contracts")).

(30) days prior to the intended date of termination.

2.   Contractor shall give the Agency written notice of termination at least thirty (30) days prior to the intended date of termination, which notice shall (i) identify all the Agency's material breaches of this Agreement upon which the termination is based and (ii) state what the Agency must do to cure such material breaches. Contractor's notice of termination shall only be effective (i) if the Agency does not cure all material breaches within the thirty (30) day notice period or (ii) in the case of material breaches that cannot be cured within thirty (30) days, the Agency does not, within the thirty (30) day notice period, notify the Contractor of its intent to cure and begin with due diligence to cure the material breach.

Services Contract ¶ 7, at 6. Dr. Howes argues that "the State of New Mexico is clearly the party in a superior bargaining position, and Locumtenans can virtually not avoid doing business with it under the terms it offers." MTD Response at 3-4. He highlights the imbalanced notice requirements and asserts that "[t]here is no requirement that Defendants actually cure the breach at any time, and so it appears that it is effectively impossible for Locumtenans to terminate the contract at all." MTD Response at 4. Dr. Howes concludes, therefore, that "[t]his contract provision is clearly unconscionable, and was not negotiated by the parties but is the classic 'take it or leave it' example of an unconscionable adhesion contract that allows one party the right to immediately terminate for no reason, and the other no effective right to terminate for any reason." MTD Response at 4.

The Court disagrees with Dr. Howes and concludes that he has not alleged facts which show that the Services Contract's termination clause is "clearly unconscionable," either

procedurally or substantively.  MTD Response at 4.  Procedural unconscionability occurs when there is inequality in forming the contract.  See State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669 (citing Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 23, 146 N.M. at 262-63, 208 P.3d at 907-08).  A contract is procedurally unconscionable "only where the inequality is so gross that one party's choice is effectively non-existent."  Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 18, 103 N.M. at 510, 709 P.2d at 679.  To determine whether the Services Contract is procedurally unconscionable, the Court must examine "the relative bargaining strength, sophistication of the parties, and the extent to which either party felt free to accept or decline terms demanded by the other."  Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 27, 146 N.M. at 262-63, 208 P.3d at 907-08.  See City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d at 1154 (Browning, J)("In analyzing whether a contract or a term in a contract is procedurally unconscionable, New Mexico courts consider several factors, including the use of high pressure tactics, the relative scarcity of the subject matter of the contract, and the relative education, sophistication and wealth of the parties.")(citing Guthmann v. La Vida Llena, 1985-NMSC-106, ¶ 16, 103 N.M. at 510, 709 P.2d at 679).

Dr. Howes asserts only in his MTD Response -- not in his Amended Complaint -- that "Locumtenans can virtually not avoid doing business with [New Mexico] under the terms it offers," that the termination provision "was not negotiated by the parties," and that, because Locumtenens has maintained its contractual relationship with New Mexico, it has "no incentive or reason to 'poison the well' by enforcing the rights of individuals like Plaintiff, nor do they appear to be on an equal footing with the State of New Mexico to have bargained for favorable terms for those assigned under this contract."  MTD Response at 4-5.  Dr. Howes has not alleged in his Amended Complaint or argued in his MTD Response that New Mexico used high pressure tactics

or that Locumtenens did not feel free to reject any of New Mexico's demanded terms.  See Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 27, 146 N.M. at 262-63, 208 P.3d at 907-08; City of Raton v. Arkansas River Power Auth., 760 F. Supp. 2d at 1154 (Browning, J).  He also has not alleged in his Amended Complaint or argued in his MTD Response that Locumtenens was "rushed into signing the agreement, [or] deprived of an opportunity to fully examine the terms of the contract prior to its execution, or to have an attorney selected by [Locumtenens] to go over each of the contract's provisions."  Smith v. Price's Creameries, 1982-NMSC-102, ¶ 10, 98 N.M. 541, 544, 650 P.2d 825, 828.  Dr. Howes has not alleged in his Amended Complaint or argued in his MTD that the Services Contract is like the formulaic payday loan contracts that the Supreme Court of New Mexico found unconscionable in State ex rel. King v. B & B Investment Group, Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669.  There, the substantive terms came preprinted and were nonnegotiable, and even the loan provider's employees were unable to modify interest rates, which could reach quadruple digits.  See State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669.  Further, because the people taking out payday loans are "by definition underbanked," the Supreme Court of New Mexico concluded that they lacked financial sophistication, and that the defendants in that case had exploited this disadvantage.  State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 14, 329 P.3d at 665.  Locumtenens, on the other hand, is a "placement firm" with which Dr. Howes has worked on multiple assignments in multiple states.  Removed Complaint ¶¶ 8-10, at 3.  Locumtenens is a sophisticated contractor that enters frequently into agreements in this field.  Although New Mexico may include uniform termination provisions in its supply contracts, see N.M.S.A. § 13-1-170(A) ("A state agency, local public body or central purchasing office with the power to issue regulations may require by regulation that contracts include uniform clauses providing for termination of contracts . . . "), Dr. Howes has not

alleged nor argued that Locumtenens wanted to, but could not, negotiate around the provision, or bargain for more favorable provisions elsewhere in exchange, or that New Mexico presented a form contract on a "take-it-or-leave-it basis." State ex rel. King v. B & B Inv. Grp., Inc., 2014-NMSC-024, ¶ 27, 329 P.3d at 669.  Accordingly, the Court concludes that the Services Contract's termination provision is not procedurally unconscionable.

The Court next reviews whether the termination provision is substantively unconscionable. This analysis requires courts "to consider 'whether the contract terms are commercially reasonable and fair, the purpose and effect of the terms, the one-sidedness of the terms, and other similar public policy concerns' to determine 'the legality and fairness of the contract terms themselves.'" Dalton v. Santander Consumer USA, Inc., 2016-NMSC-035, ¶ 8, 385 P.3d at 621 (quoting Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 22, 146 N.M. at 262, 208 P.3d at 907). With these considerations in mind, the Court concludes that the termination provisions are not so grossly unfair as to be substantively unconscionable.  The Court notes again that State law allows State agencies to include uniform termination for convenience clauses.   See N.M.S.A. § 13-1-170(A)(6).  Further, the Court of Appeals of New Mexico previously has upheld nonmutual termination provisions in government supply contracts, specifically noting that, while such provisions may seem unfair, "good reasons" support their inclusion in these contracts.  Mb Oil Ltd. v. City of Albuquerque, 2016-NMCA-090, ¶¶ 17, 382 P.3d at 978.[44]  In addition to the State

---

[44]In Maxima Corp. v. United States, 847 F.2d 1549 (Fed. Cir. 1988), the United States Court of Appeals for the Federal Circuit notes that termination for convenience came into existence in the post-Civil War era "to facilitate putting a speedy end to war production."  847 F.2d at 1552 (citing the historical review in Torncello v. United States, 681 F.2d 756, 764-66 (Ct. Cl. 1982)). The Federal Circuit further notes that termination for convenience enjoys "fairly uniform modern application."  Maxima Corp. v. United States, 847 F.2d at 1552.  See Tomcello v. United States, 681 F.2d at 24 (noting that termination for convenience clauses are "a standard term in federal procurement").  The Tenth Circuit also has acknowledged in the federal government the existence

Legislature's approval, the Court of Appeals of New Mexico notes that "[t]he flexibility provided by a termination for convenience clause allows it to limit expenditures without binding successor governments to contractual obligations that are not in the best interests of the citizenry." Mb Oil Ltd. v. City of Albuquerque, 2016-NMCA-090, ¶¶ 18, 382 P.3d at 979 (citing Maxima Corp. v. United States, 847 F.2d 1549, 1552 (Fed. Cir. 1988)("One of the few exceptions to the common

---

of "standard termination for convenience clauses of government contracts." Murdock Mach. & Engineering Co. of Utah, 81 F.3d 922, 926 n.2 (10th Cir. 1996).

   The Supreme Court of New Mexico has not evaluated whether a uniform termination-for-convenience clause is unconscionable, and has not reviewed § 13-1-170, which authorizes New Mexico agencies to include several uniform provisions in State contracts. See N.M.S.A. § 13-1-170. It has cited, however, to the purposes of the Procurement Code, N.M.S.A. § 13-1-28 to -199, to which § 13-1-170 belongs. Planning and Design Solutions v. City of Santa Fe, 1994-NMSC-112, ¶ 8, 118 N.M. 707, 710, 885 P.2d 628, 631. Specifically, it has stated:

> "The purposes of the Procurement Code are to provide for the fair and equitable treatment of all persons involved in public procurement, to maximize the purchasing value of public funds and to provide safeguards for maintaining a procurement system of quality and integrity." Section 13-1-29(C). Of all the interests involved in competitive bidding, the public interest is the most important. *State ex rel. Educational Assessments Sys., Inc. v. Cooperative Educ. Servs. of N.M., Inc.*, 115 N.M. 196, 201, 848 P.2d 1123, 1128 (Ct. App. 1993). An economical and efficient system of procurement directly benefits taxpayers. *See Id.* at 201, 848 P.2d at 1128. Through competitive bidding the municipality hopes to obtain the best product at the best price. *See John J. Brennan Constr. Corp. v. City of Shelton*, 187 Conn. 695, 448 A.2d 180, 184 (1982). Thus the Code protects against the evils of favoritism, nepotism, patronage, collusion, fraud, and corruption in the award of public contracts. *Id.* It is certainly in the public interest that the City abide by the procurement rules it has set for itself.

Planning and Design Solutions v. City of Santa Fe, 1994-NMSC-112, ¶ 8, 118 N.M. at 710, 885 P.2d at 631. The "good reasons" which the Court of Appeals of New Mexico outlines in Mb Oil Ltd. v. City of Albuquerque are in line with the Supreme Court of New Mexico's analysis of the Procurement Code's purposes in Planning and Design Solutions v. City of Santa Fe, namely to limit expenditures that are not in the citizenry's best interests and to increase governmental flexibility. Mb Oil Ltd. v. City of Albuquerque, 2016-NMCA-090, ¶¶ 17, 382 P.3d at 978. Accordingly, the Court predicts that, were the Supreme Court of New Mexico to confront squarely the uniform termination clause issue, it would align with the Court of Appeals of New Mexico's reasoning and uphold the validity of those clauses.

- 164 -

law requisite mutuality of contract is that here at issue.")).  Additionally, while the termination

provision does not allow Locumtenens to terminate the Services Contract at any time, it is not so

unequal as to prevent it from terminating the Services Contract at all; rather, it requires

Locumtenens to provide the NMDOH with thirty days' notice and an opportunity to cure.  See

Services Contract ¶ 7, at 6.  Because the public policy considerations support nonmutual

termination provisions in this context, and because the termination is not "grossly unreasonable,"

Cordova v. World Fin. Corp. of N.M., 2009-NMSC-021, ¶ 31, 146 N.M. at 264-65, 208 P.3d at

909-10, the Court concludes that the termination provision is not substantively unconscionable.

Because the Court has determined that the termination provision is neither procedurally

nor substantively unconscionable, it will uphold the provision.  Thus, even if Dr. Howes had an

implied contract with the State based on the State's contract with Locumtenens, or otherwise was

an intended third-party beneficiary of the Services Contract, his argument that the termination

provision is unconscionable and that, thus, he required thirty days' notice before the NMDOH

could terminate his employment, lacks a sound basis in the Amended Complaint's allegations, in

the applicable New Mexico law, and in the Services Contract itself, which does not refer to the

termination of a medical professional's employment, but of the agreement between the NMDOH

and Locumtenens to provide employees.[45]  Dr. Howes has not alleged adequately that he has a

"legitimate claim of entitlement" to his continued employment, and has not alleged that such a

claim, if it exists, is based on any "affirmative grant of tenure or a guarantee from the government

---

[45]Dr. Howes acknowledges that the Services Contract is silent on the termination of a
provided medical professional's employment.  See Amended Complaint ¶ 64, at 9 ("This contract
contains no ability for Defendants to terminate individuals provided by Locumtenans under this
contract, with, or without notice.").  As the Court discusses below, see infra, at 194, this
termination provision and the Services Contract generally are not the proper vehicle for Dr. Howes
to vindicate his grievances regarding his termination.

that termination can occur only for cause." Blantz v. California Dep't of Corr. & Rehab, 727 F.3d

at 925.  Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 (quoting Bd. of Regents of State Colls.

v. Roth, 408 U.S. at 577).   Accordingly, the Court concludes that Dr. Howes has not alleged

adequately a property interest in his continued employment with NMDOH.

<b>c.     Dr. Howes Has Not Alleged Adequately That He Has a <u>Protected Property Interest in His Professional License.</u></b>

The Court next will look to whether Dr. Howes alleges adequately a constitutionally

protected property interest in his professional license.  Dr. Howes is not clear whether he asserts a

property interest in the professional licenses which he held before coming to New Mexico or

whether he asserts a property interest in his New Mexico medical license.   In the Removed

Complaint, he argues that he "has a constitutional right to . . . due process prior to being deprived

of his property interests in his professional license . . . "  Removed Complaint ¶ 28, at 5; id. ¶ 46,

at 7.  He later alleges that his injury encompasses his lost job, his damaged reputation, his lost

contract, and his having to return to South Carolina to search for another job.  See Removed

Complaint ¶ 38, at 6; id. ¶ 47, at 7.  He does not allege, however, that losing his professional license

made up part of his injury.   The extent to which he discusses additionally his license's status

includes the following two paragraphs:

> 16.     On Thursday, June 25, 2020, Dr. Howes received a phone call from Locumtenans informing him that someone from DOH had called Locumtenans and told them that Dr. Howes' license had been suspended after a complaint had been made that he was practicing medicine without a license.  Dr Howes has been provided no further information which suggests any truth to this allegation.

> . . . .

> 24.     The New Mexico Regulation and Licensing Department oversees the Board of Psychological Examiners.  They have no record of any complaints or

- 166 -

disciplines against Dr. Howes or his license.  They granted his license in or around August 2020.

Removed Complaint ¶¶ 16, 24, at 3-4.[46]  Thus, although "courts typically treat . . . professional licenses as a type of property entitled to due-process protection," Chiddix Excavating, Inc. v. Colo. Springs Utils., 737 F. App'x 856, 858 (10th Cir. 2018)(citing Barry v. Barchi, 443 U.S. 55, 64 (1979)), Dr. Howes has not alleged that the Defendants deprived him of a property right, with or without due process protections.  That "someone called Locumtenans" contending that Dr. Howes' license had been suspended is not an allegation that his license in fact had been suspended, and Dr. Howes admits that the New Mexico Regulation and Licensing Department granted his license in August, 2020.  Removed Complaint ¶ 16, at 3.  See id. ¶ 24, at 4.  Based on Dr. Howes' allegations, he had not received his license upon his termination, which suggests that its approval was subject to the New Mexico Regulation and Licensing Department's discretion.  This fact cuts against his argument that he had a protected property interest in the pending license.  See Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 756 (2005)("Our cases recognize that a benefit is not a protected entitlement if government officials may grant or deny it in their discretion.").  The Court, after making all reasonable inferences in Dr. Howes' favor, does not find that Dr. Howes alleges adequately a violation of his property interest in his professional license.

### 2.     Dr. Howes Does Not Allege Adequately a Liberty Interest Violation.

Dr. Howes further alleges that Dr. Massaro and Grogan violated his "liberty interests in his reputation and his job at NMBHI."  Removed Complaint ¶ 28, at 5; id. ¶ 46, at 7.  The Defendants

---

[46]The Court has analyzed the allegations Dr. Howes has made in his Amended Complaint. The allegations regarding his professional license are substantially the same as in the Removed Complaint, with the exception of the paragraph describing the New Mexico Regulation and Licensing Department, to which he adds that he received his license "after a period of unexplained delay."  Amended Complaint, ¶ 26, at 4.

argue that Dr. Howes must allege that "he has been *permanently* excluded from all gainful employment in his profession in order for this Court to find he has a liberty interest."  MTD at 9 (emphasis in original).  Dr. Howes responds by stating that the Court in Isengard v. New Mexico Public Education Department, 708 F. Supp. 2d 1190, 1200-01 (D.N.M. 2009)(Browning, J.), relies on a test from the Tenth Circuit that plaintiffs must satisfy to prove a liberty interest's deprivation as a result of defamatory statements.  See MTD Response at 6.  Specifically, the test requires that: "'(i)  . . . the statements must impugn the good name, reputation, honor, or integrity of the employee; (ii) the statements must be false; (iii) the statements must occur in the course of terminating the employee or must foreclose other employment opportunities; and (iv) the statements must be published.'"  Isengard v. N.M. Pub. Educ. Dep't, 708 F. Supp. 2d at 1201 (quoting Workman v. Jordan, 32 F.3d at 481).  He further asserts that he must satisfy the stigma-plus standard -- i.e., he must demonstrate governmental defamation and an altered legal status -- and asserts that the termination of public employment is sufficient to demonstrate an altered legal status.  See MTD Response at 7 (quoting Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d at 1184).  Dr. Howes also notes that the Defendants rely on Ninth Circuit case law for the proposition that only permanent exclusion from all gainful employment amounts to a liberty interest violation and states that the Tenth Circuit does not require the same showing of permanent exclusion.  See MTD Response at 7 & n.3.  Dr. Howes asserts that "Defendants Massaro and Grogan made statements which impugned Dr. Howes' good name, reputation, honor and integrity when he [sic] stated that Dr. Howes had been practicing medicine without a license and that his license in New Mexico had been suspended."  MTD Response at 8.  He asserts that those statements are false, occurred in the course of his termination, and "were

communicated to the public when they were communicated to employees at LocumTenans, as well as suspected communications with the Board of Psychological Examiners."  MTD Response at 8.

The Defendants reply that Dr. Howes' allegations are insufficient to support a claim that Dr. Massaro and Grogan violated his liberty interest, in part because he has not shown that Dr. Massaro or Grogan made any defamatory statements.  See MTD Reply at 5-6.  Instead, he notes only that "'someone'" called Locumtenens.  MTD Reply at 6 (quoting Removed Complaint ¶ 16, at 3).  The Defendants argue additionally that Dr. Howes "has not shown a causal connection between the alleged stigmatizing statement and punitive action," and that he alleges only that Dr. Massaro and Grogan terminated his employment, but does not allege that the alleged telephone call to Locumtenens caused the NMDOH to terminate his employment.  MTD Reply at 6 (citing Melton v. City of Okla., 928 F.2d at 930, for the proposition that "a stigmatizing statement must be the basis of punitive action").  In response to Dr. Howes' assertion that there is no Tenth Circuit requirement that he has been excluded permanently from employment, the Defendants reassert that Dr. Howes must prove "both that the statement occurred in the course of termination and that the statement foreclosed other employment opportunities to satisfy the third part of the stigma plus test."  MTD Reply at 7.  They cite to Phelps v. Wichita Eagle-Beacon to argue that a "'defamatory cloud' over [a plaintiff's] 'employment opportunities'" is insufficient to state a deprivation-of-a-liberty-interest claim under § 1983.  MTD Reply at 7 (quoting Phelps v. Wichita Eagle-Beacon, 886 F.2d at 1268-69 (quoting Setliff v. Mem'l Hosp. of Sheridan Cnty., 850 F.2d 1384, 1396-97 n.18 (10th Cir. 1988)).  They contend next that communications to Locumtenens would not satisfy the stigma-plus test's publication prong, as Locumtenens does not qualify as the public.  See MTD Reply at 8-9.  Finally, the Defendants contend that, although they have not evaluated the alleged statement's veracity, "[neither] an evaluation of the content of the statement, nor providing

information outside of the [Removed] Complaint to evaluate the veracity of the statement, is necessary to defeat Plaintiff's 1983 Claims," because the claim fails on the stigma-plus test's third and fourth parts.  MTD Reply at 9.

The Court will apply the four-part Workman v. Jordan test to determine whether Dr. Howes states a claim for a deprivation of his liberty interest in his reputation.  See Workman v. Jordan, 32 F.3d at 480-81.  See Melton v. City of Okla., 928 F.2d at 926-27 (holding that these elements are not disjunctive, but must all be satisfied).  The test's first element is that the statement "impugn [Dr. Howes'] good name, reputation, honor, or integrity."  Workman v. Jordan, 32 F.3d at 480-81.  The statement must make a "false charge of sufficient opprobrium that would make the plaintiff an unlikely candidate for employment."  Palmer v. City of Monticello, 31 F.3d at 1503.  "Stigma [is] sufficient if it involves dishonesty, serious felony . . . or the like."  Melton v. City of Okla., 928 F.2d at 927 n.11.

Dr. Howes alleges in his Amended Complaint that "[p]racticing medicine without a license is a felony, and is an extremely serious accusation with lasting consequences."  Amended Complaint ¶ 18, at 4.  In New Mexico, "[a]ny person who practices medicine . . . without first complying with the provisions of the Medical Practice Act and without being the holder of a license entitling him to practice medicine in New Mexico is guilty of a fourth degree felony."  N.M.S.A. § 61-6-20.  In New Mexico, a fourth-degree felony is the lowest felony grade.  See N.M.S.A. § 31-18-15.  The Court, therefore, does not consider practicing medicine without a license to be a "serious felony."  Melton v. City of Okla., 928 F.2d at 927 n.11.  It also is not clear that an accusation of practicing medicine without a license involves necessarily an accusation of dishonesty, as the statute could apply as easily to an individual who does not hold himself out as a licensed medical professional but nevertheless provides medical services.  Nevertheless, given

that Dr. Howes held himself out to be a licensed medical professional, the Court considers that such an accusation would impugn his reputation, particularly within his professional community, sufficient to satisfy the Workman v. Jordan test's first prong.  See Workman v. Jordan, 32 F.3d at 480-81.

The second factor is that the statement must be false.  See Workman v. Jordan, 32 F.3d at 480-81.  Dr. Howes alleges that "[h]e was already licensed in four other states" before seeking a license in New Mexico, and that he "worked under the supervision of a Doctor who was licensed in New Mexico, while he awaited the completion of his reciprocal license in New Mexico." Removed Complaint ¶¶ 9, 13, at 3.  The statement's truth value is not immediately apparent, because it is not clear what the accuser meant when they allegedly told Locumtenens that Dr. Howes was practicing medicine without a license.  If they meant that he was unlicensed in any State to practice medicine, that statement is false, based on Dr. Howes' allegations in the Removed Complaint.  See Removed Complaint ¶ 9, at 3.  If they meant that he was unlicensed to practice medicine in New Mexico, Dr. Howes acknowledges that he was waiting for "the completion of his reciprocal license for New Mexico," which indicates that he was not licensed to practice medicine in New Mexico.  Dr. Howes asserts that he practiced medicine under a supervising physician, Dr. Stricherz, and that this practice is "customary," Removed Complaint ¶ 13, at 3, from which, without additional information regarding the specific arrangement between Dr. Howes, Dr. Stricherz, and the New Mexico Regulation and Licensing Department, the Court infers that such practice does not run afoul of § 61-6-20's prohibition of practicing medicine without a license.  Accordingly, the Court concludes that the statement to Locumtenens was false, satisfying the Workman v. Jordan test's second prong.  See Workman v. Jordan, 32 F.3d at 480-81.

The third factor is that the statement occurred in the course of terminating Dr. Howes and foreclosed his other employment opportunities.  See Workman v. Jordan, 32 F.3d at 480-81.  To determine if a statement is made "in the course of terminating the employee," a court must consider the nature and the timing of an allegedly defamatory statement, and the statement need not be made before or during the termination.  Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 727.  The Defendants cite Melton v. City of Oklahoma for the proposition that "'a stigmatizing statement must be the basis of punitive action.'"  MTD Reply at 6 (quoting Melton v. City of Okla. City, 928 F.2d at 930).  In Melton v. City of Oklahoma, the Tenth Circuit cites the Supreme Court's analysis in Owen v. City of Independence, Missouri, 445 U.S. 622 (1980), which states that dismissing a government employee accompanied by a "'charge against him that might seriously damage his standing and associations in his community'" implicates the employee's due process rights. Melton v. City of Okla. City, 928 F.2d at 930 (quoting Owen v. City of Indep., Mo., 445 U.S. at 634 n.13).  The Tenth Circuit states that, "[b]ecause the defendants in this case took no action against [the plaintiff] that was even impliedly the product of the false accusation of perjury, there was no 'charge' of perjury made by the defendants."  Melton v. City of Okla. City, 928 F.2d at 930 (no citation given for quotation).  Accordingly, Dr. Howes' termination must have resulted from the accusation that he practiced medicine without a license.

The parties also dispute whether the statement must have foreclosed permanently Dr. Howes' employment opportunities.  In Board of Regents v. Roth, the Supreme Court states that a State may abridge a liberty interest if the alleged dishonest or otherwise stigmatizing behavior forecloses the employee's "freedom to take advantage of other employment opportunities."  Bd. of Regents v. Roth, 408 U.S. at 573.  See Melton v. City of Okla. City, 928 F.2d at 930 (quoting Bd. of Regents v. Roth, 408 U.S. at 573).  The Tenth Circuit translated this

language into the "must foreclose other employment opportunities" requirement in Workman v. Jordan, 32 F.3d at 481.  Foreclose's definition is ambiguous; among other definitions, it can mean "[t]o preclude, hinder, or prohibit (a person) *from* (an action) or *to do* something; to hinder the action, working, or activity of," or alternatively, "[t]o bar, exclude, shut out completely." Foreclose, Oxford English Dictionary, https://www.oed.com/view/Entry/72991 (last visited January 12, 2023)(italics in original).  The Supreme Court in Board of Regents v. Roth suggests that foreclosure in this context contemplates a broad exclusion from employment opportunities: "The State, for example, did not invoke any regulations to bar the respondent from all other public employment in state universities.  Had it done so, this . . . would be a different case." Bd. of Regents v. Roth, 408 U.S at 574.  The Tenth Circuit has not stated specifically that they use foreclose in this context in the sense of being shut out completely from employment, but has concluded that statements about a nurse that caused her to no longer obtain employment in her chosen field -- delivery nursing -- satisfied the third prong, even though she was able to secure employment in a different nursing specialty.  See Watson v. Univ. of Utah Med. Ctr., 75 F.3d at 579.  The Court similarly has concluded that a bus driver's "reinstatement shows he may be able to obtain employment, but it is not employment in his chosen field of bus driving." Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1241 (D.N.M. 2011)(Browning, J.)(concluding that reinstatement to a different position does not necessarily defeat a liberty-interest claim and, ultimately, denying defendants' request to dismiss plaintiff's due process claim for a liberty interest violation).  Without further guidance from the Supreme Court or the Tenth Circuit requiring permanent exclusion from future employment opportunities, the Court is unwilling to

add a permanence requirement to the foreclosure analysis.[47]  Instead, the Court concludes that an employee alleges satisfactorily that he or she has been foreclosed from other employment opportunities when he or she alleges that the stigmatizing statement is such that the employee is unlikely to earn gainful employment in his or her chosen field.[48]

The Court concludes that Dr. Howes has alleged facts sufficient to infer that his termination occurred as a result of the alleged statement, but does not allege that either of the Defendants that he names in the action, Dr. Massaro or Grogan, made that statement, or that he will be unable to earn gainful employment in his chosen field.  First, Dr. Howes alleges that, subsequent to Locumtenens learning of the allegation that he was practicing medicine without a license, Dr. Massaro "made the decision that Dr. Howes should be immediately terminated."  This contemporaneity suggests that the termination was, at least, "impliedly the product of the false

---

[47]The Court predicts that the Tenth Circuit likely will align with the Ninth Circuit's stricter "permanent exclusion" language if it is presented squarely with the issue.  Blantz v. California Dep't of Corr. & Rehab., 727 F.3d 917, 925 (9th Cir. 2013).  Dr. Howes does not allege that he is unlikely to earn gainful employment in his chosen field.  If the Court's prediction is correct, it follows, then, that he also does not allege that he has been permanently excluded from his profession.  Thus, if the requirement is permanent exclusion, Dr. Howes has not satisfied the requirement.

[48]This statement is a similar interpretation to that of the Honorable Kenneth J. Gonzales, United States District Judge of the United States District Court for the District of New Mexico. See Healthcare Integrity, LLC v. Rehoboth McKinley Christian Health Care Servs., Civ. No. 20-750 KG/LF, 2021 WL 4129248, at *7 (D.N.M. September 9, 2021)(Gonzales, J.)("Allegations supporting the inference that the false statements are sufficiently stigmatizing and disparaging that the plaintiff is unlikely to obtain future employment, i.e., is effectively excluded from employment, are sufficient to satisfy the requirement . . . .").  At minimum, the impact on the employee's future opportunities must go beyond making an employee merely "'somewhat less attractive'" to employers.  Asbill v. Housing Authority of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (1984)("[T]he Supreme Court has indicated that circumstances which make an employee 'somewhat less attractive' to employers would hardly establish the kind of 'foreclosure of opportunities amounting to a deprivation of liberty.'")(quoting Bd. of Regents v. Roth, 408 U.S. at 574 n.13).

accusation." Melton v. City of Okla. City, 928 F.2d at 930.  This allegation also is tied closely to the nature of Dr. Howes' employment, as it implicates his ability to practice medicine lawfully. Where Dr. Howes' allegations fall short, however, is in their categorization of who made the alleged statement.  Courts which have concluded that a government employer violated an employee's liberty interest on the basis of defamatory statements have made such conclusions on the basis of the government employer's own statements.  See, e.g., Salazar v. City of Albuquerque, 776 F. Supp. 2d at 1240 (noting that city defendants "publicly and repeatedly" called the plaintiff a "sex offender" and "child molester"); Watson v. Univ. of Utah Medical Ctr., 75 F.3d at 579 (noting that the plaintiff's "supervisors made public statements to the entire nursing staff").  Here, however, Dr. Howes has alleged only that "someone from DOH" called Locumtenens.  Removed Complaint ¶ 16, at 3.  Nowhere does he allege that Dr. Massaro or Grogan were the individuals that made that telephone call.[49]  Additionally, he does not allege that the person who called

---

[49]Dr. Howes alleges that, "[a]t Dr. Massaro's direction, Locumtenans was told that Dr. Howes' license was suspended for practicing medicine without a license . . . ."  Removed Complaint ¶ 45, at 7.  This allegation implies that Dr. Massaro did not make the alleged defamatory statement to Locumtenens, but that someone subordinate to him made it instead.  The Supreme Court has clarified that, in alleging a § 1983 action against a government agent in an individual capacity, as Dr. Howes does here, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  Ashcroft v. Iqbal, 556 U.S. at 676.  Consequently, there is no respondeat superior liability under § 1983.  See Ashcroft v. Iqbal, 556 U.S. at 676.  The Tenth Circuit has concluded, however, that Ashcroft v. Iqbal does not eliminate entirely supervisory liability under § 1983.  See Dobbs v. Richardson, 614 F.3d 1185, 1200-01 (10th Cir. 2010)(concluding that, despite Ashcroft v. Iqbal's limitations on § 1983 supervisory liability, "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement" of which deprives the plaintiff of his or her constitutional rights).  Further, the Tenth Circuit recognizes that there must be "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'" Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362 (1976)).  To establish this affirmative link, a plaintiff must establish three elements: (i) personal involvement;

(ii) causation; and (iii) state of mind.  See Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 767 (10th Cir. 2013).

"Before the Supreme Court's decision in *Iqbal*, this circuit allowed a plaintiff to establish personal involvement in several ways, for example, 'by demonstrating [a defendant's] personal participation, his exercise of control or direction, or his failure to supervise.'" Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 768 (quoting Dodds v. Richardson, 614 F.3d at 1195)(alteration in Schneider v. City of Grand Junction Police Dep't).  "*Iqbal*, however, articulated a stricter liability standard for this first element of personal involvement . . . .  None of [a list of cases], however, presented us with the occasion to address the precise contours of this standard." Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 768.  Somewhat circularly,

> [u]nder the first element, the plaintiff "must show an 'affirmative link' between the supervisor and the constitutional violation." Estate of Booker v. Gomez, 745 F.3d 405, 435 (10th Cir. 2014)(quotations omitted).  The plaintiff can show such a link by establishing "the [supervisor] promulgated, created, implemented[,] or possessed responsibility for the continued operation of a policy," Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011), or "the establishment or utilization of an unconstitutional policy or custom," Dodds[ v. Richardson], 614 F.3d at 1199, provided the policy or custom resulted in a violation of the plaintiff's constitutional rights.

Burke v. Regalado, 935 F.3d 960, 997 (10th Cir. 2019).

Regarding the state-of-mind requirement, "[p]recisely what state of mind is required for individual liability depends on the type of claim a plaintiff brings." Schneider v. City of Grand Junction Police Dep't, 717 F.3d at 769 (citing Ashcroft v. Iqbal, 556 U.S. at 676; Dodds v. Richardson, 614 F.3d at 1204-05).  The Tenth Circuit has noted that, "[a]ccording to the Supreme Court, a plaintiff must show that the defendant was more than simply negligent to make out a procedural due process claim." Brown v. Montoya, 662 F.3d 1152, 1170 (10th Cir. 2011)(citing Daniels v. Williams, 474 U.S. 327, 333-36 (1086)).  Further, the Tenth Circuit, without distinguishing between substantive and procedural due process, "suggested that [it] would require more than simple negligence . . . when [it] said that 'a state official's negligence does not invariably rise to the level of an abuse of power necessary to give rise to a due process violation.'" Brown v. Montoya, 662 F.3d at 1170 n.13 (quoting Specht v. Jensen, 832 F.2d 1516 (10th Cir. 1987)).  The Supreme Court in Siegert v. Gilley notes that the Court of Appeals assumed that the defendant's malice in writing the letter at issue in that case would state a constitutional claim, an assumption which Siegert asserted was correct, stating that "if the defendant acted with malice in defaming him, what he describes as the 'stigma plus' test of *Paul v. Davis* is met." Siegert v. Gilley, 500 U.S. at 234.  The Supreme Court continued, stating that its "decision in *Paul v. Davis* did not turn, however, on the state of mind of the defendant, but on the lack of any constitutional protection for the interest in reputation." 500 U.S. at 234.  The Seventh Circuit has interpreted this statement to mean that a plaintiff does not need to allege a specific state of mind to state a claim for a violation of a due process liberty interest in one's reputation. See McMath v. City of Gary, Ind., 976 F.2d 1026, 1032 (7th Cir. 1992).  The Supreme Court's decision in Paul v. Davis, however, does not discuss a state-of-mind requirement, and finds that the respondent in that case could not "assert

Locumtenans is a person with authority to terminate his employment, such that the statement occurred "in the course of" his termination.  Workman v. Jordan, 32 F.3d at 480-81.  The Court, having "examin[ed] the nature of the alleged defamation, as well as its timing," concludes that the statement did not occur in the termination's course.  Renaud v. Wyo. Dep't of Family Servs., 203 F.3d at 727.

Dr. Howes further has not alleged that these statements will foreclose his future employment opportunities.  In the Removed Complaint, he alleges only that he "suffered injury to his professional reputation."  Removed Complaint ¶ 38, at 6.  It does not appear, however, that he is unlikely to find subsequent employment as a clinical psychologist, as he alleges further that he

---

denial of any right vouchsafed to him by the State and thereby protected under the Fourteenth Amendment."  Paul v. Davis, 424 U.S. at 712.  Thus, the Supreme Court's statement in Siegert v. Gilley that Paul v. Davis did not turn on the defendant's state of mind could mean that Siegert relied improperly on Paul v. Davis for the proposition that allegations that a defendant acted maliciously satisfy Paul v. Davis' stigma-plus test, and does not necessarily mean that due process claims arising out of alleged liberty interest violations do not require a state of mind element.  See Siegert v. Gilley, 500 U.S. at 234.  Given the Tenth Circuit's view that something more than negligence is required to state a due process violation claim, however, the Court is unwilling to eschew entirely a state-of-mind requirement.

Assuming his allegations are true, Dr. Howes has alleged sufficiently that Dr. Massaro was personally involved in the defamatory statement's utterance and that Dr. Massaro's actions caused the constitutional violation, because he allegedly directed someone to tell Locumtenens that Dr. Howes' license had been suspended.  See Removed Complaint ¶ 45, at 7.  Although he alleges that "Grogan knew, or should have known, that he had violated Dr. Howes' rights . . . ," Removed Complaint ¶ 37, at 6, Dr. Howes does not allege what Dr. Massaro's state of mind was when he allegedly ordered someone to make the telephone call.  Dr. Massaro could have believed that Dr. Howes was practicing medicine without a license, or that Dr. Howes' license had been suspended, and, therefore, was informing Locumtenens about a problem with one of the temporary medical professionals it provided the NMDOH under the Services Contract.  Without an allegation regarding Dr. Massaro's state of mind when he directed someone to make that telephone call, then, Dr. Howes does not satisfy the third prong necessary to establish an affirmative link to hold Dr. Massaro liable under § 1983.  Even if the Court infers in Dr. Howes' favor that Dr. Massaro intentionally directed someone to make the defamatory telephone call, as the Court discusses below, Dr. Howes has not alleged facts sufficient to satisfy Workman v. Jordan's foreclosure-of-future-employment-opportunities requirement.

moved "back to South Carolina unexpectedly while he searched for another job," Removed Complaint ¶ 38, at 6, and states that he "ha[d] to accept several shorter-term contracts around the country," Removed Complaint ¶ 58, at 8, indicating that he has been able to find employment in his chosen field.   In his Amended Complaint, he gives additional information about the accusation's alleged effect, noting only that it "is an extremely serious accusation with lasting consequences."   Amended Complaint ¶ 18, at 4.   He does not allege, however, what these lasting consequences might be.   Accordingly, the Court cannot infer from Dr. Howes' allegations that he will be unlikely to find further employment in his field.   Coupled with the Court's conclusion that the statement did not occur in the termination's course, the Court concludes that Dr. Howes has not alleged facts sufficient to satisfy the Workman v. Jordan test's third prong.

The fourth factor is that the statement be published.   See Workman v. Jordan, 32 F.3d at 480-81.   Intra-governmental dissemination of statements "'falls short of the Supreme Court's notion of publication: "to be made public."'"   McCarty v. City of Bartlesville, 8 F. App'x 867, 874 (10th Cir. 2001)(quoting Asbill v. Housing Auth. Of Choctaw Nation of Okla., 726 F.2d 1499, 1503 (10th Cir. 1984)(quoting Bishop v. Wood, 426 U.S. 341, 348 (1976))).   Additionally, the Tenth Circuit notes that it sees "no meaningful distinction between applying the 'intra-governmental dissemination' standard to communications across units of government (such as between a city and county) and between a state and its sub-units."   Alcorn v. La Barge, WY, 784 F. App'x 614, 619 (10th Cir. 2019).[50]   Statements made to non-governmental entities, meanwhile,

---

[50]The line between intra- or inter-governmental communications and a communication from a governmental entity to a non-governmental entity, however, is not clear when the governmental entity communicates to its own employees.   In Watson v. University of Utah Medical Center, the Tenth Circuit concludes that evidence that a nurse's "supervisors made public statements to the entire nursing staff" met the publication requirement.   75 F.3d at 579.   The Tenth Circuit does not analyze specifically whether the communications from the nurses' supervisors to

do not require wide dissemination, such as to a media outlet or on the internet.  See Watson v. Univ. of Utah Med. Ctr., 75 F.3d at 579 (concluding that evidence that a nurse's "supervisors made public statements to the entire nursing staff" met the publication requirement).

Here, Dr. Howes alleges that "someone from DOH" spoke with Locumtenens to inform it that he allegedly was practicing medicine without a license, Removed Complaint ¶ 16, at 3, and he asserts additionally that there were "suspected communications with the Board of Psychological Examiners," MTD Response at 8.  Although Locumtenens contracts with the NMDOH, it is not a

---

the nurses are intra-governmental; however, the Tenth Circuit has held -- before its decision in Watson v. University of Utah Medical Center -- that it does not consider intra-governmental communications to be published, which implies that the Tenth Circuit considers the statements to the nurses not to be intra-governmental.  See Asbill v. Housing Auth. of Choctaw Nation of Okla., 726 F.2d at 1503.  In Harris v. Blake, 798 F.2d 419 (10th Cir. 1986) however, the Tenth Circuit concludes that a statement was intra-governmental when it was "disseminated among some of [the program's] instructors and administrative personnel," and not to "anyone not connected with [the program]."  798 F.2d at 421-22 & n.2 (citing Asbill v. Housing Auth. of Choctaw Nation of Okla., 726 F.3d at 1503).  In both cases, the individuals receiving the communications were State entity employees: the University of Utah Medical Center in one, and the University of Northern Colorado's Center for Special and Advanced Program.  See Watson v. Univ. of Utah Med. Ctr., 75 F.3d at 573; Harris v. Blake, 798 F.2d at 420.

A key distinguishing feature between the two groups is that, in the instructors' and administrative personnel's case, they "share an interest in the substance of the communication." Alcorn v. La Barge, WY, 784 F. App'x at 619 (explaining why the Tenth Circuit considers communications between a municipal government and a State agency to be intra-governmental, even though they are not "within the same unit of government, such as a state, city, or agency"). In Harris v. Blake, a professor wrote a letter concerning the defendant's academic performance, which "became a part of Harris' academic file and was disseminated among some of [the program's] instructors and administrative personnel."  798 F.2d at 421.  The letter concerned the professor's belief that Harris, a student, has "exhibited specific behaviors of being incompetent and unethical," and noted that she believed that Harris "should not be allowed to register for a practicum and that if he does, the practicum should be aware of his past performance."  798 F.2d at 420-21.  An Advisory Committee then determined "that future instructors should be informed of his performance."  798 F.2d at 421.  Based on this information, and because the professors and administrative staff likely would be evaluating Harris' performance or placing him in practicums in the future, while the nurses did not need to know why the university medical center terminated Watson's employment, the university professors and administrative staff "share[d] an interest in the substance of the communication," Alcorn v. La Barge, WY, 784 F. App'x at 619, beyond the nurses' interest in knowing details behind a fellow nurse's alleged misconduct.

- 179 -

government agency, and, so, assuming, as the Court must at the motion-to-dismiss stage, Dr. Howes' allegations to be true, the NMDOH "made public" its allegation when it communicated it to Locumtenens.  Bishop v. Wood, 426 U.S. at 348.  Additionally, although he does not allege in either the Removed Complaint or the Amended Complaint, but only in the MTD Response, that the NMDOH conveyed these allegations to the New Mexico Board of Psychologist Examiners, the Board of Psychologist Examiners is a State agency which the New Mexico Regulation and Licensing Department oversees.  See Removed Complaint ¶ 24, at 4.  Thus, communications from the NMDOH to the Board of Psychologist Examiners are intra-governmental and are not published for the Workman v. Jordan test's purposes.  See Asbill v. Housing Auth. Of Choctaw Nation of Okla., 726 F.2d 1499, 1503.  Accordingly, as to the alleged communication between the NMDOH and Locumtenens only, Dr. Howes satisfies the Workman v. Jordan test's fourth prong.  In summary, because Dr. Howes satisfies prongs one, two, and four, but not prong three, the Court determines that he has not alleged facts sufficient to satisfy the Workman v. Jordan test and therefore has not alleged a violation of his liberty interest in his reputation.  See Melton v. City of Okla., 928 F.2d at 926-27 (holding that these elements are not disjunctive, but all must be satisfied).

### 3.    Even If Dr. Howes Has Alleged Adequately a Property or Liberty Interest Violation, Those Rights Are Not Clearly Established for Qualified Immunity Purposes.

The Court next turns to the Saucier v. Katz analysis' second prong.  Specifically, the Court asks whether, if the Court finds that Dr. Howes' allegations established properly a due process violation, that violation is a violation of clearly established law.  The Court does not consider Dr. Howes' allegations to be "particularly egregious" such that "any reasonable officer should have realized" that such conduct was unlawful.  Taylor, 141 S. Ct. at 54.  Accordingly, Dr. Howes

must identify a factually similar Supreme Court or Tenth Circuit case on point.  See Thomas v. Kaven, 765 F.3d at 1194; Estate of Smart by Smart v. City of Wichita, 951 F.3d at 1178 (noting that the plaintiff bears the burden to show that his rights were clearly established at the time of the alleged violation).  Because Dr. Howes does not present the Court with any on point cases, the Court concludes that he does not allege a violation of a clearly established right.

Dr. Howes' first alleged constitutional violation is that Dr. Massaro and Grogan impinged improperly upon Dr. Howes' property rights to his contract and professional license by terminating his employment without due process.  See Removed Complaint ¶¶ 28, 46, at 5, 7.  Dr. Howes has not provided the Court with any caselaw that is factually similar to the present case which establishes clearly that termination in this manner violates his property rights.  In the MTD Response, he reasserts that he is a third-party beneficiary to the Services Contract, citing New Mexico State law cases, with the exception of United Steelworkers of America, AFL-CIO-CLC v. Rawson, 495 U.S. 362, 375 (1990), and then discusses whether the Services Contract is an unconscionable adhesion contract, relying primarily on New Mexico State court cases, with the exception of Jerry Erwin Assocs., Inc. v. Estate of Asher, 290 F. Supp. 3d at 1252, which is a United States District Court for the District of New Mexico case.  See MTD Response at 2-5. Neither case discusses property rights or due process, and thus do not establish clearly Dr. Howes' constitutionally protected property interests in a contract as a third-party beneficiary, or in his professional license.  In a later section titled "Constitutional Rights," Dr. Howes references his asserted property interest in his contract, but does not cite to any cases to support his claims.  MTD Response at 6.  Instead, he argues that the Defendants' cited case law, Martin Marietta Materials, Inc. v. Kansas Department of Transportation, 810 F.3d at 1177, and Rooker v. Ouray County, 504 F. App'x 734, 738 (10th Cir. 2012), is inapposite or otherwise distinguishable from his case.  See

MTD Response at 9 ("In *Marietta*, the Plaintiff was an incidental beneficiary, not an intended beneficiary.  And in *Rooker*, the Plaintiff doesn't actually establish his third-party status, or how it would give him a property interest.").  With its own research, the Court also has not identified any relevant Tenth Circuit or Supreme Court case law to support the proposition that an individual has a protected property interest in a contract to which they are a third-party beneficiary. Additionally, although there is Tenth Circuit caselaw which notes that "courts typically treat . . . professional licenses as a type of property entitled to due-process protection," Chiddix Excavating, Inc. v. Colo. Springs Utils., 737 F. App'x at 858 (citing Barry v. Barchi, 443 U.S. at 64, Dr. Howes has not presented, and the Court has not identified, any case which states that a public employer violates this property interest when it terminates a public employee's employment, particularly when that employee later becomes licensed in spite of the termination.  For these reasons, the Court determines that Dr. Howes has not alleged adequately that Dr. Massaro and Grogan violated a clearly established property right.

Dr. Howes' second alleged constitutional violation is that Dr. Massaro and Grogan impinged improperly upon Dr. Howes' liberty interest in his reputation when they "made statements that impugned Dr. Howes' good name, reputation, honor and integrity."   MTD Response at 8.  See Removed Complaint ¶¶ 28, 46, at 5, 7.  Dr. Howes asserts that his "right to be free from the stigma of allegation of unprofessional and illegal conduct is well established."  MTD Response at 8 (citing Melton v. City of Okla. City, 928 F.2d at 933).  The pincite Dr. Howes uses to Melton v. City of Oklahoma City, however, is to the dissent of the Honorable James Logan, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit.  In the Tenth Circuit's majority opinion, however, the Tenth Circuit "conclude[s] that the mere reporting of the defamatory accusations of a third party will not make governmental agencies or

governmental officials liable for the deprivation of a protected liberty interest," and states that "[t]o hold here that the defendants were required to provide Mr. Melton with a hearing to clear his name from accusations neither made nor adopted by these defendants . . . would be . . . an absurdity." Melton v. City of Okla. City, 928 F.2d at 931-32.

Dr. Howes also cites to Board of Regents v. Roth, 408 U.S. at 573. In that case, however, the Supreme Court concluded that the state university petitioners had not violated the assistant professor respondent's liberty interests when it did not renew his contract. See Bd. of Regents v. Roth, 408 U.S. at 575. The only other Tenth Circuit cases to which Dr. Howes cites in this section include Workman v. Jordan, 32 F.3d at 481, Guttman v. Khalsa, 669 F.3d at 1126, Stidham v. Peace Officer Standards and Training, 265 F.3d at 1153, Martin Marietta Materials, Inc. v. Kan. Dep't of Transp., 810 F.3d at 1184, and Nixon v. City and County of Denver, 784 F.3d, 1364 1368 (10th Cir. 2015). See MTD Response at 6-7. None of these cases, however, find that the respective defendants violated the plaintiffs' liberty interests or violated them in a way that is factually similar to Dr. Howes' case. On its own, the Court has not identified any caselaw which establishes clearly that Dr. Massaro and Grogan's alleged actions violate Dr. Howes' constitutionally protected liberty interests. Accordingly, Dr. Massaro and Grogan enjoy qualified immunity from Dr. Howes' due process claims against them. Because the Court has concluded that Dr. Massaro and Grogan enjoy qualified immunity from Dr. Howes' § 1983 claims, it will dismiss those claims.

## B.    DR. HOWES HAS NOT STATED CONTRACT CLAIMS AGAINST THE DEFENDANTS.

In addition to his § 1983 claims, Dr. Howes also brings two claims which arise under State

contract law.[51]   See Removed Complaint ¶¶ 50-67, at 7-9.   In Count III, he asserts a breach-of-

---

[51]The Court has dismissed Dr. Howes' federal § 1983 claims.   Without original jurisdiction over the State law contract claims, it ordinarily would decline to exercise supplemental jurisdiction to review them.   This case also is before the Court properly on diversity jurisdiction grounds. Although the Defendants removed this case to federal court on federal question jurisdiction grounds and write on the Civil Cover Sheet attached to their Notice of Removal that Dr. Howes' "County of Residence" is San Miguel County, Civil Cover Sheet at 1, filed March 24, 2021 (Doc. 1-1), Dr. Howes' allegations in the Removed Complaint establish that there is diversity jurisdiction sufficient to anchor the Court's exercise of original diversity jurisdiction over the remaining State law claims.   Specifically, Dr. Howes alleges that he "was a resident of San Miguel County, New Mexico at all times alleged herein . . . ," but, in conjunction with Dr. Howes' subsequent allegations, this allegation does not establish that he is a New Mexico citizen.   Removed Complaint, ¶ 1, at 2.   See Middleton v. Stephenson, 749 F.3d 1197, 1200 (10th Cir. 2014).

> "For purposes of diversity jurisdiction, a person is a citizen of a state if the person is domiciled in that state.   *Crowley v. Glaze*, 710 F.2d 676, 678 (10th Cir. 1983).   And a person acquires domicile in a state when the person resides there and intends to remain there indefinitely.   *See id.*; *see also Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 . . . (1989)("[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there.").

> [Regarding] who has the burden of proving . . . citizenship.   Here's how we think it works.   Start with the rule that a party invoking diversity jurisdiction bears the burden of proving its existence by a preponderance of the evidence.   *See Mid-Continent Pipe Line Co. v. Whiteley*, 116 F.2d 871, 873 (10th Cir. 1940).   The party invoking diversity jurisdiction might satisfy this burden by leaning on a rebuttable presumption that its domicile, once established, remains the same.   *Mitchell v. United States*, 88 U.S. (21 Wall.) 350, 353 . . . (1874)("A domicile once acquired is presumed to continue until it is shown to have been changed."); *see State Farm Mut. Auto. Ins. Co. v. Dyer*, 19 F.3d 514, 519 (10th Cir. 1994).

Middleton v. Stephenson, 749 F.3d at 1200.   Dr. Howes alleges that the Defendants' conduct forced him "to move back to South Carolina unexpectedly while he searched for work."   Removed Complaint ¶ 47, at 7.   This allegation indicates, then, that Dr. Howes was domiciled in South Carolina and, therefore, was a South Carolina citizen when he filed this case.   He has not made any allegations which suggest that he since has changed his residence back to New Mexico with an intent to remain here.   See De La Rosa v. Reliable, Inc., 113 F. Supp. 3d 1135, 1172 (D.N.M.

implied-contract claim against all the Defendants in their official capacities, on the basis that the NMDOH and Locumtenens' agreement for Dr. Howes' services creates an implied contract between Dr. Howes and the NMDOH "that was subject to good faith performance."  Removed Complaint ¶ 53, at 8.  See id. ¶¶ 50-59, at 7-8.  He alleges that the "Defendants unlawfully breached this contract when they terminated Dr. Howes in bad faith, for false reasons," Removed Complaint ¶ 55, at 8, and alleges that the "Defendants had no good cause to terminate Dr. Howes' contract and did so in bad faith by inventing false allegations about Dr. Howes' license status," Removed Complaint ¶ 56, at 8.[52]   In Count IV, he asserts a wrongful-termination and breach-of-implied-covenant-of-good-faith-and-fair-dealing claim against all the Defendants in their official capacities.   See Removed Complaint ¶¶ 60-67, at 8-9.[53]   He alleges specifically that the "Defendants breached the Implied Covenant of Good Faith and Fair Dealing when they called Locumtenans and made defamatory statements about Dr. Howes [sic] work performance and the status of his license."  Removed Complaint ¶ 61, at 8.  He then alleges that the "Defendants breached the Implied Covenant of Good Faith and Fair Dealing when it wrongfully terminated Dr.

---

2015)(Browning, J.)("Jurisdiction is determined when the suit is filed.")(citing Freeport-McMoRan, Inc. v. K N Energy, Inc., 498 U.S. 426, 428 (1991)).  Thus, the Court determines that Dr. Howes was a South Carolina citizen, or at least was not a New Mexico citizen, when he filed this case, and thus, at the time he filed his Complaint, there also existed diversity jurisdiction.  The Court thus will decide the State law claims under diversity jurisdiction and not under supplemental jurisdiction.

[52]In the Amended Complaint, Dr. Howes replaces his breach-of-implied-contract claim with a breach-of-contract claim, because he alleges that he is a third-party beneficiary to the Services Contract, that the Defendants breached the Services Contract by terminating his employment without providing the contractually required notice, and that the Services Contract's termination provision is an unconscionable adhesion contract provision.  See Amended Complaint ¶¶ 56-70, at 8-10.

[53]Dr. Howes does not make substantial changes to his allegations in the Amended Complaint's Count IV.  See Amended Complaint ¶¶ 71-78, at 10-11.

Howes' contract with no notice and provided him no reason for this termination."  Removed Complaint ¶ 62, at 9.  Dr. Howes alleges that the Defendants breached the covenant of good faith and fair  dealing when they did not follow an internal policy to investigate the allegations that he practiced  medicine  without  a  license,  did  not  give  him  a  hearing  before  terminating  his employment, and terminated his employment for no cause.  Removed Complaint ¶¶ 64-66, at 9.

The Defendants move to dismiss on the ground that "New Mexico law prohibits Plaintiff's claim of having an implied contract with the State" on the basis of sovereign immunity.  MTD at 12.  They assert that this immunity includes not only the NMDOH, but also state officials acting in their official capacities.  MTD at 12-13 (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989)).  The Defendants argue that, without an express written contract, the Defendants are immune from suit, and that, in any event, Dr. Howes does not allege that Dr. Massaro and Grogan are parties to the implied contract and, therefore, "are not proper defendants to this claim or any of Plaintiff's contract claims."  MTD at 13.  They assert that, even if the parties' conduct creates an  implied-in-fact  contract,  that  contract  would  not  be  a  "'valid  written  contract'"  for § 37-1-23(A)'s purposes.  MTD at 13 (quoting N.M.S.A. § 37-1-23(A)).

Regarding Count IV, the Defendants argue that Dr. Howes has not stated a wrongful-termination claim, because New Mexico employment law establishes generally an at-will employment rule.  See MTD at 13 (quoting Hudson v. Vill. Inn Pancake House of Albuquerque, Inc., 2001-NMCA-104, ¶ 4, 121 N.M. at 310, 35 P.3d at 315).  They note that two exceptions to this general rule exist: in retaliatory discharge cases and when an implied employment contract restricts the employer's ability to terminate an employee.  See MTD at 13-14 (quoting Hudson v. Vill. Inn Pancake House of Albuquerque, Inc., 2001-NMCA-104, ¶ 4, 121 N.M. at 310, 35 P.3d at 315).  The Defendants note that Dr. Howes has not alleged a retaliatory discharge and that,

"[b]ecause an implied contract could not exist, DOH was allowed to terminate at any time, for any reason, with no liability."  MTD at 14.  They further assert that Dr. Howes cannot bring a breach-of-implied-covenant-of-good-faith-and-fair-dealing claim, because there is no implied contract, and thus, no duty of good faith.  See MTD at 14 (quoting Black Card, LLC v. Visa U.S.A., Inc., 766 F. App'x 583, 593 (10th Cir. 2019)).

In Dr. Howes' MTD Response, he no longer discusses his implied contract claims, but asserts instead that he is a third-party beneficiary to the Services Contract.  See MTD Response at 2.  He then asserts that the Services Contract's termination clause is unconscionable and an "example of an unconscionable adhesion contract."  MTD Response at 4.  He asserts that the "Defendants committed to giving at least 30 days' notice before terminating this contract," and that he "had a right to rely on his one-year contract at NMBHI, and, at the very least, had the right to rely on at least 30 days' notice of its early termination."  MTD Response at 5.  He asserts that, as a third-party beneficiary of the Services Contract, he has a right to enforce the Services Contract's promises.  MTD Response at 5.  Regarding his breach-of-implied-covenant-of-good-faith-and-fair-dealing claim, Dr. Howes states only that the "Defendants [sic] argument on this issue has no merit.  Dr. Howes has an enforceable right as a third-party beneficiary, and there is a written contract.  Defendants breached this covenant in multiple ways, including fabrication of criminal conduct and bad faith breach of contract."  MTD Response at 6.

In the MTD Reply, the Plaintiffs do not respond to Dr. Howes' third-party beneficiary arguments, because they are not in the Removed Complaint, and argue that the Court should not consider those arguments.  See MTD Reply at 1-2.  The Defendants then reassert that New Mexico is immune from suits based on implied contracts, and that Dr. Howes' employment is at-will.  See

MTD Reply at 2-3.  The Defendants assert, therefore, that Dr. Howes cannot bring his contract claims against the Defendants.  See MTD Reply at 2-3.

The Court has addressed above whether Dr. Howes has an implied contract with New Mexico and whether he is a third-party beneficiary to the Services Contract.  See supra, at 140-47; id. at 151-54.  The Court concludes above that the Services Contract's language does not contemplate conferring a benefit on Dr. Howes and that he is not, therefore, and intended third-party beneficiary to the Services Contract.  See supra, at 141-47.  The Court additionally concludes above that Dr. Howes has not alleged that he satisfies the basic contracting requirements necessary to enter into an implied contract and concludes that the Services Contract does not define the employer-employee relationship in a way that is sufficient to give rise to an implied employment contract which restricts the NMDOH's ability to terminate Dr. Howes' employment.  See supra, at 151-54.  Additionally, the Court has determined that the Services Contract's termination provision is neither substantively nor procedurally unconscionable.  See supra, at 158-65.  The Court first will analyze Dr. Howes' claims under his initial implied contract theory and then will analyze his claims under his amended third-party beneficiary theory.  The Court concludes that: (i) under Dr. Howes' implied contract theory, he has not alleged facts sufficient to support his claim that he has an enforceable implied contract with New Mexico which limits New Mexico's ability to terminate his employment; and (ii) under Dr. Howes' third-party-beneficiary theory, he has not alleged facts sufficient to support his claim that he has more than an at-will employment relationship and, thus, his contract claims fail.

1.      **Even If Dr. Howes Has an Implied Contract with New Mexico, He Cannot Enforce It.**

Dr. Howes alleges that the NMDOH and Locumtenens' agreement for Dr. Howes' services created an implied contract between Dr. Howes and the NMDOH "that was subject to good faith performance."  Removed Complaint ¶ 53, at 8.  See id. ¶¶ 50-59, at 7-8.  As the Court discusses above, see supra, at 151-52, the Supreme Court of New Mexico has stated that "[c]ontracts with governmental entities must be in writing," Carrillo v. Rostro, 1992-NMSC-054, ¶ 12, 114 N.M. at 612, 845 P.2d at 135 (citing N.M.S.A. § 37-1-23(A)), but that an implied employment contract nevertheless may satisfy § 37-1-23's valid written contract requirement, see Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 14, 121 N.M. at 732, 918 P.2d at 11.  To satisfy § 37-1-23's requirements, however, Dr. Howes must show that his interactions with New Mexico satisfy the basic contract requirements of an offer, acceptance, consideration, and mutual assent, sufficient to create what is ordinarily an at-will employment contract.  See Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶¶ 9-10, 121 N.M. at 731, 918 P.2d at 10 (citing Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶¶ 4-7, 115 N.M. at 668-69, 857 P.2d at 779-80).  Dr. Howes has not alleged that he satisfies any of these basic contracting criteria.  Instead, he alleges only that either his contract with Locumtenens or Locumtenens' Services Contract with the NMDOH "created an implied one-year contract directly between Dr. Howes and the Department of Health."  Removed Complaint ¶ 53, at 8.[54]

---

[54]The Court uses "either," because the Removed Complaint states that "[t]his agreement created" the implied contract, but is not clear about which agreement it references.  Removed Complaint ¶ 53, at 8.  In the preceding two paragraphs, Dr. Howes references both his "non-specific one-year service contract with 'AP-Contractor.Com'" as well as the Services Contract.  Removed Complaint ¶¶ 51-52, at 7.

The Court above has concluded that Dr. Howes has not alleged adequately that he has an implied contract with New Mexico.  See supra, at 151-54.  Even if, however, as Dr. Howes alleges, he entered into an implied contract with New Mexico, he has not alleged facts sufficient to demonstrate that it is enforceable against New Mexico.  To establish an enforceable implied contract with New Mexico, he may point to "'written representations such as *an employee handbook*, . . . oral representations, . . . the conduct of the parties, or . . . a combination of representations and conduct.'"  Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 10, 121 N.M.at 731, 918 P.2d at 10 (citing Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 6, 115 N.M. at 669, 857 P.2d at 780)(emphasis in Garcia v. Middle Rio Grande Conservancy Dist.).  He has not alleged, however, that such representations or conduct exist.  At most, he seeks to anchor the alleged implied contract in either the Services Contract or his contract with Locumtenens.  See Removed Complaint ¶ 53, at 8.  Aside from referencing the agreement, however, Dr. Howes does not allege that any written, oral, or conduct-based representations define his employment relationship with the NMDOH such that they have restricted their ability to terminate his employment.  See Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 108 N.M. at 427, 773 P.2d at 1234 ("Under New Mexico law, a personnel manual gives rise to an implied contract if it controlled the employer-employee relationship and an employee could reasonably expect his employer to conform to the procedures it outlined."); Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779 ("New Mexico courts have recognized two additional exceptions to the general rule of at-will employment: wrongful discharge in violation of public policy (retaliatory discharge), and an implied contract term that restricts the employer's power to discharge.").  Indeed, Dr. Howes acknowledges that the Services Contract is silent on whether the NMDOH can terminate his employment, with or without notice.  See

Amended Complaint, ¶ 64, at 9.  The Services Contract discusses some elements of the treatment the NMDOH agrees to provide its temporary medical professionals, such as making efforts to provide them notice of schedule changes or outlining the work's scope, see Services Contract ¶ 2, at 2-4, but these services do not contain the level of detail sufficient to define the employee-employer relationship in a way that limits the NMDOH's ability to terminate Dr. Howes' employment.  See supra, at 153-54; Garcia v. Middle Rio Grande Conservancy Dist., 1996-NMSC-029, ¶ 14, 121 N.M. at 732, 918 P.2d at 11; Newberry v. Allied Stores, Inc., 1989-NMSC-024, ¶ 7, 108 N.M. at 427, 773 P.2d at 1234.  Accordingly, the Court concludes that, even if Dr. Howes has an implied contract with New Mexico, he would not be able to enforce it against New Mexico.

This inability to enforce an implied contract against New Mexico also applies with respect to Dr. Massaro and Grogan, whom Dr. Howes has sued in their official capacities.  See Removed Complaint ¶¶ 50-57, at 7-9.  The Supreme Court has announced that "a judgment against a public servant 'in his official capacity' imposes liability on the entity that he represents."  Brandon v. Holt, 469 U.S. 464, 471 (1985).  The Supreme Court further has announced that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."  Edelman v. Jordan, 451 U.S. 651, 663 (1974).  The Tenth Circuit supports this conclusion, stating that "[s]uits against state officials acting in their official capacities similarly fall with the [Eleventh] amendment's proscription because 'a suit against a state official in his or her official capacity . . . is no different than a suit against the State itself."  Muscogee (Creek) Nation v. Okla. Tax Comm'n, 611 F.3d 1222, 1227 (10th Cir. 2010)(quoting Will v. Mich. Dep't of State Police, 491 U.S. at 71)(ellipsis added in Muscogee (Creek) Nation v. Okla. Tax Comm'n).  Although this doctrine is a federal one, the Court has identified no caselaw suggesting that it should not apply to a State law contract claim brought against a government

official in his or her official capacity, and the Court does not see a sound reason why the Supreme Court of New Mexico would not treat such official capacity claims as one against the State.

Dr. Howes has requested that the Court grant him contractual, compensatory, punitive, and "any other damages available." Removed Complaint ¶ 68, at 9-10. In this case, a successful suit against Dr. Massaro and Grogan would impose a liability on the NMDOH and, by extension, on New Mexico. See Brandon v. Holt, 469 U.S.at 471. Thus, the Eleventh Amendment bars Dr. Howes' suit in federal court for damages against State officials acting in their official capacities. By removing this case to federal court, however, New Mexico has waived its Eleventh Amendment immunity from suit. See Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. at 624; Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d at 1264; Armijo v. State Dep't of Transp., 2009 WL 1329192, at *5.[55] Dr. Howes then must overcome New Mexico's sovereign immunity, which provides "[g]overnmental entities . . . immunity from actions based on contract, except actions based on a valid written contract." N.M.S.A. § 37-1-23. As discussed above, see supra, at 151-54, Dr. Howes has not alleged facts sufficient to state a claim that he has an enforceable implied contract with New Mexico sufficient to overcome this immunity. Accordingly, the Court concludes that Dr. Howes' may not enforce his breach-of-implied-contract, wrongful-termination, and breach-of-implied-covenant-of-good-faith-and-fair-dealing claims, against these Defendants.

---

[55]Although the Court would like to see assurances that the Defendants' counsel is authorized to waive New Mexico's Eleventh Amendment immunity, in the absence of evidence and argument to the contrary, the Court presumes that the Defendants' counsel is so authorized. See Abreu v. N.M. Children, Youth & Families Dep't, 646 F. Supp. 2d at 1268; Armijo v. State, Department of Transportation, 2009 WL 1329192, at *5.

>    **2.      Even If Dr. Howes Were a Third-Party Beneficiary of the Services
>             Contract, He Has Not Alleged Sufficient Facts to State His State Law
>             Claims.**

In his Amended Complaint, Dr. Howes alleges that he is an intended third-party beneficiary

of the Services Contract.  See Amended Complaint ¶ 13, at 3; id. ¶ 59, at 8.  As discussed above,

see supra, at 140-47, the Court concludes that Dr. Howes is not an intended third-party beneficiary

of the Services Contract, because he does not allege facts that "show that the parties to the contract

intended to benefit him."  Tarin's, Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 129 N.M. at 191, 3 P.3d

at 686.  Assuming, however, that Dr. Howes is, as he alleges, an intended third-party beneficiary

of the Services Contract, the Court nevertheless concludes that Dr. Howes has not alleged facts

sufficient to support his breach-of-contract, wrongful-termination, and breach-of-implied-

covenant-of-good-faith-and-fair-dealing claims.

Turning first to Dr. Howes' breach-of-contract claim, he alleges that the Services

Contract's termination provision is an "unconscionable adhesion contract provision" in the

NMDOH's favor, Amended Complaint ¶ 63, at 9, and that the "Defendants unlawfully breached

this contract when they terminated Dr. Howes . . . .  Defendants had no legal ability under this

contract to terminate Dr. Howes' contract . . . ," Amended Complaint ¶¶ 66-67, at 9.  As the Court

discusses above, see supra, at 158-65, it concludes that the termination provision is neither

substantively nor procedurally unconscionable.  Even if the Court assumes, however, that the

termination provision is unconscionable, Dr. Howes still has not alleged facts sufficient to state a

breach-of-contract claim.

On its face, the termination provision does not discuss the parties' ability to terminate the

contracted medical professionals' contracts, with or without notice.  See Amended Complaint ¶

64, at 9.  Instead, it speaks specifically to the termination of "this Agreement," i.e., the agreement

between the NMDOH and Locumtenens to provide temporary medical professionals, and conditions termination only on the NMDOH or Locumtenens' breach.  Services Contract ¶ 7(A), at 6.  The NMDOH's and Locumtenens' ability to terminate the Services Contract is separate from the ability to terminate a given medical professional's employment.  Instead, Dr. Howes entered into a contract with Locumtenens "to provide services to unnamed client or clients."  Amended Complaint ¶ 57, at 8.  Presumably, that employment contract, not the Services Contract, establishes the terms under which Dr. Howes' employment may be terminated, but he does not allege what those terms might be.  Accordingly, the termination provision does not restrict the NMDOH's ability to terminate employees.

Even if this provision is unconscionable, it is unclear whether that conclusion would have any effect on the NMDOH's ability to terminate Dr. Howes.  As the Services Contract stands, it is silent on the issue of a provided medical professional's termination, other than to provide that the NMDOH "reserves the right to require a change in contractor representatives if the assigned representatives are not, in the opinion of the agency, serving the needs of the State of New Mexico adequately."  Services Contract ¶ 21, at 10.  Even if the termination provision is unconscionable and it is stricken from the Services Contract, the Services Contract still will be silent on the issue of a provided medical professional's termination.  The Services Contract simply is not the vehicle for Dr. Howes to anchor his claims that the NMDOH improperly terminated his employment.  Instead, he must rely on his employment contract with Locumtenens, or on a contract directly between himself and the NMDOH that restricts explicitly the NMDOH's termination power.  See Hartbarger v. Frank Paxton Co., 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779.  Thus, the Court concludes that Dr. Howes has not alleged facts sufficient for his breach-of-contract claim to withstand a motion to dismiss.

The Court turns next to Dr. Howes' wrongful-termination claim.  As just discussed, Dr. Howes has not alleged sufficient facts to support his breach-of-contract claim -- i.e., that the Defendants breached the contract when they terminated his employment.  The same problem is fatal to his wrongful-termination claim here.  Dr. Howes' argues that the "Defendants had no legal right or good cause to terminate" his employment.  Amended Complaint ¶ 74, at 10.  Again, the Services Contract does not limit the NMDOH's ability to terminate Dr. Howes' employment, and, even if the termination provision is unconscionable, the Services Contract will remain silent on this issue of the NMDOH's ability to terminate Dr. Howes' employment, other than to reserve the right to change contractor representatives.  Thus, the Court concludes that Dr. Howes has not alleged sufficient facts to support his wrongful-termination claim.

Finally, the Court turns to Dr. Howes' breach-of-implied-covenant-of-good-faith-and-fair-dealing claim.  Dr. Howes alleges that the "Defendants breached the Implied Covenant of Good Faith and Fair Dealing when they called Locumtenans and made defamatory statements about Dr. Howes [sic] work performance and the status of his license . . . [and] when it wrongfully terminated Dr. Howes' contract without right and without notice."  Amended Complaint ¶¶ 72-73, at 10.  He also alleges that "[f]ailure to follow internal policy to investigate and substantiate any allegations about Dr. Howes, and instead to immediately terminate his employment," as well as "[f]ailing to give Dr. Howes any opportunity to be heard before immediate termination," are breaches of good faith and fair dealing.  Amended Complaint ¶¶ 75-76, at 10.

For most contracts' purposes, "[w]hether express or not, every contract imposes upon the parties a duty of good faith and fair dealing in its performance and enforcement."  Watson Truck & Supply Co. v. Males, 1990-NMSC-105, ¶ 12, 111 N.M. at 60, 801 P.2d at 642.  "'Broadly stated, that covenant requires that neither party do anything which will deprive the other of the benefits

of the agreement.'" <u>Watson Truck & Supply Co. v. Males</u>, 1990-NMSC-105, ¶ 12, 111 N.M. at 60, 801 P.2d at 642 (quoting <u>Romero v. Mervyn's</u>, 1989-NMSC-081, ¶ 32, 109 N.M. at 257, 784 P.2d at 1000).  The Supreme Court of New Mexico notes, however, that it does "not recognize a cause of action for breach of an implied covenant of good faith and fair dealing in an at-will employment relationship." <u>Melnick v. State Farm Mut. Auto. Ins. Co.</u>, 1988-NMSC-012, ¶ 13, 106 N.M. at 730, 749 P.2d at 1109.  As discussed above, even if the Services Contract's termination provision is unconscionable, the Services Contract does not restrict the employer-employee relationship in a way that would give rise to more than an at-will employment relationship.  <u>See</u> <u>Yedidag v. Roswell Clinic Corp.</u>, 2015-NMSC-012, ¶ 51, 346 P.3d 1136, 1150; <u>Hartbarger v. Frank Paxton Co.</u>, 1993-NMSC-029, ¶ 4, 115 N.M. at 668, 857 P.2d at 779 (citing <u>Melnick v. State Farm Mut. Auto. Ins. Co.</u>, 1988-NMSC-012, ¶ 14, 106 N.M. at 730, 749 P.2d at 1109).  Accordingly, even taking Dr. Howes' allegations as true, the Court cannot conclude that Dr. Howes has alleged facts sufficient to support his breach-of-implied-covenant-of-good-faith-and-fair-dealing claim.  Thus, the Court concludes that, under either Dr. Howes' implied contract theory or his third-party beneficiary theory, his contract claims do not survive the Defendants' MTD.

### III.   THE COURT WILL DENY THE STAY MOTION.

Having concluded that none of Dr. Howes' claims survive the Defendants' MTD, the Court turns to Dr. Howes' Stay Motion.  In Dr. Howes' Stay Motion, he reminds the Court of his Remand Motion and notes that, if the Court grants the Remand Motion, the MTD will become moot.  <u>See</u> Stay Motion ¶ 7, at 2.  Accordingly, Dr. Howes contends that requiring full briefing on the MTD will "cause unnecessary costs and burden to the Federal Court resources."  Stay Motion ¶ 8, at 2. He notes that a temporary stay would not prejudice any party and that, if the Court determines that

it has jurisdiction over the case, the Court can lift the stay and resume briefing on the MTD.  See Stay Motion ¶ 9, at 2.  Thus, Dr. Howes requests that the Court stay the proceedings until it rules on the Remand Motion and, alternatively, requests a two-week extension to respond to the MTD in the event that the Court denies the Stay Motion.  See Stay Motion at 3.

A court has broad discretion in managing its docket, which includes decisions regarding issuing stays for all or part of a proceeding.  See Clinton v. Jones, 520 U.S. at 706; Cole v. Ruidoso Mun. Sch., 43 F.3d at 1386.  The party seeking a stay generally faces a difficult burden.  See Clinton v. Jones, 520 U.S. at 708.  "The underlying principle clearly is that '[t]he right to proceed in court should not be denied except under the most extreme circumstances.'"  Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc., 713 F.2d at 1484 (quoting Klein v. Adams & Peck, 436 F.2d at 339)(alteration added in Commodity Futures Trading Comm'n v. Chilcott Portfolio Mgmt., Inc.).

The Court will not exercise its discretion to stay the proceedings in this case.  It has not granted the Remand Motion, so Dr. Howes' argument that the MTD will become moot is unavailing.  Further, Dr. Howes' justification for staying the proceedings was so that he would not have to brief the MTD while the Court analyzed the Remand Motion.  See Stay Motion ¶ 9, at 2. The Court announced at the March 1, 2022, hearing that it would deny the Stay Motion and instructed Dr. Howes to respond to the MTD before the Court decided the MTD at the end of March.  See Tr. at 19:10-17 (Court).  Dr. Howes filed his MTD Response on March 14, 2022, and the Defendants filed their MTD Reply, completing briefing on the MTD, on March 28, 2022. Accordingly, at this late stage, particularly given that Dr. Howes already has appealed the Court's earlier Order to the Tenth Circuit, the Court sees no sound reason to stay the proceedings, as the parties have completed briefing on both the MTD and the Remand Motion, and the Court has

analyzed fully the arguments presented in both motions in this Memorandum Opinion and Order.

Accordingly, the Court will deny the Stay Motion.

## IV.   THE COURT WILL DENY THE STRIKE MOTION.

The Defendants also have filed their Strike Motion.  In the Strike Motion, they assert that the Court should strike the Amended Complaint pursuant to rule 12(f)(2).  See Strike Motion at 3 (quoting Fed. R. Civ. P. 12(f)(2))(citing Est. of Anderson v. Denny's Inc., 291 F.R.D. 622, 634 (D.N.M. 2013)(Browning, J.)).  The Defendants argue further that the Court should not grant Dr. Howes retroactive leave to amend the Removed Complaint -- i.e., allowing the Amended Complaint to stand.  See Strike Motion at 4.

As an initial matter, the Court reviews the naming conventions it has used to refer to these documents throughout this Memorandum Opinion and Order.  It refers to Dr. Howes' Amended Complaint for Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 25, 2021 (Doc. 5-1), which the Defendants call the "First Amended Complaint," as the "Removed Complaint," because it was the operative complaint at the time that the Defendants removed the case to federal court.  It refers to Dr. Howes' Complaint for Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29), which he does not label "Amended," and which the Defendants call the "Second Amended Complaint," as the "Amended Complaint."  It has not made any reference to Dr. Howes' original complaint, which is not before the Court, either as a document filed on its own, or as an attachment to another filed document.

Several factors weigh in favor of the Court granting retroactive leave for Dr. Howes to amend the Removed Complaint.  First, the Court notes that, after the Defendants filed their MTD

on March 29, 2021, Dr. Howes did not respond, but filed instead his Remand Motion on April 1, 2021, and his Stay Motion on April 11, 2021.  It was not until the March 1, 2022 hearing, nearly a year after the Defendants filed their MTD, that Dr. Howes indicated his intent to file the MTD Response and amend the Removed Complaint.  See Tr. at 15:4-24 (Court, Burke).  At the hearing, Dr. Howes noted that the Court was "correct that we could brief [the MTD].  But because we were awaiting the decision from the Court on how to proceed on that . . . it just kind of sat out there.  So I apologize if I should have been ready for that."  Tr. at 17:16-22 (Burke).  When the Court turned to scheduling matters, it stated:

> The plaintiff's motion to remand and motion are, of course, pending, but the plaintiff shall be allowed until February 18, 2022, to amend the pleadings and to join additional parties, in compliance with the requirement of Rule 15(a).  That date has already passed, so we can either just consider it passed, we can set another deadline.  It doesn't preclude the plaintiff from filing a motion to amend.  But they'll just need leave of the Court and need to prove good cause.

Tr. at 25:8-17 (Court).  Dr. Howes then replied:

> Well, as I stated earlier, we have contemplated adding the third-party beneficiary status to the complaint.  But we're awaiting the decision on the remand before worrying about amending the complaint, in case we weren't staying in this court.  So that's the only thing that, at this time, that I know of that we would need to change in that complaint . . . .   We can obviously work with those [dates], with the exception of needing to amend the third-party beneficiary status.

Tr. at 25:22-26:14 (Burke).  Dr. Howes next stated: "I can do that amendment at the same time that I'm briefing this motion to dismiss, so I could have that done in the next couple of weeks at the least."  Tr. at 26:18-21 (Burke).  The Court responded:

> All right.  So we'll change that to March 15.  This doesn't change the substantive requirements of Rule 15(a).  So if you can do something as of right, you need to do it by that date, and if you need leave of the Court, you need to move for leave of the Court by that date.  Same for the defendants.  Again, we know that the motion to dismiss is pending, but it's not -- and so we'll allow 30 days.

Tr. at 27:1-9 (Court)(emphasis added).  After this discussion, Dr. Howes did not move for leave to amend the Removed Complaint, and the Court did not enter an order granting such leave. Dr. Howes similarly did not have a right to amend the Removed Complaint, because rule 15 provides a party the ability to amend a pleading as a matter of course within twenty-one days of its filing, or, "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15.  Twenty-one days after the Defendants filed their MTD would have been April 19, 2021.  Dr. Howes filed the MTD Response and the Amended Complaint on March 14, 2022, 329 days after the April 19, 2021, deadline.  Before that time, the Court had not heard arguments on, and did not grant, the Stay Motion.  Accordingly, because the proceedings were not stayed, Dr. Howes should not have assumed that he did not need to comply with rule 15.

In the Amended Complaint, Dr. Howes raises allegations which he also defends in his MTD Response, which he filed on the same day, including that he is a third-party beneficiary to the Services Contract.  See, e.g., Amended Complaint ¶ 59, at 8; MTD Response at 5.  At this point, then, Dr. Howes has had several opportunities to buttress his claims, and the Court already has considered all of his arguments, including those raised in the Amended Complaint, in this Memorandum Opinion and Order.  Accordingly, the Court will grant Dr. Howes retroactive leave to amend the Removed Complaint.  Moreover, because the Court already has considered the arguments which he raises in the Amended Complaint to provide the Tenth Circuit fulsome analysis on appeal, the Court will not strike the Amended Complaint from the record.

**IT IS ORDERED** that: (i) the requests in Defendants' Memorandum Brief in Support of Their Motion to Dismiss for Failure to State a Claim, Qualified Immunity, and Prohibition Against Implied Contracts with the State, filed March 29, 2021 (Doc. 7), to dismiss Plaintiff Ronald

Howes' claims are granted; (ii) the Plaintiff's Opposed Motion to Remand to State Court, filed April 1, 2021 (Doc. 9), is denied; (iii) the Plaintiff's Emergency Opposed Motion for Stay of Briefing of Defendants' Motion to Dismiss Pending Consideration of Plaintiff's Motion to Remand, or in the Alternative, an Extension of Time to Respond, filed April 11, 2021 (Doc. 11), is denied; (iv) the Defendants' Motion to Strike Plaintiff's Second Amended Complaint for Violation of 42 U.S.C. § 1983, filed March 28, 2022 (Doc. 31), is denied; (v) the Plaintiff's Amended Complaint for Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 25, 2021 (Doc. 5-1)("Removed Complaint"), is dismissed; (vi) the Plaintiff's Complaint for Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29)("Amended Complaint"), is dismissed[56]; and (vii) the Court will enter separately a Final Judgment.

_____
UNITED STATES DISTRICT JUDGE

---

[56]As discussed above, the Court has considered the allegations that Dr. Howes presents in his Complaint for Violations of 42 U.S.C. § 1983, Breach of Implied Contract, and Wrongful Termination\Breach of Implied Covenant of Good Faith and Fair Dealing, filed March 14, 2022 (Doc. 29)("Amended Complaint"). The Court has called this document the Amended Complaint to contrast it with the Removed Complaint, which the Defendants initially removed from State court, and which Dr. Howes titles "AMENDED," because it is the amended version of the original State court complaint, which is not before the Court. Dr. Howes has not moved formally for leave to amend the Removed Complaint; however, the Court retroactively has granted him such leave and has considered the Removed Complaint, the Amended Complaint, the facts that Dr. Howes puts in his briefing, and the arguments that he made at the March 1, 2022, hearing. Thus, Dr. Howes has had three complaints in this case. He has not requested further leave to amend.

*Counsel:*

Heather C. Burke
Burke Law
Santa Fe, New Mexico

      *Attorney for the Plaintiff*

Laura Renee Ackermann
Miller Stratvert P.A.
Albuquerque, New Mexico

      *Attorneys for the Defendant*